Receipt #

ORIGINAL

FILED

FEB 3 2006

U.S. COURT OF FEDERAL CLAIMS

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SCHOONER HARBOR VENTURES, INC. PLAINTIFF

VS. CAUSE NO. 06-87 L

UNITED STATES OF AMERICA DEFENDANT

# COMPLAINT

COMES NOW the Plaintiff, SCHOONER HARBOR VENTURES, INC., and files this Complaint against the UNITED STATES OF AMERICA on behalf of UNITED STATES FISH & WILDLIFE SERVICES, and in support of same would show unto the court, the following to-wit:

I.

Plaintiff, SCHOONER HARBOR VENTURES, INC., has filed this action seeking a declaration that the action of the Defendant, in requiring the Plaintiff to purchase 77 acres of off-site, high priority crane habitat to grant to the United States Fish & Wildlife Services in order to sell property owned by Plaintiff, which forms the basis of this suit, constitutes the taking of property in violation of Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution, U.S. Const., Amendments 5 and 14. Plaintiff also seeks an award of just compensation for taking of its property as required under the Fifth and Fourteenth Amendments of the United States Constitution.

II.

This Court has exclusive jurisdiction over the claim set forth in this Complaint pursuant to the Tucker Act, 28 USCA § 1491.

RUSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

PARTIES

III.

Plaintiff, SCHOONER HARBOR VENTURES, INC., is a Mississippi Corporation with its principal place of business at 910 Howard Avenue, Biloxi, Mississippi, 39530.

IV.

The Defendant, UNITED STATES FISH & WILDLIFE SERVICES (hereinafter "USFWS") is a federal agency of the United States Department of the Interior whose responsibilities include the determinations of a "take" under the Endangered Species Act, 16 USCA § 1531-1544, and which may be served with process through the office of the United States Attorney and the Attorney General of the United States.

STATEMENT OF FACTS

V.

Plaintiff held title to approximately 75 acres of undeveloped land north of Interstate 10 on Highway 57 in Jackson County, Mississippi (hereinafter the "Property").

VI.

Plaintiff had the right to sell and develop the Property. These development rights were an integral part of the Property's title and value. Plaintiff fully expected to develop the Property for sale, and/or to sell the Property with full rights of future development. In furtherance of, and in reliance upon, those reasonable expectations, Plaintiff expended considerable sums in purchasing and arranging for the sale and development of the Property.

VII.

The United States of America, Jackson County and the State of Mississippi and the public at-large have clearly benefitted from the activities of the Plaintiff with respect to the purchase and

RUSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

development of the Property in that the Property was purchased by the United States Navy for the express purpose of constituting a 188 family housing unit assigned to the Naval Station Pascagoula.

VIII.

The Plaintiff desired to sell the 75 acre Property to the United States of America and the United States Navy, to be used for said housing project.

IX.

However, as the Property of the Plaintiff was located within a defined critical habitat of the Mississippi Sandhill Crane, a declared and published endangered species, development of the Property was not allowed.

X.

Therefore, conveyance of an off-site 77 acre property unto the Mississippi Sandhill Crane National Wildlife Refuge was required to serve as "setup" or "mitigation" for loss of the habitat, which would otherwise be lost and result in the invocation of an enforcement of certain sections of the Endangered Species Act as set forth in a letter from Larry Goldman, Field Supervisor, United States Fish & Wildlife Service dated August 3, 2001. See a copy of letter from Larry Goldman attached as Exhibit "A".

XI.

This conveyance of the 77 acre property required the Plaintiff to be divested of Three Hundred Twelve Thousand, Five Hundred Dollars ($312,500.00). This Three Hundred Twelve Thousand, Five Hundred Dollars ($312,500.00) expenditure was required in order to complete the sale to the United States Navy pursuant to the requirements of the Defendant.

RUSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925

228 374-2313

XII.

On or about 1973, the United States Congress enacted the Endangered Species Act, 16 USC § 1531, et seq., in response to threats of fish, wildlife and plants.

XIII.

The Endangered Species Act prohibits the "take" of an endangered species, which includes harassing, harming, pursuing or killing such an animal, 16 USC § 1532 and 1538.

XIV.

The Environmental Protection Agency defines the Endangered Species Act prohibition against harming endangered species to include "significant habitat modification or degradation, where it actually kills or endangers wildlife by significantly impairing essential behavioral patterns including, feeding, breeding or sheltering" 50 CSR § 17.3.

XV.

The Endangered Species Act grants the Secretary of the Department of the Interior the authority to "determine where any species is an endangered species or a threatened species." 16 § 1533 (a) (1). Pursuant to this responsibility, the USFWS, a division of the United States Department of the Interior, provides a list of endangered and threatened species.

XVI.

In further pursuance of this responsibility, the USFWS required the Plaintiff to purchase the additional off-site 77 acres and expend the cost of Three Hundred Twelve Thousand, Five Hundred Dollars ($312,500.00) in order to sell the Property.

RUSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925

228 374-2313

XVII.

On or about February 2001, it came to the attention of the Mississippi Sandhill Crane National Wildlife Refuge that the United States Navy was considering purchasing the Property to build a large housing development.

XVIII.

On or about April 2001, the USFWS stated that there may be potential adverse impacts to the Sandhill crane, its habitat or the Mississippi Sandhill Crane National Wildlife Refuge resulting from the Plaintiff selling the Property to the United States Navy for the housing project. See letter from USFWS dates April 25, 2001, attached as Exhibit "B".

XIX.

On or about August 3, 2001, the United States Navy was advised by the USFWS to avoid the purchase of the Property.

XX.

In order to continue with the sale of the Property to the Navy, the Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to designated critical habitats on the Property. See USFSW's Biographical Opinion dates February 12, 2002, attached hereto as Exhibit "C".

XXI.

Thus the Plaintiff was required to sacrifice all economically beneficial use of the Property in the name of the common good. As a result of the USFWS' determination under the Endangered Species Act insofar as it establishes requirements for the development of critical habitats which preclude the development of the Property for any productive or beneficial use and which has denied

RUSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925

228 374-2313

the Plaintiff all economically viable use of the Property and interfered with the distinct investment backed expectations of the property and have affected the taking of the Plaintiff.

COUNT I

PERMANENT TAKING

XXII.

Plaintiff repeats and realleges herein the allegations of Paragraphs I through IV of the Complaint as if fully set forth at length.

XXIII.

Plaintiff, having acquired a fee simple interest in the Property, had the right to the use and enjoyment of the Property. That right included the ability to develop upon the Property. This right is inherit in the title to said Property.

XXIV.

Through the regulations imposed by the Defendant, USFWS, the Plaintiff was effectively deprived of all productive and beneficial use of the Property by virtue of the requirement to purchase additional off-site property at the same value of the Property at issue in order to sell and develop the Property.

PRAYER

WHEREFORE, Plaintiff prays that the actions of the Defendant be declared a permanent taking of the Property in violation of Plaintiff's rights under the Fifth and Fourteenth Amendments of the United States Constitution and that the Court award damages, attorneys' fees, expenses and cost of suit and grant such other relief as the Court may deem just.

RUSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925

228-374-2313

Respectfully submitted, this the 1st day of February, 2006.

**SCHOONER HARBOR VENTURES, INC., Plaintiff**

**BY:** ______________________________

**WILLIAM LEE GUICE III**
**MS BAR NO. 5059**
**RUSHING & GUICE, P.L.L.C.**
**P. O. BOX 1925**
**BILOXI, MS 39533-1925**
**228-875-5263 VOICE**
**228-875-5987 FAX**

**ATTORNEYS FOR PLAINTIFF**

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
P. O. Drawer 1190
Daphne, Alabama 36526

IN REPLY REFER TO:
01-0763d

August 3, 2001

SOUTHNAVFACENGCOM
Attn: Code 0642RD, Richard Davis
P.O. Box 190010
North Charleston, SC 29419-9010

Dear Sir:

Based on continuing informal consultation with the U.S. Navy (Navy) and the Mississippi Sandhill Crane National Wildlife Refuge (Refuge), the U.S. Fish and Wildlife Service (Service) is providing additional information for your use in preparing an Environmental Assessment for the proposed construction of a 188 family housing unit assigned to Naval Station Pascagoula, Jackson County, Mississippi as it relates to the Endangered Species Act of 1973 (87 Stat. 884, as amended; 16 U.S.C. 1531 et seq.).

Background:

In February 2001, it came to the attention of Refuge management that the Navy (Pascagoula Station) was looking at, among others, a site identified as "Site 28" located north of Interstate 10 on Highway 57 in Jackson County, Mississippi, to build a large housing development. This location, highly suitable for the proposed housing unit, is in critical habitat designated for the endangered Mississippi sandhill crane (*Grus canadensis pulla*). The site, situated between the Refuge's "Ocean Springs" and "Gautier" management units, encompasses 75 acres, of which 20 acres are delineated jurisdictional wetlands and 55 are considered upland. Of the 55 upland acres, 45 acres are prime foraging habitat for the endangered crane. A 10 acre pond at this location has been used for roosting habitat by the cranes for many years. Documented observations reveal that a peninsula in the pond was used for nesting as recently as the late 1990s and is quite probably still being utilized for nesting. The adjacent, onsite pasture has been used by cranes as foraging habitat for many years. The location of any development at this site would have a definite impact on cranes due to the displacement of nesting, foraging, and roosting areas. Also, disturbance and trespass onto the neighboring Refuge by housing occupants could impact crane foraging, as well as roosting and nesting activities. In a letter dated April 4, 2001, the Service stated that there may be potential adverse impacts to the crane, its habitat and/or the Refuge resulting from the Navy's housing project. We recommended that the Navy consider avoidance of this particular site.

**EXHIBIT A**

PHONE: 334-441-5181 www.fws.gov FAX: 334-441-6222
SHIPPING ADDRESS: 1208-B Main Street, Daphne, AL 36526

On June 27, 2001 Messrs. Steven Carter and Lawrence Rumsey, owners of Site 28, approached the Refuge Manager to propose the purchase of offsite lands which they could include in their sale package to the Navy in order to offset impacts caused by the project to designated critical habitat on Site 28. At that time, Messrs. Carter and Rumsey were given information on selected locations which the Refuge had identified as high priority sites to acquire for protection, based on current, or potential, crane use. Many of these sites are, like Site 28, at high risk for development. Sites were identified because they contained the crane's preferred habitat, wet pine savannas, although in some cases, the particular area is currently overgrown with trees.

Property Review:

A Refuge biologist inspected four proposed mitigation sites offered by the applicants. Site 1, a 60 acre parcel on Old Fort Bayou Road, was rejected because in 1998 it was designated as mitigation lands for another project and is slated to become a part of the Refuge through those negotiations. Therefore, three sites adjacent to the Refuge were surveyed and evaluated: the Eugenie Huger Tract, the Walnut Acquisition Property, and a 30 acre parcel belong to Mr. Gary Young. Results of the evaluation are as follows:

Huger Tract - This is a 40 acre parcel containing 18 acres of thick cypress-tupelo wetland which is unsuitable for crane use. The remaining 22 acres are overgrown wet pine savanna which the Refuge biologist believes could be restored to viable crane habitat by instituting a management and maintenance program including burning and machine removal of the overgrowth.

Walnut Acquisition Property - This is a 510 acre site which also includes cypress-tupelo drains and overgrown wet pine savanna. Again, with burning and machine removal of overgrowth, the savanna may provide quality habitat for cranes.

Gary Young Property - Although encompassing 30 acres, only 6 -10 acres on this property are overgrown pine savanna - having the potential to become preferred crane habitat. The remainder is upland or wet pond cypress swamp forest. The Refuge currently has access through this property via an agreement with the owner. We are unaware that this site is targeted for immediate development or that the owner plans to use it for purposes detrimental to cranes. The existing overgrown savanna is irregularly shaped and would be difficult to effectively manage after required habitat conversion.

Endangered Species Act

The Endangered Species Act (ESA), requires that any Federal action that may affect a listed species or its designated critical habitat must go through formal consultation in accordance with Section 7 of the ESA. Such consultations are required to insure that the Federal action does not jeopardize the continued existence of the species, nor destroy or adversely modify its designated critical habitat. Purchase of Site 28 by the Navy would therefore trigger the need for Section 7 consultation due to likely impacts both to the listed cranes and critical habitat. If the land remains in private ownership, and use of that land (e.g., development) would result in take[1] of cranes, that take would be prohibited. The only option for allowing take by a private individual that is incidental to an otherwise lawful action, such as development, would be a Section 10(a)(1)(B) permit issued to the landowner, including the development and implementation of a Habitat Conservation Plan, or HCP. The species is losing both critical habitat and other potential crane habitat as a result of accumulated development in Jackson County.

Because Site 28 (Rumsey-Carter property) is utilized by cranes (for breeding and foraging) and is designated Critical Habitat, the species has some protection on this parcel of land. As stated above, the location of any development at this site would have a definite impact on cranes due to the displacement of nesting, foraging, and roosting areas. However, based on preliminary discussions with the Navy and the private landowner, there may be options for providing additional security to other parcels of land (described below) that, if submitted as part of the proposed action, may provide an offset to the incremental loss of prime foraging habitat and designated Critical Habitat, both onsite and throughout the species' range. This, in turn, would reduce the likelihood that Section 7 consultation would result in a jeopardy or adverse modification biological opinion.

After reviewing maps and surveying Site 28, both from the air and on the ground, Refuge specialists believe that approximately 45 acres of prime foraging habitat and one roosting/nesting site will be lost for use by the endangered Mississippi sandhill crane. All of this site is considered "critical habitat" and it lies within the current acquisition boundary for the Refuge. Although it has been proposed that the 10 acre pond section be "set-aside" for the cranes, and mitigation credit awarded, Refuge personnel do not believe that this would be an adequate measure due to the cranes' requirement for an extensive uninterrupted buffer area of a minimum 100 meters (for

---

[1]**Take** - to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct. [ESA §3(19)] Harm is further defined by FWS to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing behavioral patterns such as breeding, feeding, or sheltering. Harass is defined by FWS as actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. [50 CFR §17.3]

foraging, nesting, loafing, roosting, etc. - particularly for hatchlings). The refuge may try to recreate nesting/roosting habitat at one of the other proposed offsite locations.

Based on Refuge expertise and experience and discussions with experts in the field, the options discussed below are proposed to offset loss of crane Critical Habitat due to development of Site 28. These options include additional properties to those discussed above. Due to the degree of management required and the proximity of these sites to the Refuge, we have made a preliminary determination that Operation and Maintenance costs (O&M) would be minimal and therefore were not included as an additional requirement in the following proposed options. We will reevaluate this preliminary position during the preparation of the Biological Opinion (as below). The Service's final judgement, though, on whether any proposal by the Navy would result in a determination of no jeopardy to the existence of the species and/or no adverse modification of critical habitat, would be rendered only in a Biological Opinion resulting from the Navy's request for initiation of formal consultation.

All options include on site requirements (Site 28) that involve a 30 foot development set back on the east side of property to include the existing tree line and a continuous 8 foot, Navy maintained, chain link or similar fence between refuge property and development.

Option 1: Obtain, and transfer to the Refuge, ownership of 101 adjacent acres of Walnut Acquisition property to offset loss of foraging habitat (see attached map). This property will then be converted to foraging habitat.

Option 2: Obtain, and transfer to the Refuge, ownership of the 40 acre Eugenie Huger property (see map) **and** 71 adjacent acres of Walnut Acquisition property. These properties would then be converted to foraging habitat.

Option 3: Obtain, and transfer to the Refuge, ownership of 77 acres of Ford Property (site identified as Tract 77 - west parcel, see map).

Option 4: Obtain, and transfer to the Refuge, ownership of 89 acres of Ford Property (site identified as Tract 78 - east parcel, see map).

Option 5: Obtain, and transfer to the Refuge, ownership of 91 acres of Bailey/Russ/Gulf Park Estates land south of Hwy 90 (identified on original acquisition maps as # 1 and 6, see enclosed maps) **and** 23 additional acres from another source, such as those listed above, for a total of 114 acres.

Option 6: Obtain, and transfer to the Refuge, ownership of 156 acres of Mary Miller property (see maps).

Option 7: Obtain, and transfer to the Refuge, ownership of 30 acres of Gary Young property and 113 acres of Mary Miller property (see maps).

As discussed above, because Mississippi sandhill cranes are known to utilize Site 28, and could be affected by the Navy's activities, we believe a "may affect" situation exists within the meaning of Section 7 of the Endangered Species Act and, therefore, recommend that the Navy request formal consultation with the U.S. Fish and Wildlife Service. We believe that such consultation could be completed in a compressed time frame.

For additional discussion or information, please contact Patric Harper at (334) 441-5181, x34.

Sincerely,

Larry E. Goldman
Field Supervisor

cc: USFWS, MSHCNWR (ATTN: Ms. Sabrina Keen, Refuge Manager)
USN, Pascagoula, MS (ATTN: Lt. Steve Bukoski, Public Works Director)
Messrs. Steven Carter and Lawrence Rumsey
Schooner Harbor Ventures, Inc.
910 Howard Ave., Biloxi, MS 39530

Option 1: Walnut
T7S R7W Sec 27 & 28



Option 2: Huger
T7S R7W Sec 8






Option 3: Ford Tract 77
T7S R7W Sec 2

Option 4: Ford Tract 78
T7S R7W Sec 2

Option 6: Mary Miller
T6S R8W Sec 35



Option 7: Gary Young
T6S R7W Sec 27



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
Mississippi Sandhill Crane National Wildlife Refuge
7200 Crane Lane
Gautier, MS 39553

April 25, 2001

SOUTHNAVSACENGCOM
Attn: Code 064, Richard Davis
P.O. Box 190010
2155 Eagle Drive
North Charleston, SC 29419-9010

Dear Mr. Davis:

This letter is upon your request from the Mississippi Sandhill Crane National Wildlife Refuge to provide you with information regarding impacts to the refuge from Naval development of sites #28 and #8 in the Gautier, MS area.

Site #28

After looking at the site on foot, via air and map, refuge specialists believe that 45 acres of prime foraging habitat and one roosting/nesting site will be lost for use by the endangered Mississippi sandhill crane. All of the acres located in this site are considered "critical habitat" and are within the current acquisition boundary for the refuge. If the Navy were to choose this site for their housing units, the refuge would require these items:

1) 30 foot set back on east side of property to include the tree line. 2) 2:1 replacement of habitat for crane foraging. What this means is that for every critical habitat acre removed from the crane foraging base (in this case 45 acres), 2 acres would have to be purchased for replacement. The refuge biologist has identified several sites which would be suitable and desirable for the refuge to obtain since cranes currently, or have the potential to, use the area. 3) 8 foot fence at edge of property

We are sending realty information regarding suitable areas in the area adjacent to the refuge with this correspondence. Our preferred sites, corresponding to our faxed information, are numbers 3, 1, and 6. After these sites, any part of site 5 adjacent to the refuge.

te #8

After looking at the site on foot, via air and map, the refuge biologist believes that only 1) a slight setback would be required (ie., 15 feet) from the fence line. No additional buffer is required and since the acres are not critical habitat, there is no requirement to replace lost acres. Currently, the cranes do not use the property. 2) 8 foot fence at edge of property.

you have any additional questions, please do not hesitate to call. Thank you for your cooperation.

Sabrina Keen

brina Keen
uge Manager
-497-6322 ext. 29

EXHIBIT B

cc: Fred Carter

# United States Department of the Interior

FISH AND WILDLIFE SERVICE
P. O. Drawer 1190
Daphne, Alabama 36526

IN REPLY REFER TO:
02-0009a

February 12, 2002

Mr. L. M. Pitts
Head, Environmental Planning Branch
Department of the Navy
Southern Division
Naval Facilities Engineering Command
P.O. Box 190010
2155 Eagle Drive
North Charleston, S.C. 29419-9010

FOR OFFICIAL USE ONLY
Not For Public Release

FOR STEVEN CARTER
– STEVE, AS DISCUSSED TODAY 3/8/02, THIS DOCUMENT PAGES 1-19 ARE FORWARDED FOR YOUR EYES ONLY.
NAD

COPY TO: FILE

Dear Sir:

This document transmits the Fish and Wildlife Service's (Service) biological opinion based on our review of the proposed new family housing for Naval Station Pascagoula (NAVSTA) north of Interstate 10 on Highway 57 (Site 28) in Jackson County, Mississippi, and its effects on the Mississippi sandhill crane (*Grus canadensis pulla*) in accordance with section 7 of the Endangered Species Act (Act) of 1973, as amended (16 U.S.C. 1531 et seq.).

This biological opinion is based on the *Environmental Assessment for the Proposed Construction of 188 Family Housing Units at Naval Station Pascagoula, Pascagoula, Mississippi*, meetings, discussions, e-mail, and written correspondence with the Navy, the property owners, the Mississippi Sandhill Crane National Wildlife Refuge (Refuge), colleagues, and Ecology and Environment, Inc., a consultant for the project. A complete administrative record of this consultation is on file in this office. If you have any questions about this biological opinion please contact Patric Harper at (251) 441-5181 extension 34, and refer to log number 02-0009.

## Consultation History

Thirty potential building sites for the Navy's proposed housing development were initially identified (see Fig. 2-1 in the EA). Upon completion of their screening process, this number was reduced to the following five:

Alternative 1 - Site 7 (Gautier High School)
Alternative 2 - Site 8 (Red Bird Lane)
Alternative 3 - Site 28 (Highway 57/I-10)
Alternative 4 - Site 29 (Rosewood)
Alternative 5 - Site 30 (Singing River Island)

PHONE: 334-441-5181
www.fws.gov
SHIPPING ADDRESS: 1208-B Main Street, Daphne, AL 36526
FAX: 334 441 6222

EXHIBIT C




Option 5: Bailey, Russ, Gulf Park Estates
T7S R8W Sec 35, T8S R8W, Sec 2

FOR INTERNAL USE ONLY
Not For Release

On February 1, 2001 the Refuge and Service's Daphne Field Office (DFO) received a request from the consultant for input concerning issues or concerns related to the development of the EA. DFO's response recommended that surveys for the following Federally listed species be conducted, if suitable habitat existed, on Sites 7, 8, 28, and 29: red-cockaded woodpecker (*Picoides borealis*), bald eagle (*Haliaeetus leucocephalus*), gopher tortoise (*Gopherus polyphemus*), eastern indigo snake (*Drymarchon corais couperi*), and Louisiana quillwort (*Isoetes louisianensis*). Additionally, we recommended that the following species be considered at Site 30: piping plover (*Charadrius melodus*), brown pelican (*Pelecanus occidentalis*), loggerhead sea turtle (*Caretta caretta*), Kemp's ridley sea turtle (*Lepidochelys kempii*), and green sea turtle (*Chelonia mydas*). The Refuge responded that Sites 8, 28, and 29 might have an impact on the Refuge but additional information was required.

In an April 4, 2001 letter to the consultant, the Service expressed concern, based on additional information received from the Navy and recommendations by the Refuge, that proposed development might have direct and/or indirect impacts on the Mississippi sandhill crane, its designated critical habitat, or the Refuge proper if Alternatives 2, 3 or 4 (Sites 8, 28 and 29, respectively) were implemented. We indicated that development of either Alternative 1 or 5 (Sites 7 or 30, respectively) would not affect the crane or the Refuge.

During an April 19, 2001 meeting, it was noted that Alternative 5 was not a preferred site due to several considerations including other planned uses and site constraints. Impacts to the remaining proposed sites and possible minimization efforts, such as fencing and setbacks, were also discussed. The possibility that development of Site 28, the Navy's proposed alternative, would result in adverse modification of critical habitat and/or "take" of a nesting pair of Mississippi sandhill cranes was presented. Discussion included the potential for offsetting the impacts to critical habitat by purchasing other lands which would then be deeded to the Service and maintained for crane use. It was noted that these "other" lands would have to meet certain requirements that included, but were not limited to: adequate quality and quantity of habitat, proximity to the existing Refuge boundary, occurring within the Refuge's acquisition boundary, current or potential crane use, susceptibility to development, etc.

Continuing discussions led to generation of a list of sites that the Refuge considered as high-priority for acquisition and determining a system for rating the value and suitability of potential "offsetting" sites (as well as the impact site). The Refuge stated that the list was not all-inclusive and that they would entertain any reasonable offsite proposals. The Navy determined that due to the complexity of this exercise, other site attributes, and necessary timelines for proposed action implementation, there was an uncertainty regarding the eligibility of Site 28 and, therefore, it began to re-evaluate the other four alternatives. The Service's letter of June 14, 2001 indicated, based on site visits and discussions with the Refuge, that, due to lack of onsite critical habitat and by incorporating adequate property boundary setbacks and fencing, there would be no impact to the crane, its habitat or the Refuge if Site 8 (Alternative 2) was chosen for development.

FOR OFFICIAL USE ONLY
Not For Public Release

The owners of Site 28 (Messrs. Steven Carter and Lawrence Rumsey), in an effort to expedite the sale of their property to the Navy, began to investigate the possibility of purchasing offsite habitat to be subsequently conveyed to the Service in order to offset the impacts of the Navy's housing development on Mississippi sandhill crane designated critical habitat. During a meeting on June 27, 2001, the owners requested that the Refuge evaluate four of the high-priority locations.

On July 24, 2001 the owners of Site 28 submitted a proposal that included donation to the Service of onsite portions of Site 28 and a 10 acre portion of one of the offsite locations mentioned above. The owners were informed that this was not a viable alternative because once the housing development was constructed, all of Site 28 would be essentially lost to crane use.

In a August 3, 2001 letter, the Service provided additional information to the Navy for its use in preparing the EA. This letter included onsite reviews by the Refuge of the four proposed offsite locations and seven preliminary options, based on the Refuge's Simplified Habitat Evaluation, that might offset the impacts to Site 28.

On August 17, 2001 a meeting was held at NAVSTA among the owners of Site 28, the Navy, and the Service to discuss a proposal that included one of the options (Option 4 - 89 acres of Mr. John Ford's property on Tract 78). Although the Site 28 owners indicated that a verbal agreement had been reached with Mr. Ford, and as such the process could proceed, it was discovered that the acreage figure was not what had been agreed upon. Therefore, the owners of Site 28 were informed that a new proposal would be required.

Subsequently, Option 3 (77 acres of Ms. Rena Ford's property) was proposed by the owners of Site 28 to offset the Navy's housing development impacts to critical habitat of the Mississippi sandhill crane. A contract (Option for Exchange/Conveyance of Real Property) to that effect was signed on August 29, 2001 and a copy received by the Service on September 5, 2001.

The Service agreed, by letter dated September 20, 2001, to enter into, and expedite to the degree possible, formal consultation with the Navy on the construction of new family housing for Naval Station Pascagoula (NAVSTA) north of Interstate 10 on Highway 57 (Site 28) in Jackson County, Mississippi.

## BIOLOGICAL OPINION

### DESCRIPTION OF PROPOSED ACTION

The proposed action is the construction of 188 units of Navy family housing and ancillary facilities (in two phases), including future operation, maintenance, and upgrades, on one of five alternative site locations identified in the *Final Planning Study to Identify Potential Navy Housing Sites for 188 Family Housing Units, Naval Station Pascagoula (NAVSTA), Jackson County, Mississippi.*

FOR OFFICIAL USE ONLY
Not For Public Release

The proposed site, as determined in the Navy's Environmental Assessment, is identified as Alternative 3 which is located adjacent to the Mississippi Sandhill Crane National Wildlife Refuge and in designated critical habitat for the endangered Mississippi sandhill crane (*Grus canadensis pulla*). The housing units are required to be within a 30-minute drive time of NAVSTA Pascagoula. The new family housing will be multi-family housing units, including 53 two-bedroom units, 84 three-bedroom units, and 51 four-bedroom units, constructed of wood or metal frame, or masonry with stucco or vinyl siding. The proposal also includes covered parking, covered patios, privacy fencing, exterior storage, and recreational facilities.

Alternative 3 involves an area identified as "Site 28" located north of Interstate 10 on Highway 57 in Jackson County, Mississippi (see Figure 3-3, in the EA). This location, highly suitable for the proposed housing unit, is in critical habitat designated for the Mississippi sandhill crane. The site, situated between the Refuge's "Ocean Springs" and "Gautier" management units, encompasses 75.1 acres, of which 10.7 are delineated as jurisdictional wetlands, 9.7 are an open water pond, and 54.7 are considered upland. Of the upland acreage, 45 acres are deemed foraging habitat for the endangered crane. The pond has been used for roosting habitat by the cranes. Documented observations reveal that a peninsula in the pond was used for nesting in 1997 and 1998.

The action area for a project is the entire area that is directly and indirectly impacted by a proposed action. The immediate and future affects of this project will not only directly impact Site 28 itself, but also indirectly impact offsite crane habitat on the adjacent Refuge because of disturbance. The project will also affect, in a beneficial way, an offsite location that is to be protected and managed in order to offset the construction impacts. Due to the limited range of the Mississippi sandhill crane (approximately 153,600 acres), the offsite disturbance, and potential movement of affected cranes throughout their range, we are identifying the action area for this project as the entire range of the Mississippi sandhill crane. This broad range is taken from the Recovery Plan and, therefore, includes some areas that are not utilized by the crane.

Land-use activities proposed by the Navy to minimize disturbance to the species (see Section 4.3.1 in the EA) include creating a barrier between the development and the Refuge, educating the residents about potential impact of trespassing onto the Refuge, and avoiding heavy construction activities during the crane's nesting season (March 1 through June 30) consistent with final resolution of issue.

Simultaneous with sale of Site 28 to the Navy, the owners (of Site 28) would purchase and then convey to the Service a separate parcel of land in order to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane. This separate parcel of land is known as the Ford property (Ms. Rena Ford), or Tract 77, or the South 77 acres of Government Lots 5 & 6, or the South 77 acres of the South ½ of the Southwest 1/4, Section 2, Township 7 South, Range 7 West, Jackson County, Mississippi. Tract 77 is immediately adjacent to the Refuge along the northeast border of the Gautier Unit.

FOR OFFICIAL USE ONLY
Not For Public Release

Other sites that could also be purchased and conveyed to the Service to offset the Navy's impacts include: 89 acres of Tract 78, which is adjacent to the above Tract 77 - to the east (noted in previous correspondence as Option 4) or 30 acres of Gary Young property (T6S R7W Sec 27) and 113 acres of Mary Miller property (T6S R8W Sec 35) (Option 7).

## STATUS OF THE SPECIES/CRITICAL HABITAT

### Species/critical habitat description

Sandhill cranes (*Grus canadensis*) resemble great blue herons (*Ardea herodias*). A major distinguishing characteristic is that cranes are completely gray. When standing erect, cranes are about four feet tall. Male and female cranes are similar in appearance. All cranes have long necks, and adult cranes possess a naked red crown. The species vocalizations are loud and clattering. Mississippi sandhill cranes (*G. c. pulla*) are a nonmigratory subspecies which have become reproductively isolated from other sandhill cranes. The only known wild population is on and near the Mississippi Sandhill Crane National Wildlife Refuge in Jackson County, Mississippi. The birds present range is restricted to an area defined by the Pascagoula River (east), to about the Jackson County line (west), to about Simmons Bayou (south), to 4 miles north of the town of Vancleave (north).

Mississippi sandhill cranes were listed as rare in the 1968 list of Rare and Endangered Fish and Wildlife of the United States. After being described as a subspecies in 1972, the Mississippi sandhill crane was added to the U.S. List of Endangered Fish and Wildlife on June 4, 1973 38 Fed. Reg. 14678. The first recovery plan was written in 1976 and the latest revision (3rd) completed in 1991. In 1974 the Nature Conservancy purchased 1,709 acres which the Service acquired in 1975 to establish the Mississippi Sandhill Crane National Wildlife Refuge. Additional lands have been acquired such that the current total acreage of the Refuge is 19,273 acres. Reducing the likelihood of extinction will require a self-sustaining population of cranes and suitable habitat. Original estimates suggested the Refuge crane population may require a minimum of about 130 to 170 birds, consisting of about 60 nesting cranes per breeding season, for a continuous period of at least 10 years (USFWS, 1991). Long term self-sustenance and stability will require a genetically viable population, high levels of natural recruitment, and cessation of the captive release program.

Critical habitat for the Mississippi sandhill crane was designated on September 8, 1977 42 Fed. Reg. 39985. (USFWS,1977). Current Service policy requires that the primary constituent elements of critical habitat be defined. Primary constituent elements are those physical and biological features of a landscape that a species needs to survive and reproduce. However, the Final Rule that determined critical habitat for the Mississippi sandhill crane occurred prior to establishment of this policy. Nevertheless, for the purposes of this Biological Opinion, we now define the primary constituent elements to be those elements required to support appropriate foraging, roosting, and nesting habitat isolated from human disturbance by a minimum of 100

FOR OFFICIAL USE ONLY
Not For Public Release

yards. The areas delineated for critical habitat cover about 26,000 acres of which 19,273 acres are currently protected on the Refuge. Most known breeding, summer feeding, and roosting sites are included in the 26,000 acres of critical habitat. During the last 5-10 years, surveys indicate that approximately 90% of crane breeding sites and approximately 70% of their roosting sites occur in critical habitat. Since 1965, approximately 9% of documented nesting has been located off the Refuge. Scattered winter feeding areas are located both on the refuge (approximately 80%) and on neighboring farmlands outside of designated critical habitat. These sites cover a large area, and sporadic use of these areas by cranes vary with the planted crops. Although included within the critical habitat boundary, not all such areas actually possess all of the constituent elements of critical habitat.

**Life history**

These cranes are long lived. In the wild they do not reach reproductive age until around 4 to 5 years of age (sometimes not until their "teens"), have large nesting territories, and frequently raise only one chick per year (U.S. Fish and Wildlife Service 1991).

Savannahs are the optimal habitat of the Mississippi sandhill crane and are inhabited year round. These wet grasslands are predominated by wiregrass (*Aristida spp.*), with scattered longleaf pine (*Pinus palustris*), slash pine (*P. elliottii*), and cypress (*Taxodium ascendens*) trees. Other associated plants include pitcher plants (*Sarracenia spp.*), sundew (*Drosera spp.*), clubmoss (*Lycopodium alopecuroides*), and pipeworts (*Eriocaulon spp.*). Cranes also utilize wooded depressions (swamps) dominated by cypress, longleaf, and slash pine trees with an understory of swamp cyrilla (*Cyrilla racemiflora*), buckwheat tree (*Cliftonia monophylla*), wax myrtle (*Myrica cerifera*), and several species of holly (*Ilex spp.*) (U.S. Fish and Wildlife Service 1991).

Cranes roost in shallow water in savannas, edges of wooded depressions or swamps, and ponds. Paired cranes roost near the nest during the breeding season. Mississippi sandhill cranes prefer to nest as far from sources of disturbance as possible. Ideally this is in open area of grasses and sedges adjacent to perennial shallow water. Such an area, surrounded by trees and shrubs, is typically large enough for the cranes to see potential predators and allow flight. Due to the economic growth of coastal Mississippi, construction of miles of access roads, and plantation pine forestry techniques, most of the original ideal nesting habitat has been destroyed.

Crane feeding habits vary with the seasons. During the spring, summer, and early fall, cranes consume both plant and animal matter equally, including roots, tubers, fruits, insects, earthworms, other invertebrates, and occasionally a few frogs and other small vertebrates. During the cooler months, cranes switch some of their preferred items diet to products of upland agriculture including corn, seeds, and insects found in farms, pastures, and Refuge food plots. Chufa is planted in the spring or summer for the cranes on the Refuge and then cool season grasses and legumes are planted in the fall. As a result of human population growth, some agricultural areas in the vicinity of the Refuge that are now used by cranes for foraging (including some that have

FOR ... USE ONLY
Not For Public Release

been utilized for decades and even generations), are being converted to high density residential or commercial development that is not suitable for cranes.

**Population dynamics**

Population estimates in 1929, 1949, and 1969 indicated that the crane population has been less than 100 since 1929 with evidence of continuing decline through 1980 (Seal, et al. 1992). Since inception of the Refuge in 1975 and formal designation of critical habitat for the Mississippi sandhill crane (USFWS, 1977), the population levels have increased from a low of 30-35 individuals and 5-6 nesting pairs to over 100 birds and 25 nesting pairs. Supplementation of the population began in 1981 and has continued every year since. Approximately 95% of the current free ranging population is from captive hatched or captive bred birds (S. Hereford, pers. comm.). The population has been maintained purposely from 100-130 birds over the last 5-6 years (S. Hereford, pers. comm.). Mapping of the habitat requirements of the crane (in the early 1990s) indicated that a population of about 130-150 birds was the maximum capacity of the refuge at that time, even with intensive site management (Seal, et al, 1992). Changes on the Refuge in the past 10 years (including expansion) dictate that the population model should be re-run in order to obtain a more accurate evaluation of the crane's current situation and to update the requirements for a self-sustaining population (S. Hereford, pers. comm.). Ultimately the carrying capacity of the Refuge will be limited by the habitat available for nesting territories. The addition of protected, managed, high quality crane habitat, particularly potential nesting areas, to the Refuge is vital for the recovery of the species.

**Status and distribution**

The Mississippi sandhill crane is a nonmigratory endangered subspecies which has become reproductively isolated from other sandhill cranes and is in danger of extinction. Major reasons for the decline include loss of habitat, human predation, and decreased natural recruitment. Mississippi sandhill cranes were once found all along the Gulf Coast with a total population possibly into the thousands. During the 1950's thousands of acres of the crane's favored savannah habitat were drained and converted to slash pine plantations. Dense understories developed underneath the mature pine trees, and the once open, undisturbed habitat became unsuitable for cranes. The latter part of the 20th century brought a human population explosion to the Mississippi coast, including residential and commercial development and infrastructure utilities to support that growth. Eight paved highways now transect or border the crane's range. These roads have further depleted habitat, caused pollution problems, and provided public access to the cranes, all of which have caused problems for the species.

FOR OFFICIAL USE ONLY
Not For Public Release

**Analysis of the species/critical habitat likely to be affected**

The Service anticipates that Mississippi sandhill cranes will be adversely affected by the proposed project due to the displacement of one nesting pair and the disruption of normal behavior patterns for any Mississippi sandhill cranes that may utilize Site 28 or adjacent Refuge lands. 75 acres of designated critical habitat on Site 28, and varying amounts of acreage on the adjacent Refuge, will also likely be lost, directly and indirectly, through construction of the housing project, normal everyday housing operations, and future maintenance and construction. Indirect effects, due to audio or visual disturbance from the project site, on cranes that may be utilizing adjacent Refuge lands are difficult to quantify. This is due to the uncertainty of the distance that any particular disturbance may affect nearby cranes. The Service believes that the worst case scenario would be the temporary disruption of feeding or loafing activities (no adjacent nesting habitat) on a maximum of eight Mississippi sandhill cranes that may or may not be utilizing approximately 22 - 35 acres of adjacent Refuge property during any such disruption (S. Hereford, pers. comm.).

The project will beneficially affect 77 acres of offsite crane habitat (the Rena Ford property) because, if the proposal is approved, the Refuge would receive and manage those acres to offset the impacts to critical habitat on Site 28. Potential impacts will be considered further in the remaining sections of this opinion.

## ENVIRONMENTAL BASELINE

This section is an analysis of the effects of past and ongoing human and natural factors leading to the current status of the species, its habitat, and ecosystem, within the action area. Because the species range is wholly contained within the action area, this analysis is based on the preceding rangewide status discussion but will highlight baseline conditions at the affected areas (Site 28, Refuge land adjacent to Site 28 and the Ford property).

**Status of the species within the action area**

The impact area (Site 28) encompasses 75 acres or 0.3% of the entire designated critical habitat for the Mississippi sandhill crane and approximately 0.05% of the crane's total range (action area). Currently, the impact area contains good quality crane habitat inadvertently created and maintained by human involvement. This would include the borrow pit which has become a shallow water pond for roosting and nesting and the clearing and maintenance of open foraging habitat. This site contains all the necessary features for critical habitat, which will be lost by development of the site.

One pair of cranes has been documented nesting at the Site 28 pond. They nested once in 1997 and twice in 1998 with only the first nest in 1998 resulting in a hatch. The chick survived for about a month after which it was presumably lost to predation. This data results in a 33%

FOR ... USE ONLY
Not For Public Release

hatchling production rate and 0% fledgling production rate at Site 28. According to the Population and Habitat Viability Assessment (PHVA), the best chance for recovery of this subspecies is with 60% hatchling production and 20% juvenile mortality (Seal, et al. 1992). Therefore, this site (28) does not appear to be as productive as those on the Refuge that had an average fledgling production rate of 33% prior to 1992 (Seal, et al. 1992) and from 1993-2001 a fledgling production rate of approximately 16.5% (S. Hereford, pers. comm., based on preliminary results). Whether the low numbers from Site 28 are due to encroaching development, predation, low viability, incomplete data, or other factors could only be determined through an extensive study of the nest site.

The amount of Refuge acreage that will be indirectly impacted by the adjacent project is difficult to quantify or qualify. Construction of the housing project, normal everyday housing operations, and future maintenance and construction will result in varying amounts of audio and visual disturbances that could affect crane behavior. The acreage impacted may be influenced by time of day, time of year, level, duration, and frequency of disturbance, etc. As above, the Service believes that the worst case scenario would be the temporary disruption of crane activities on approximately 22 - 35 acres of the adjacent Refuge.

**Factors affecting species environment within the action area**

Previously described development has historically affected the species and its habitat throughout the action area (cranes' range), and continues to do so (with the exception of lands on the Refuge). This includes development or other use of lands within the cranes range that are not designated as critical habitat (approximately 83% of their range is not designated as critical habitat).

Site 28 is located in unincorporated Jackson County but in the City of Gautier proposed annexation area. The property has frontage on both Highway 57 and Robinson Still Road. Originally, the property was 83 acres, but 8 acres have been sold as outparcels to private developers. These parcels are being developed commercially (one as a gas station, and the other two, as yet, unknown). Site 28 was recently re-zoned to Planned Unit Development (PUD) to accommodate a 350-unit apartment complex proposed by the current owner. Because funding was not secured, no construction commenced. The PUD zoning classification allows for flexibility in land use activities (residential, commercial, office) and permits multi-family residential housing. Low density residential development occurs south of the property, and west of the site is Highway 57 and a KOA campground.

Past and present impacts of all Federal, state, or private actions and other human activities on Site 28 appear to be limited to the construction of a borrow pit for construction of I-10, haying, and, for the past few years, regular bushhogging. There have been no known impacts to Refuge property adjacent to Site 28 or to the Ford property.

FOR ... USE ONLY
Not For Public Release

There are no known unrelated Federal actions that may affect the cranes and have previously undergone formal or early section 7 consultation or known state or private actions that are contemporaneous with the consultation in process.

## EFFECTS OF THE ACTION

### Factors to be considered

The action is within designated critical habitat for the Mississippi sandhill crane and immediately adjacent to the Mississippi Sandhill Crane National Wildlife Refuge. The action will directly and indirectly impact critical habitat and what would be considered constituent elements. The duration of the effect will be a permanent event. The disturbance frequency will be variable. Early construction (Phases 1 and 2) will result in an initial disturbance, with normal everyday housing operations, and future maintenance and construction resulting in varying levels of disturbance for the life of the project.

### Analyses for effects of the action

The construction of the proposed housing development on Site 28 would directly and indirectly impact 75.1 acres of land within the Mississippi sandhill crane's critical habitat boundary. Of the total area, 10.7 acres are delineated as jurisdictional wetlands, 9.7 acres are an open water pond, and 54.7 acres are considered upland. Direct impacts include approximately 45 acres of uplands for the footprint of the housing development. All remaining acreage onsite will be indirectly impacted and completely lost as suitable habitat for the crane, for the life of the project (as long as the housing development exists), due to human activities that preclude crane use, such as noise, vibration, pollution, and visual disturbance. Therefore, no critical habitat will remain onsite once proposed construction has begun. Cranes will lose foraging and loafing habitat in the upland areas and roosting and nesting habitat in the pond.

This project will have indirect impacts to the adjacent critical habitat, on Refuge property, through increases in domestic animals, human activity, and noise. As stated above, the Service believes that the worst case scenario of offsite indirect effects would be the temporary disruption of crane activities on approximately 22 - 35 acres of the adjacent Refuge. These impacts will be minimized because the applicant has agreed to include a setback and to place a fence along the entire boundary between the development and the Refuge and augment the existing natural buffer of shrubs and trees which will decrease noise and visual disturbance.

The loss of Site 28 would, if it was the only facet of the project, impede recovery of the species by reducing the number of active nests (see Section 2.2 of the Recovery Plan), decrease feeding and roosting habitat (Section 2.3) and decrease winter foraging habitat (Section 2.4).

FO... ONLY

Not For Public Release

To offset the impacts to critical habitat on Site 28, the Service would receive 77 acres of offsite high priority crane habitat (the Rena Ford property). The Refuge would manage this land in perpetuity and when managed with adjacent refuge lands, the additional cost would be minimal compared to the habitat gained (S. Keen, pers. comm.). This land, with management, would have a net positive effect on the recovery of the Mississippi sandhill crane. The Ford tract is adjacent to the Refuge and within the Acquisition Boundary, which would be a gain for species recovery (see Part II, Section 2.1 of the Recovery Plan). The Ford tract was previously identified by the Refuge as high priority for acquisition and, if obtained, would help in filling the gap to the next closest Refuge unit. This area was rated as having high management and protection urgency by the Mississippi Natural Heritage Program's assessment of priority conservation sites in coastal Mississippi based on biodiversity and special species. This site was known to be utilized by cranes for foraging and loafing and may still be used today. Although much of the site is in good condition for cranes, the open pine savanna portion can be upgraded with regular controlled burn management. Other management actions can also be taken so that this site would contain all of the necessary constituent elements for designation as critical habitat (e.g., creation of a pond and access road, S. Hereford, pers. comm.).

Additional factors that would aid in recovery include: the Ford property has potential nesting habitat (Section 2.2); with management, the site would increase and improve the amount of feeding and roosting habitat (Section 2.3); it would increase winter foraging habitat (Section 2.4); it would reduce human contact with nesting cranes (Section 3.1), and it would likely lead to reduced mortality (Section 3.5). Obtaining this site will also aid in the Implementation Schedule of the Recovery Plan by meeting the following Tasks: 2.1 - Acquire other suitable habitat (Priority 2 - An action that must be taken to prevent a significant decline in species population/habitat quality, or some other significant negative impact short of extinction), 2.2 - Improve nesting habitat (Priority 2), 2.4 - Increase winter foraging habitat (Priority 3 - All other actions necessary to meet recovery objective), 3.1 - Minimize disturbance (Priority 1 - An action that <u>must</u> be taken to prevent extinction or to prevent the species from declining irreversibly in the <u>foreseeable</u> future) and 3.5-Reduce mortality (Priority 1).
The latter tasks (disturbance and mortality) particularly support the proposed action. Site 28 is becoming more disturbed by encroaching development and, since there already have been recent attempts to develop this property, it is likely that it could become developed in the foreseeable future. Even if development does not occur on this property, it is quite probable that the site will not be maintained by the new ownership for optimal crane usage. If the site is not maintained in its current state, or better, then it is reasonable to assume that cranes would cease to utilize the site for foraging, roosting or nesting. Therefore, the Service believes that Site 28 will be lost for suitable crane habitat and usage in the foreseeable future even without the proposed action. Recent lack of hatching and loss of fledglings on Site 28 appears to be due to factors (e.g., predation) that the Refuge is unable to remedy because it has no management authority on the site. On the other hand, the Ford property, if acquired, will be protected by the Refuge and see an increase in habitat quality and, hopefully, crane usage. The Ford tract is adjacent to a large portion of the Refuge which has a potential nesting territory, but has not been utilized due to lack of adequate shallow water habitat. If acquired, the Ford tract will have an access road built, a

FOR ... ONLY
Not For Public Release

pond(s) created, and burn management enacted, such that, the entire nesting territory may become more likely to be used by cranes. The Ford property will also then become available for release of captive-bred juveniles. Acquisition would expand the Refuge's protected and managed lands that contain designated critical habitat, as compared to the current situation involving occupied offsite locations that cannot be protected or managed by the Refuge and may become less and less suitable for cranes. It is hoped that cranes will expand into these new protected sites if/when they abandon the less desirable off-Refuge locations.

In order to determine the appropriate amount of habitat required to offset the impacts to Site 28, the Refuge biologist (together with Florida's non-migratory sandhill crane expert) formulated a model that would score both the impact site and potential offsite locations for crane value. This model, called the Mississippi Sandhill Crane Simplified Habitat Evaluation assumes that: "In general, present important habitat needs appear to be met by wetland/upland complexes isolated from human disturbance, especially during the March-June nesting period. Optimal habitat conditions exist when all requirements occur in close proximity over large contiguous areas." Variables that were utilized in the model include:

CRITICAL HABITAT - area within designated critical habitat boundary.
ACQUISITION BOUNDARY - area within the Refuge's Acquisition Boundary.
NESTING HABITAT - area of nesting habitat, including open wet pine savanna, swamp edge, shallow pond, shallow water from March-May on average, and wet pine scrub restorable to savanna.
ROOSTING HABITAT - area in shallow water (3 - 10" deep), such as ponds, swales, open swamp edges, and shallow marshes.
FORAGING HABITAT - area for feeding, including upland pasture or cropland, pine savanna, and restorable pine scrub.
ISOLATION - area potentially usable by cranes that is at least 100 yards from any existing human disturbance (e.g., roads, high density residential, commercial, industrial).
BUFFER - area adjacent to the Refuge serving as buffer from disturbance.

For a particular site, acreage for each of the variables was multiplied by a weighted factor and the results totaled. This number was then divided by the acreage of that site to obtain points/acre. The score for the impact site was then divided by the score for each proposed offsetting site to obtain the ratio that would determine the amount of acreage necessary at that particular site. By using this methodology it was calculated that the 77 acres of the Ford property would adequately offset the impacts at Site 28. Even though, with management, the Ford site will become even more valuable for crane usage, the evaluation technique determined that it already has more nesting and isolation value (based on acreage) than does Site 28. The only factors that the Ford property was deficient in, roosting and foraging, can be upgraded with standard management practices.

FOR OFFICIAL USE ONLY
Not For Public Release

**Species' response to a proposed action**

The number of individuals affected by the proposed project in the action area is difficult to determine. One nesting pair of Mississippi sandhill cranes, and any others who roost and/or forage at the site and on the adjacent Refuge property, will be displaced by the loss of 75.1 acres of critical habitat. On the other hand, it is hoped that cranes will expand their limits of utilized habitat for foraging, roosting, and nesting into the Ford property, once it has been acquired, enhanced, and managed by the Refuge.

## CUMULATIVE EFFECTS

Cumulative effects include the impacts of future state, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Although the immediate area has little current development, the residential and commercial prospects are high. A sewer line has already been installed to the property on the east side of the highway, with complete water and sewer line installation plans for both sides of the highway currently being drafted (Jackson County Planning Department, pers. comm.). Development is imminent, particularly because this is the last major intersection with I-10 in the county that has not been developed. A gas station has already been constructed on one of the outparcels of the project site and a convenience store and strip mall have been contemplated for this site. Other development interests are apparently waiting only on the utility lines to be installed in order to make their building decisions (Jackson County Planning Department, pers. comm.).

Because the Navy's proposed construction will impact all onsite habitat (Site 28) for the life of the project, for any possible crane usage, there can be no additional future impacts from federal, state, local, or private actions because no critical habitat will remain onsite once proposed construction has begun. The proposed project will also indirectly impact foraging habitat on the Refuge property adjacent to Site 28 and beneficially affect the Ford property. These offsite locations will have no additional future impacts from federal, state, local, or private actions because they are, or will be, owned and protected by the Refuge. Although the Service does not currently know of any particular projects, future state, local, and private development throughout the action area (cranes' range) is reasonably certain to occur (with the exception of lands on the Refuge). This includes development or other use of lands within the cranes range that are not designated as critical habitat.

FOR ... USE ONLY
Not For Public Release

## CONCLUSION

After reviewing the current status of the Mississippi sandhill crane, the environmental baseline for the action area, the effects of the Navy's proposed housing development, the beneficial effects of obtaining additional Refuge land, and the cumulative effects, it is the Service's biological opinion that the proposed action is not likely to jeopardize the continued existence of the Mississippi sandhill crane or destroy or adversely modify designated critical habitat. Although critical habitat will be impacted in one location (Site 28 and adjacent Refuge), it will be enhanced, protected, and managed in another location by acquisition of another property of equivalent or better habitat value. This action will reduce the adverse effect to critical habitat to the point where it will not result in an overall adverse modification of critical habitat. The Service believes that there will be no jeopardy to the continued existance of the crane because the nesting pair of cranes that utilized the project site will presumably relocate to another nesting site, the amount of lost crane habitat is a small percentage of the cranes overall range, and benefits will be realized by acquisition and management of the offsite property.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by Service as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

The measures described below are non-discretionary, and must be implemented by the Navy so that they become binding conditions of any grant, permit, agreement, or contract issued to the non-federal sponsor, applicant, or contractor, as appropriate, in order for the exemption in section 7(o)(2) to apply. The Navy has a continuing duty to regulate the activity covered by this incidental take statement. If the Navy: (1) fails to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the grant, permit, agreement, or contract document, and/or (2) fails to retain oversight to ensure compliance with these terms and conditions, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of incidental take, the Navy must report the progress of the action and its

FOR ... USE ONLY
Not For Public Release

impact on the species to the Service as specified in the incidental take statement. [50 CFR §402.14(i)(3)]

## AMOUNT OR EXTENT OF TAKE ANTICIPATED

The Service anticipates take of the Mississippi sandhill crane will be difficult to detect for the following reasons: the nesting pair (those cranes that used the site in 1998 and 1999) may or may not be able to find a suitable location to nest, when conditions were appropriate for them to nest at Site 28, and cranes foraging on the adjacent Refuge property may or may not be disrupted by activities on Site 28. However, the following level of take of this species can be anticipated by the loss of 75.1 acres of critical habitat because this area is used for roosting, foraging and nesting habitat. The Service believes that no more than the displacement of one nesting pair of Mississippi sandhill cranes and the disruption of normal behavior patterns for any cranes that may utilize Site 28 or the adjacent Refuge property will be taken.

## EFFECT OF THE TAKE

In the accompanying biological opinion, the Service determined that this level of anticipated take is not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat.

## REASONABLE AND PRUDENT MEASURES

The Service believes the following reasonable and prudent measures by the Navy are necessary and appropriate to minimize impacts of incidental take of Mississippi sandhill cranes:

1. Reduce onsite noise and visual disturbance that may affect cranes on the adjacent Refuge.

2. Reduce disturbance and pollution effects on nesting cranes.

3. Reduce likelihood that housing personnel will intrude onto adjacent Refuge.

## TERMS AND CONDITIONS

In order to be exempt from the prohibitions of section 9 of the Act, the Navy must comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline required reporting/monitoring requirements. These terms and conditions are non-discretionary and for the life of the project.

FOR ... ONLY
Not For Public Release

1. The Navy should ensure that a fence having a minimum height of 8 feet is installed on a 30 foot setback line which parallels the boundary between the project area and the Refuge before construction commences. The fence would not have to be constructed in areas that contain wetlands with heavy vegetation that form a natural barrier.

2. The natural border of trees and shrubs should be left intact between the fence and the Refuge boundary, and the 30 foot setback area augmented with additional native trees and shrubs. The species type and density of planting should be coordinated with Refuge personnel. This barrier will satisfy the noise and visual disturbance requirements and the 100 yard human disturbance barrier (constituent element) (but see #3, below).

3. Heavy and/or loud construction, including framing, roofing, paving, etc., should not take place during the crane's nesting season (March 1 through June 30). Site improvements, such as landscaping, utility work, etc., may not take place within 300 feet of the Refuge boundary during nesting season. Interior housing work may be performed at any time on the property.

4. The Navy should develop information packets for potential housing personnel to make them aware of the Mississippi sandhill crane, its protected status, and the potential impact of trespassing onto the Refuge and make them aware of the burn maintenance program administered by the Refuge personnel.

5. The Navy must report the progress of the above terms and conditions on an annual basis until initial construction (Phases 1 and 2) is complete and every five years thereafter. Reports will be forwarded to the Refuge Manager and the Service's Field Offices in Daphne, AL and Jackson, MS.

Upon locating a dead, injured, or sick individual of an endangered or threatened species, initial notification must be made to the Fish and Wildlife Service Law Enforcement Office at Jackson, MS. Additional notification must be made to the Refuge and the Fish and Wildlife Service Ecological Services Field Offices in Daphne, AL and Jackson, MS. Care should be taken in handling sick or injured individuals and in the preservation of specimens in the best possible state for later analysis of cause of death or injury.

The Service believes that no more than the displacement of one nesting pair of Mississippi sandhill cranes and the disruption of normal behavior patterns for any cranes that may utilize Site 28 or the adjacent Refuge property will be taken, as measured by the loss of 75.1 acres of critical habitat, as a result of the proposed action. The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action. If, during the course of the action, this level of incidental take is

FOR ... ONLY
Not For Public Release

exceeded, such incidental take represents new information requiring reinitiation of consultation and review of the reasonable and prudent measures provided. The Navy must immediately provide an explanation of the causes of the taking and review with the Service the need for possible modification of the reasonable and prudent measures.

## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. The following conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

> Install all utility lines for the Navy's proposed housing development, (e.g., telephone, power, TV cable, etc.) underground to eliminate the possibility of collision and mortality to Mississippi sandhill cranes.

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or benefitting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the Navy's proposed construction of new family housing for Naval Station Pascagoula at Site 28 in Jackson County, Mississippi and its affects on the endangered Mississippi sandhill crane and its designated critical habitat. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or designated critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or designated critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

Sincerely,

Larry E. Goldman
Field Supervisor

FOR ... USE ONLY
Not For Public Release

cc: SOUTHNAVFACENGCOM (ATTN: Mr. Richard Davis)
NAVSTA Pascagoula, MS (ATTN: Lt. Steve Bukoski)
MSCNWR (ATTN: Ms. Sabrina Keen, Refuge Manager)
FWS, Regional Office, Atlanta, GA (ATTN: Joe Johnston)
FWS, Solicitors Office, Atlanta, GA (ATTN: Mike Stevens)
FWS, Jackson, MS (ATTN: Linda LaClaire and Mike Dawson)

FOR ... USE ONLY
Not For Public Release

**LITERATURE CITED**

Hereford, S. 2001. Personal communication. Biologist. Mississippi Sandhill Crane National Wildlife Refuge. Gautier, Mississippi.

Jackson County Planning Department. 2001. Personal communication. Jackson County, Mississippi.

Keen, S. 2001. Personal communication. Refuge manager. Mississippi Sandhill Crane National Wildlife Refuge. Gautier, Mississippi.

Seal, U.S., S. Hereford, and workshop participants. 1992. Mississippi Sandhill Crane (*Grus canadensis pulla*) Population and Habitat Viability Assessment Workshop Report. Pascagoula, MS. 146 pp.

U.S. Fish and Wildlife Service. 1977. Determination of critical habitat for Mississippi Sandhill Crane; Final Rulemaking. Federal Register 42: 39985-39988.

U.S. Fish and Wildlife Service. 1991. Mississippi Sandhill Crane (*Grus canadensis pulla*) Recovery Plan. U.S. Fish and Wildlife Service, Atlanta, Georgia. 42 pp.