# TAB NO. 1

United States Department of the Interior

FISH AND WILDLIFE SERVICE
P. O. Drawer 1190
Daphne, Alabama 36526

IN REPLY REFER TO:
02-0009a

February 12, 2002

Mr. L. M. Pitts
Head, Environmental Planning Branch
Department of the Navy
Southern Division
Naval Facilities Engineering Command
P.O. Box 190010
2155 Eagle Drive
North Charleston, S.C. 29419-9010

Dear Sir:

This document transmits the Fish and Wildlife Service's (Service) biological opinion based on our review of the proposed new family housing for Naval Station Pascagoula (NAVSTA) north of Interstate 10 on Highway 57 (Site 28) in Jackson County, Mississippi, and its effects on the Mississippi sandhill crane (*Grus canadensis pulla*) in accordance with section 7 of the Endangered Species Act (Act) of 1973, as amended (16 U.S.C. 1531 et seq.).

This biological opinion is based on the *Environmental Assessment for the Proposed Construction of 188 Family Housing Units at Naval Station Pascagoula, Pascagoula, Mississippi*, meetings, discussions, e-mail, and written correspondence with the Navy, the property owners, the Mississippi Sandhill Crane National Wildlife Refuge (Refuge), colleagues, and Ecology and Environment, Inc., a consultant for the project. A complete administrative record of this consultation is on file in this office. If you have any questions about this biological opinion please contact Patric Harper at (251) 441-5181 extension 34, and refer to log number 02-0009.

**Consultation History**

Thirty potential building sites for the Navy's proposed housing development were initially identified (see Fig. 2-1 in the EA). Upon completion of their screening process, this number was reduced to the following five:

Alternative 1 - Site 7 (Gautier High School)
Alternative 2 - Site 8 (Red Bird Lane)
Alternative 3 - Site 28 (Highway 57/I-10)
Alternative 4 - Site 29 (Rosewood)
Alternative 5 - Site 30 (Singing River Island)

On February 1, 2001 the Refuge and the Service's Daphne Field Office (DFO) received a request from the consultant for input concerning issues or concerns related to the development of the EA. DFO's response recommended that surveys for the following Federally listed species be conducted, if suitable habitat existed, on Sites 7, 8, 28, and 29: red-cockaded woodpecker (*Picoides borealis*), bald eagle (*Haliaeetus leucocephalus*), gopher tortoise (*Gopherus polyphemus*), eastern indigo snake (*Drymarchon corais couperi*), and Louisiana quillwort (*Isoetes louisianensis*). Additionally, we recommended that the following species be considered at Site 30: piping plover (*Charadrius melodus*), brown pelican (*Pelecanus occidentalis*), loggerhead sea turtle (*Caretta caretta*), Kemp's ridley sea turtle (*Lepidochelys kempii*), and green sea turtle (*Chelonia mydas*). The Refuge responded that Sites 8, 28, and 29 might have an impact on the Refuge but additional information was required.

In an April 4, 2001 letter to the consultant, the Service expressed concern, based on additional information received from the Navy and recommendations by the Refuge, that proposed development might have direct and/or indirect impacts on the Mississippi sandhill crane, its designated critical habitat, or the Refuge proper if Alternatives 2, 3 or 4 (Sites 8, 28 and 29, respectively) were implemented. We indicated that development of either Alternative 1 or 5 (Sites 7 or 30, respectively) would not affect the crane or the Refuge.

During an April 19, 2001 meeting, it was noted that Alternative 5 was not a preferred site due to several considerations including other planned uses and site constraints. Impacts to the remaining proposed sites and possible minimization efforts, such as fencing and setbacks, were also discussed. The possibility that development of Site 28, the Navy's proposed alternative, would result in adverse modification of critical habitat and/or "take" of a nesting pair of Mississippi sandhill cranes was presented. Discussion included the potential for offsetting the impacts to critical habitat by purchasing other lands which would then be deeded to the Service and maintained for crane use. It was noted that these "other" lands would have to meet certain requirements that included, but were not limited to: adequate quality and quantity of habitat, proximity to the existing Refuge boundary, occurring within the Refuge's acquisition boundary, current or potential crane use, susceptibility to development, etc.

Continuing discussions led to generation of a list of sites that the Refuge considered as high-priority for acquisition and determining a system for rating the value and suitability of potential "offsetting" sites (as well as the impact site). The Refuge stated that the list was not all-inclusive and that they would entertain any reasonable offsite proposals. The Navy determined that due to the complexity of this exercise, other site attributes, and necessary timelines for proposed action implementation, there was an uncertainty regarding the eligibility of Site 28 and, therefore, it began to re-evaluate the other four alternatives. The Service's letter of June 14, 2001 indicated, based on site visits and discussions with the Refuge, that, due to lack of onsite critical habitat and by incorporating adequate property boundary setbacks and fencing, there would be no impact to the crane, its habitat or the Refuge if Site 8 (Alternative 2) was chosen for development.

The owners of Site 28 (Messrs. Steven Carter and Lawrence Rumsey), in an effort to expedite the sale of their property to the Navy, began to investigate the possibility of purchasing offsite habitat to be subsequently conveyed to the Service in order to offset the impacts of the Navy's housing development on Mississippi sandhill crane designated critical habitat. During a meeting on June 27, 2001, the owners requested that the Refuge evaluate four of the high-priority locations.

On July 24, 2001 the owners of Site 28 submitted a proposal that included donation to the Service of onsite portions of Site 28 and a 10 acre portion of one of the offsite locations mentioned above. The owners were informed that this was not a viable alternative because once the housing development was constructed, all of Site 28 would be essentially lost to crane use.

In a August 3, 2001 letter, the Service provided additional information to the Navy for its use in preparing the EA. This letter included onsite reviews by the Refuge of the four proposed offsite locations and seven preliminary options, based on the Refuge's Simplified Habitat Evaluation, that might offset the impacts to Site 28.

On August 17, 2001 a meeting was held at NAVSTA among the owners of Site 28, the Navy, and the Service to discuss a proposal that included one of the options (Option 4 - 89 acres of Mr. John Ford's property on Tract 78). Although the Site 28 owners indicated that a verbal agreement had been reached with Mr. Ford, and as such the process could proceed, it was discovered that the acreage figure was not what had been agreed upon. Therefore, the owners of Site 28 were informed that a new proposal would be required.

Subsequently, Option 3 (77 acres of Ms. Rena Ford's property) was proposed by the owners of Site 28 to offset the Navy's housing development impacts to critical habitat of the Mississippi sandhill crane. A contract (Option for Exchange/Conveyance of Real Property) to that effect was signed on August 29, 2001 and a copy received by the Service on September 5, 2001.

The Service agreed, by letter dated September 20, 2001, to enter into, and expedite to the degree possible, formal consultation with the Navy on the construction of new family housing for Naval Station Pascagoula (NAVSTA) north of Interstate 10 on Highway 57 (Site 28) in Jackson County, Mississippi.

## BIOLOGICAL OPINION

### DESCRIPTION OF PROPOSED ACTION

The proposed action is the construction of 188 units of Navy family housing and ancillary facilities (in two phases), including future operation, maintenance, and upgrades, on one of five alternative site locations identified in the *Final Planning Study to Identify Potential Navy Housing Sites for 188 Family Housing Units, Naval Station Pascagoula (NAVSTA), Jackson County, Mississippi.*

The proposed site, as determined in the Navy's Environmental Assessment, is described as Alternative 3 which is located adjacent to the Mississippi Sandhill Crane National Wildlife Refuge and in designated critical habitat for the endangered Mississippi sandhill crane (*Grus canadensis pulla*). The housing units are required to be within a 30-minute drive time of NAVSTA Pascagoula. The new family housing will be multi-family housing units, including 53 two-bedroom units, 84 three-bedroom units, and 51 four-bedroom units, constructed of wood or metal frame, or masonry with stucco or vinyl siding. The proposal also includes covered parking, covered patios, privacy fencing, exterior storage, and recreational facilities.

Alternative 3 involves an area identified as "Site 28" located north of Interstate 10 on Highway 57 in Jackson County, Mississippi (see Figure 3-3, in the EA). This location, highly suitable for the proposed housing unit, is in critical habitat designated for the Mississippi sandhill crane. The site, situated between the Refuge's "Ocean Springs" and "Gautier" management units, encompasses ~~75.1 acres, of which 10.7 are delineated as jurisdictional wetlands, 9.7 are an open water pond,~~ and 54.7 are considered upland. Of the upland acreage, 45 acres are deemed foraging habitat for the endangered crane. The pond has been used for roosting habitat by the cranes. Documented observations reveal that a peninsula in the pond was used for nesting in 1997 and 1998.

The action area for a project is the entire area that is directly and indirectly impacted by a proposed action. The immediate and future affects of this project will not only directly impact Site 28 itself, but also indirectly impact offsite crane habitat on the adjacent Refuge because of disturbance. The project will also affect, in a beneficial way, an offsite location that is to be protected and managed in order to offset the construction impacts. Due to the limited range of the Mississippi sandhill crane (approximately 153,600 acres), the offsite disturbance, and potential movement of affected cranes throughout their range, we are identifying the action area for this project as the entire range of the Mississippi sandhill crane. This broad range is taken from the Recovery Plan and, therefore, includes some areas that are not utilized by the crane.

Land-use activities proposed by the Navy to minimize disturbance to the species (see Section 4.3.1 in the EA) include creating a barrier between the development and the Refuge, educating the residents about potential impact of trespassing onto the Refuge, and avoiding heavy construction activities during the crane's nesting season (March 1 through June 30) consistent with final resolution of issue.

Simultaneous with sale of Site 28 to the Navy, the owners (of Site 28) would purchase and then convey to the Service a separate parcel of land in order to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane. This separate parcel of land is known as the Ford property (Ms. Rena Ford), or Tract 77, or the South 77 acres of Government Lots 5 & 6, or the South 77 acres of the South ½ of the Southwest 1/4, Section 2, Township 7 South, Range 7 West, Jackson County, Mississippi. Tract 77 is immediately adjacent to the Refuge along the northeast border of the Gautier Unit.

Other sites that could also be purchased and conveyed to the Service to offset the Navy's impacts include: 89 acres of Tract 78, which is adjacent to the above Tract 77 - to the east (noted in previous correspondence as Option 4) or 30 acres of Gary Young property (T6S R7W Sec 27) and 113 acres of Mary Miller property (T6S R8W Sec 35) (Option 7).

## STATUS OF THE SPECIES/CRITICAL HABITAT

### Species/critical habitat description

Sandhill cranes (*Grus canadensis*) resemble great blue herons (*Ardea herodias*). A major distinguishing characteristic is that cranes are completely gray. When standing erect, cranes are about four feet tall. Male and female cranes are similar in appearance. All cranes have long necks, and adult cranes possess a naked red crown. The species vocalizations are loud and clattering. Mississippi sandhill cranes (*G. c. pulla*) are a nonmigratory subspecies which have become reproductively isolated from other sandhill cranes. The only known wild population is on and near the Mississippi Sandhill Crane National Wildlife Refuge in Jackson County, Mississippi. The birds present range is restricted to an area defined by the Pascagoula River (east), to about the Jackson County line (west), to about Simmons Bayou (south), to 4 miles north of the town of Vancleave (north).

Mississippi sandhill cranes were listed as rare in the 1968 list of Rare and Endangered Fish and Wildlife of the United States. After being described as a subspecies in 1972, the Mississippi sandhill crane was added to the U.S. List of Endangered Fish and Wildlife on June 4, 1973 38 Fed. Reg. 14678. The first recovery plan was written in 1976 and the latest revision (3rd) completed in 1991. In 1974 the Nature Conservancy purchased 1,709 acres which the Service acquired in 1975 to establish the Mississippi Sandhill Crane National Wildlife Refuge. Additional lands have been acquired such that the current total acreage of the Refuge is 19,273 acres. Reducing the likelihood of extinction will require a self-sustaining population of cranes and suitable habitat. Original estimates suggested the Refuge crane population may require a minimum of about 130 to 170 birds, consisting of about 60 nesting cranes per breeding season, for a continuous period of at least 10 years (USFWS, 1991). Long term self-sustenance and stability will require a genetically viable population, high levels of natural recruitment, and cessation of the captive release program.

Critical habitat for the Mississippi sandhill crane was designated on September 8, 1977 42 Fed. Reg. 39985. (USFWS,1977). Current Service policy requires that the primary constituent elements of critical habitat be defined. Primary constituent elements are those physical and biological features of a landscape that a species needs to survive and reproduce. However, the Final Rule that determined critical habitat for the Mississippi sandhill crane occurred prior to establishment of this policy. Nevertheless, for the purposes of this Biological Opinion, we now define the primary constituent elements to be those elements required to support appropriate foraging, roosting, and nesting habitat isolated from human disturbance by a minimum of 100

yards. The areas delineated for critical habitat cover about 26,000 acres of which 19,273 acres are currently protected on the Refuge. Most known breeding, summer feeding, and roosting sites are included in the 26,000 acres of critical habitat. During the last 5-10 years, surveys indicate that approximately 90% of crane breeding sites and approximately 70% of their roosting sites occur in critical habitat. Since 1965, approximately 9% of documented nesting has been located off the Refuge. Scattered winter feeding areas are located both on the refuge (approximately 80%) and on neighboring farmlands outside of designated critical habitat. These sites cover a large area, and sporadic use of these areas by cranes vary with the planted crops. Although included within the critical habitat boundary, not all such areas actually possess all of the constituent elements of critical habitat.

**Life history**

These cranes are long lived. In the wild they do not reach reproductive age until around 4 to 5 years of age (sometimes not until their "teens"), have large nesting territories, and frequently raise only one chick per year (U.S. Fish and Wildlife Service 1991).

Savannahs are the optimal habitat of the Mississippi sandhill crane and are inhabited year round. These wet grasslands are predominated by wiregrass (*Aristida spp.*), with scattered longleaf pine (*Pinus palustris*), slash pine (*P. elliottii*), and cypress (*Taxodium ascendens*) trees. Other associated plants include pitcher plants (*Sarracenia spp.*), sundew (*Drosera spp.*), clubmoss (*Lycopodium alopecuroides*), and pipeworts (*Eriocaulon spp.*). Cranes also utilize wooded depressions (swamps) dominated by cypress, longleaf, and slash pine trees with an understory of swamp cyrilla (*Cyrilla racemiflora*), buckwheat tree (*Cliftonia monophylla*), wax myrtle (*Myrica cerifera*), and several species of holly (*Ilex spp.*) (U.S. Fish and Wildlife Service 1991).

Cranes roost in shallow water in savannas, edges of wooded depressions or swamps, and ponds. Paired cranes roost near the nest during the breeding season. Mississippi sandhill cranes prefer to nest as far from sources of disturbance as possible. Ideally this is in open area of grasses and sedges adjacent to perennial shallow water. Such an area, surrounded by trees and shrubs, is typically large enough for the cranes to see potential predators and allow flight. Due to the economic growth of coastal Mississippi, construction of miles of access roads, and plantation pine forestry techniques, most of the original ideal nesting habitat has been destroyed.

Crane feeding habits vary with the seasons. During the spring, summer, and early fall, cranes consume both plant and animal matter equally, including roots, tubers, fruits, insects, earthworms, other invertebrates, and occasionally a few frogs and other small vertebrates. During the cooler months, cranes switch some of their preferred items diet to products of upland agriculture including corn, seeds, and insects found in farms, pastures, and Refuge food plots. Chufa is planted in the spring or summer for the cranes on the Refuge and then cool season grasses and legumes are planted in the fall. As a result of human population growth, some agricultural areas in the vicinity of the Refuge that are now used by cranes for foraging (including some that have

been utilized for decades and even generations), are being converted to high density residential or commercial development that is not suitable for cranes.

**Population dynamics**

Population estimates in 1929, 1949, and 1969 indicated that the crane population has been less than 100 since 1929 with evidence of continuing decline through 1980 (Seal, et al. 1992). Since inception of the Refuge in 1975 and formal designation of critical habitat for the Mississippi sandhill crane (USFWS, 1977), the population levels have increased from a low of 30-35 individuals and 5-6 nesting pairs to over 100 birds and 25 nesting pairs. Supplementation of the population began in 1981 and has continued every year since. Approximately 95% of the current free ranging population is from captive hatched or captive bred birds (S. Hereford, pers. comm.). The population has been maintained purposely from 100-130 birds over the last 5-6 years (S. Hereford, pers. comm.). Mapping of the habitat requirements of the crane (in the early 1990s) indicated that a population of about 130-150 birds was the maximum capacity of the refuge at that time, even with intensive site management (Seal, et al. 1992). Changes on the Refuge in the past 10 years (including expansion) dictate that the population model should be re-run in order to obtain a more accurate evaluation of the crane's current situation and to update the requirements for a self-sustaining population (S. Hereford, pers. comm.). Ultimately the carrying capacity of the Refuge will be limited by the habitat available for nesting territories. The addition of protected, managed, high quality crane habitat, particularly potential nesting areas, to the Refuge is vital for the recovery of the species.

**Status and distribution**

The Mississippi sandhill crane is a nonmigratory endangered subspecies which has become reproductively isolated from other sandhill cranes and is in danger of extinction. Major reasons for the decline include loss of habitat, human predation, and decreased natural recruitment. Mississippi sandhill cranes were once found all along the Gulf Coast with a total population possibly into the thousands. During the 1950's thousands of acres of the crane's favored savannah habitat were drained and converted to slash pine plantations. Dense understories developed underneath the mature pine trees, and the once open, undisturbed habitat became unsuitable for cranes. The latter part of the 20th century brought a human population explosion to the Mississippi coast, including residential and commercial development and infrastructure utilities to support that growth. Eight paved highways now transect or border the crane's range. These roads have further depleted habitat, caused pollution problems, and provided public access to the cranes, all of which have caused problems for the species.

**Analysis of the species/critical habitat likely to be affected**

The Service anticipates that Mississippi sandhill cranes will be adversely affected by the proposed project due to the displacement of one nesting pair and the disruption of normal behavior patterns for any Mississippi sandhill cranes that may utilize Site 28 or adjacent Refuge lands. 75 acres of designated critical habitat on Site 28, and varying amounts of acreage on the adjacent Refuge, will also likely be lost, directly and indirectly, through construction of the housing project, normal everyday housing operations, and future maintenance and construction. Indirect effects, due to audio or visual disturbance from the project site, on cranes that may be utilizing adjacent Refuge lands are difficult to quantify. This is due to the uncertainty of the distance that any particular disturbance may affect nearby cranes. The Service believes that the worst case scenario would be the temporary disruption of feeding or loafing activities (no adjacent nesting habitat) on a maximum of eight Mississippi sandhill cranes that may or may not be utilizing approximately 22 - 35 acres of adjacent Refuge property during any such disruption (S. Hereford, pers. comm.).

The project will beneficially affect 77 acres of offsite crane habitat (the Rena Ford property) because, if the proposal is approved, the Refuge would receive and manage those acres to offset the impacts to critical habitat on Site 28. Potential impacts will be considered further in the remaining sections of this opinion.

**ENVIRONMENTAL BASELINE**

This section is an analysis of the effects of past and ongoing human and natural factors leading to the current status of the species, its habitat, and ecosystem, within the action area. Because the species range is wholly contained within the action area, this analysis is based on the preceding rangewide status discussion but will highlight baseline conditions at the affected areas (Site 28, Refuge land adjacent to Site 28 and the Ford property).

**Status of the species within the action area**

The impact area (Site 28) encompasses 75 acres or 0.3% of the entire designated critical habitat for the Mississippi sandhill crane and approximately 0.05% of the crane's total range (action area). Currently, the impact area contains good quality crane habitat inadvertently created and maintained by human involvement. This would include the borrow pit which has become a shallow water pond for roosting and nesting and the clearing and maintenance of open foraging habitat. This site contains all the necessary features for critical habitat, which will be lost by development of the site.

One pair of cranes has been documented nesting at the Site 28 pond. They nested once in 1997 and twice in 1998 with only the first nest in 1998 resulting in a hatch. The chick survived for about a month after which it was presumably lost to predation. This data results in a 33%

hatchling production rate and 0% fledgling production rate at Site 28. According to the Population and Habitat Viability Assessment (PHVA), the best chance for recovery of this subspecies is with 60% hatchling production and 20% juvenile mortality (Seal, et al. 1992). Therefore, this site (28) does not appear to be as productive as those on the Refuge that had an average fledgling production rate of 33% prior to 1992 (Seal, et al. 1992) and from 1993-2001 a fledgling production rate of approximately 16.5% (S. Hereford, pers. comm., based on preliminary results). Whether the low numbers from Site 28 are due to encroaching development, predation, low viability, incomplete data, or other factors could only be determined through an extensive study of the nest site.

The amount of Refuge acreage that will be indirectly impacted by the adjacent project is difficult to quantify or qualify. Construction of the housing project, normal everyday housing operations, and future maintenance and construction will result in varying amounts of audio and visual disturbances that could affect crane behavior. The acreage impacted may be influenced by time of day, time of year, level, duration, and frequency of disturbance, etc. As above, the Service believes that the worst case scenario would be the temporary disruption of crane activities on approximately 22 - 35 acres of the adjacent Refuge.

**Factors affecting species environment within the action area**

Previously described development has historically affected the species and its habitat throughout the action area (cranes' range), and continues to do so (with the exception of lands on the Refuge). This includes development or other use of lands within the cranes range that are not designated as critical habitat (approximately 83% of their range is not designated as critical habitat).

Site 28 is located in unincorporated Jackson County but in the City of Gautier proposed annexation area. The property has frontage on both Highway 57 and Robinson Still Road. Originally, the property was 83 acres, but 8 acres have been sold as outparcels to private developers. These parcels are being developed commercially (one as a gas station, and the other two, as yet, unknown). Site 28 was recently re-zoned to Planned Unit Development (PUD) to accommodate a 350-unit apartment complex proposed by the current owner. Because funding was not secured, no construction commenced. The PUD zoning classification allows for flexibility in land use activities (residential, commercial, office) and permits multi-family residential housing. Low density residential development occurs south of the property, and west of the site is Highway 57 and a KOA campground.

Past and present impacts of all Federal, state, or private actions and other human activities on Site 28 appear to be limited to the construction of a borrow pit for construction of I-10, haying, and, for the past few years, regular bushhogging. There have been no known impacts to Refuge property adjacent to Site 28 or to the Ford property.

There are no known unrelated Federal actions that may affect the cranes and have previously undergone formal or early section 7 consultation or known state or private actions that are contemporaneous with the consultation in process.

## EFFECTS OF THE ACTION

### Factors to be considered

The action is within designated critical habitat for the Mississippi sandhill crane and immediately adjacent to the Mississippi Sandhill Crane National Wildlife Refuge. The action will directly and indirectly impact critical habitat and what would be considered constituent elements. The duration of the effect will be a permanent event. The disturbance frequency will be variable. Early construction (Phases 1 and 2) will result in an initial disturbance, with normal everyday housing operations, and future maintenance and construction resulting in varying levels of disturbance for the life of the project.

### Analyses for effects of the action

The construction of the proposed housing development on Site 28 would directly and indirectly impact 75.1 acres of land within the Mississippi sandhill crane's critical habitat boundary. Of the total area, 10.7 acres are delineated as jurisdictional wetlands, 9.7 acres are an open water pond, and 54.7 acres are considered upland. Direct impacts include approximately 45 acres of uplands for the footprint of the housing development. All remaining acreage onsite will be indirectly impacted and completely lost as suitable habitat for the crane, for the life of the project (as long as the housing development exists), due to human activities that preclude crane use, such as noise, vibration, pollution, and visual disturbance. Therefore, no critical habitat will remain onsite once proposed construction has begun. Cranes will lose foraging and loafing habitat in the upland areas and roosting and nesting habitat in the pond.

This project will have indirect impacts to the adjacent critical habitat, on Refuge property, through increases in domestic animals, human activity, and noise. As stated above, the Service believes that the worst case scenario of offsite indirect effects would be the temporary disruption of crane activities on approximately 22 - 35 acres of the adjacent Refuge. These impacts will be minimized because the applicant has agreed to include a setback and to place a fence along the entire boundary between the development and the Refuge and augment the existing natural buffer of shrubs and trees which will decrease noise and visual disturbance.

The loss of Site 28 would, if it was the only facet of the project, impede recovery of the species by reducing the number of active nests (see Section 2.2 of the Recovery Plan), decrease feeding and roosting habitat (Section 2.3) and decrease winter foraging habitat (Section 2.4).

To offset the impacts to critical habitat on Site 28, the Service would receive 77 acres of offsite high priority crane habitat (the Rena Ford property). The Refuge would manage this land in perpetuity and when managed with adjacent refuge lands, the additional cost would be minimal compared to the habitat gained (S. Keen, pers. comm.). This land, with management, would have a net positive effect on the recovery of the Mississippi sandhill crane. The Ford tract is adjacent to the Refuge and within the Acquisition Boundary, which would be a gain for species recovery (see Part II, Section 2.1 of the Recovery Plan). The Ford tract was previously identified by the Refuge as high priority for acquisition and, if obtained, would help in filling the gap to the next closest Refuge unit. This area was rated as having high management and protection urgency by the Mississippi Natural Heritage Program's assessment of priority conservation sites in coastal Mississippi based on biodiversity and special species. This site was known to be utilized by cranes for foraging and loafing and may still be used today. Although much of the site is in good condition for cranes, the open pine savanna portion can be upgraded with regular controlled burn management. Other management actions can also be taken so that this site would contain all of the necessary constituent elements for designation as critical habitat (e.g., creation of a pond and access road, S. Hereford, pers. comm.).

Additional factors that would aid in recovery include: the Ford property has potential nesting habitat (Section 2.2); with management, the site would increase and improve the amount of feeding and roosting habitat (Section 2.3); it would increase winter foraging habitat (Section 2.4); it would reduce human contact with nesting cranes (Section 3.1), and it would likely lead to reduced mortality (Section 3.5). Obtaining this site will also aid in the Implementation Schedule of the Recovery Plan by meeting the following Tasks: 2.1 - Acquire other suitable habitat (Priority 2 - An action that must be taken to prevent a significant decline in species population/habitat quality, or some other significant negative impact short of extinction), 2.2 - Improve nesting habitat (Priority 2), 2.4 - Increase winter foraging habitat (Priority 3 - All other actions necessary to meet recovery objective), 3.1 - Minimize disturbance (Priority 1 - An action that <u>must</u> be taken to prevent extinction or to prevent the species from declining irreversibly in the <u>foreseeable</u> future) and 3.5-Reduce mortality (Priority 1).
The latter tasks (disturbance and mortality) particularly support the proposed action. Site 28 is becoming more disturbed by encroaching development and, since there already have been recent attempts to develop this property, it is likely that it could become developed in the foreseeable future. Even if development does not occur on this property, it is quite probable that the site will not be maintained by the new ownership for optimal crane usage. If the site is not maintained in its current state, or better, then it is reasonable to assume that cranes would cease to utilize the site for foraging, roosting or nesting. Therefore, the Service believes that Site 28 will be lost for suitable crane habitat and usage in the foreseeable future even without the proposed action. Recent lack of hatching and loss of fledglings on Site 28 appears to be due to factors (e.g., predation) that the Refuge is unable to remedy because it has no management authority on the site. On the other hand, the Ford property, if acquired, will be protected by the Refuge and see an increase in habitat quality and, hopefully, crane usage. The Ford tract is adjacent to a large portion of the Refuge which has a potential nesting territory, but has not been utilized due to lack of adequate shallow water habitat. If acquired, the Ford tract will have an access road built, a

pond(s) created, and burn management enacted, such that, the entire nesting territory may become more likely to be used by cranes. The Ford property will also then become available for release of captive-bred juveniles. Acquisition would expand the Refuge's protected and managed lands that contain designated critical habitat, as compared to the current situation involving occupied offsite locations that cannot be protected or managed by the Refuge and may become less and less suitable for cranes. It is hoped that cranes will expand into these new protected sites if/when they abandon the less desirable off-Refuge locations.

In order to determine the appropriate amount of habitat required to offset the impacts to Site 28, the Refuge biologist (together with Florida's non-migratory sandhill crane expert) formulated a model that would score both the impact site and potential offsite locations for crane value. This model, called the Mississippi Sandhill Crane Simplified Habitat Evaluation assumes that: "In general, present important habitat needs appear to be met by wetland/upland complexes isolated from human disturbance, especially during the March-June nesting period. Optimal habitat conditions exist when all requirements occur in close proximity over large contiguous areas." Variables that were utilized in the model include:

CRITICAL HABITAT - area within designated critical habitat boundary.
ACQUISITION BOUNDARY - area within the Refuge's Acquisition Boundary.
NESTING HABITAT - area of nesting habitat, including open wet pine savanna, swamp edge, shallow pond, shallow water from March-May on average, and wet pine scrub restorable to savanna.
ROOSTING HABITAT - area in shallow water (3 - 10" deep), such as ponds, swales, open swamp edges, and shallow marshes.
FORAGING HABITAT - area for feeding, including upland pasture or cropland, pine savanna, and restorable pine scrub.
ISOLATION - area potentially usable by cranes that is at least 100 yards from any existing human disturbance (e.g., roads, high density residential, commercial, industrial).
BUFFER - area adjacent to the Refuge serving as buffer from disturbance.

For a particular site, acreage for each of the variables was multiplied by a weighted factor and the results totaled. This number was then divided by the acreage of that site to obtain points/acre. The score for the impact site was then divided by the score for each proposed offsetting site to obtain the ratio that would determine the amount of acreage necessary at that particular site. By using this methodology it was calculated that the 77 acres of the Ford property would adequately offset the impacts at Site 28. Even though, with management, the Ford site will become even more valuable for crane usage, the evaluation technique determined that it already has more nesting and isolation value (based on acreage) than does Site 28. The only factors that the Ford property was deficient in, roosting and foraging, can be upgraded with standard management practices.

**Species' response to a proposed action**

The number of individuals affected by the proposed project in the action area is difficult to determine. One nesting pair of Mississippi sandhill cranes, and any others who roost and/or forage at the site and on the adjacent Refuge property, will be displaced by the loss of 75.1 acres of critical habitat. On the other hand, it is hoped that cranes will expand their limits of utilized habitat for foraging, roosting, and nesting into the Ford property, once it has been acquired, enhanced, and managed by the Refuge.

## CUMULATIVE EFFECTS

Cumulative effects include the impacts of future state, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

Although the immediate area has little current development, the residential and commercial prospects are high. A sewer line has already been installed to the property on the east side of the highway, with complete water and sewer line installation plans for both sides of the highway currently being drafted (Jackson County Planning Department, pers. comm.). Development is imminent, particularly because this is the last major intersection with I-10 in the county that has not been developed. A gas station has already been constructed on one of the outparcels of the project site and a convenience store and strip mall have been contemplated for this site. Other development interests are apparently waiting only on the utility lines to be installed in order to make their building decisions (Jackson County Planning Department, pers. comm.).

Because the Navy's proposed construction will impact all onsite habitat (Site 28) for the life of the project, for any possible crane usage, there can be no additional future impacts from federal, state, local, or private actions because no critical habitat will remain onsite once proposed construction has begun. The proposed project will also indirectly impact foraging habitat on the Refuge property adjacent to Site 28 and beneficially affect the Ford property. These offsite locations will have no additional future impacts from federal, state, local, or private actions because they are, or will be, owned and protected by the Refuge. Although the Service does not currently know of any particular projects, future state, local, and private development throughout the action area (cranes' range) is reasonably certain to occur (with the exception of lands on the Refuge). This includes development or other use of lands within the cranes range that are not designated as critical habitat.

## CONCLUSION

After reviewing the current status of the Mississippi sandhill crane, the environmental baseline for the action area, the effects of the Navy's proposed housing development, the beneficial effects of obtaining additional Refuge land, and the cumulative effects, it is the Service's biological opinion that the proposed action is not likely to jeopardize the continued existence of the Mississippi sandhill crane or destroy or adversely modify designated critical habitat. Although critical habitat will be impacted in one location (Site 28 and adjacent Refuge), it will be enhanced, protected, and managed in another location by acquisition of another property of equivalent or better habitat value. This action will reduce the adverse effect to critical habitat to the point where it will not result in an overall adverse modification of critical habitat. The Service believes that there will be no jeopardy to the continued existence of the crane because the nesting pair of cranes that utilized the project site will presumably relocate to another nesting site, the amount of lost crane habitat is a small percentage of the cranes overall range, and benefits will be realized by acquisition and management of the offsite property.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. Harm is further defined by Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. Harass is defined by Service as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

The measures described below are non-discretionary, and must be implemented by the Navy so that they become binding conditions of any grant, permit, agreement, or contract issued to the non-federal sponsor, applicant, or contractor, as appropriate, in order for the exemption in section 7(o)(2) to apply. The Navy has a continuing duty to regulate the activity covered by this incidental take statement. If the Navy: (1) fails to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the grant, permit, agreement, or contract document, and/or (2) fails to retain oversight to ensure compliance with these terms and conditions, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of incidental take, the Navy must report the progress of the action and its

impact on the species to the Service as specified in the incidental take statement. [50 CFR §402.14(i)(3)]

## AMOUNT OR EXTENT OF TAKE ANTICIPATED

The Service anticipates take of the Mississippi sandhill crane will be difficult to detect for the following reasons: the nesting pair (those cranes that used the site in 1998 and 1999) may or may not be able to find a suitable location to nest, when conditions were appropriate for them to nest at Site 28, and cranes foraging on the adjacent Refuge property may or may not be disrupted by activities on Site 28. However, the following level of take of this species can be anticipated by the loss of 75.1 acres of critical habitat because this area is used for roosting, foraging and nesting habitat. The Service believes that no more than the displacement of one nesting pair of Mississippi sandhill cranes and the disruption of normal behavior patterns for any cranes that may utilize Site 28 or the adjacent Refuge property will be taken.

## EFFECT OF THE TAKE

In the accompanying biological opinion, the Service determined that this level of anticipated take is not likely to result in jeopardy to the species or destruction or adverse modification of critical habitat.

## REASONABLE AND PRUDENT MEASURES

The Service believes the following reasonable and prudent measures by the Navy are necessary and appropriate to minimize impacts of incidental take of Mississippi sandhill cranes:

1. Reduce onsite noise and visual disturbance that may affect cranes on the adjacent Refuge.

2. Reduce disturbance and pollution effects on nesting cranes.

3. Reduce likelihood that housing personnel will intrude onto adjacent Refuge.

## TERMS AND CONDITIONS

In order to be exempt from the prohibitions of section 9 of the Act, the Navy must comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline required reporting/monitoring requirements. These terms and conditions are non-discretionary and for the life of the project.

1. The Navy should ensure that a fence having a minimum height of 8 feet is installed on a 30 foot setback line which parallels the boundary between the project area and the Refuge before construction commences. The fence would not have to be constructed in areas that contain wetlands with heavy vegetation that form a natural barrier.

2. The natural border of trees and shrubs should be left intact between the fence and the Refuge boundary, and the 30 foot setback area augmented with additional native trees and shrubs. The species type and density of planting should be coordinated with Refuge personnel. This barrier will satisfy the noise and visual disturbance requirements and the 100 yard human disturbance barrier (constituent element) (but see #3, below).

3. Heavy and/or loud construction, including framing, roofing, paving, etc., should not take place during the crane's nesting season (March 1 through June 30). Site improvements, such as landscaping, utility work, etc., may not take place within 300 feet of the Refuge boundary during nesting season. Interior housing work may be performed at any time on the property.

4. The Navy should develop information packets for potential housing personnel to make them aware of the Mississippi sandhill crane, its protected status, and the potential impact of trespassing onto the Refuge and make them aware of the burn maintenance program administered by the Refuge personnel.

5. The Navy must report the progress of the above terms and conditions on an annual basis until initial construction (Phases 1 and 2) is complete and every five years thereafter. Reports will be forwarded to the Refuge Manager and the Service's Field Offices in Daphne, AL and Jackson, MS.

Upon locating a dead, injured, or sick individual of an endangered or threatened species, initial notification must be made to the Fish and Wildlife Service Law Enforcement Office at Jackson, MS. Additional notification must be made to the Refuge and the Fish and Wildlife Service Ecological Services Field Offices in Daphne, AL and Jackson, MS. Care should be taken in handling sick or injured individuals and in the preservation of specimens in the best possible state for later analysis of cause of death or injury.

The Service believes that no more than the displacement of one nesting pair of Mississippi sandhill cranes and the disruption of normal behavior patterns for any cranes that may utilize Site 28 or the adjacent Refuge property will be taken, as measured by the loss of 75.1 acres of critical habitat, as a result of the proposed action. The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action. If, during the course of the action, this level of incidental take is

exceeded, such incidental take represents new information requiring reinitiation of consultation and review of the reasonable and prudent measures provided. The Navy must immediately provide an explanation of the causes of the taking and review with the Service the need for possible modification of the reasonable and prudent measures.

## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. The following conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

> Install all utility lines for the Navy's proposed housing development, (e.g., telephone, power, TV cable, etc.) underground to eliminate the possibility of collision and mortality to Mississippi sandhill cranes.

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or benefitting listed species or their habitats, the Service requests notification of the implementation of any conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the Navy's proposed construction of new family housing for Naval Station Pascagoula at Site 28 in Jackson County, Mississippi and its effects on the endangered Mississippi sandhill crane and its designated critical habitat. As provided in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or designated critical habitat in a manner or to an extent not considered in this opinion; (3) the agency action is subsequently modified in a manner that causes an effect to the listed species or designated critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease pending reinitiation.

Sincerely,

Larry E. Goldman
Field Supervisor

cc: SOUTHNAVFACENGCOM (ATTN: Mr. Richard Davis)
NAVSTA Pascagoula, MS (ATTN: Lt. Steve Bukoski)
MSCNWR (ATTN: Ms. Sabrina Keen, Refuge Manager)
FWS, Regional Office, Atlanta, GA (ATTN: Joe Johnston)
FWS, Solicitors Office, Atlanta, GA (ATTN: Mike Stevens)
FWS, Jackson, MS (ATTN: Linda LaClaire and Mike Dawson)

---

## LITERATURE CITED

Hereford, S. 2001. Personal communication. Biologist. Mississippi Sandhill Crane National Wildlife Refuge. Gautier, Mississippi.

Jackson County Planning Department. 2001. Personal communication. Jackson County, Mississippi.

Keen, S. 2001. Personal communication. Refuge manager. Mississippi Sandhill Crane National Wildlife Refuge. Gautier, Mississippi.

Seal, U.S., S. Hereford, and workshop participants. 1992. Mississippi Sandhill Crane (*Grus canadensis pulla*) Population and Habitat Viability Assessment Workshop Report. Pascagoula, MS. 146 pp.

U.S. Fish and Wildlife Service. 1977. Determination of critical habitat for Mississippi Sandhill Crane: Final Rulemaking. Federal Register 42: 39985-39988.

U.S. Fish and Wildlife Service. 1991. Mississippi Sandhill Crane (*Grus canadensis pulla*) Recovery Plan. U.S. Fish and Wildlife Service, Atlanta, Georgia. 42 pp.

# TAB NO. 2

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **SCHOONER HARBOR VENTURES, INC.** | **PLAINTIFF** |
| **V.** | **NO. 06-87 L** |
| **THE UNITED STATES OF AMERICA** | **DEFENDANT** |

**Honorable Marian Blank Horn**

**PLAINTIFF'S RESPONSE TO DEFENDANT'S FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS**

COMES NOW the Plaintiff, SCHOONER HARBOR VENTURES, INC., by and through its attorneys of record, Rushing & Guice, P.L.L.C., and files this its Answer to United States of America's First Set of Interrogatories and Document Requests as follows, to-wit:

I.

Plaintiff currently is pursuing an investigation of the facts and law relating to this case, and has not completed discovery or preparation for trial. Therefore, the responses (the "Responses") stated herein are given without prejudice to Plaintiff's right to produce evidence of subsequently discovered facts or to add, modify, or to otherwise change or amend the Responses herein. The information stated herein is true and correct to the best knowledge of Plaintiff as of the date of these Responses, and is subject to correction for inadvertent errors, mistakes, or omissions. These Responses are based on information presently available to Plaintiff.

II.

Furthermore, Plaintiff reserves the right to introduce at trial or deposition, or in opposition to any motion or proceeding, all information heretofore or hereafter produced by the parties in this action or by third parties. Plaintiff's Responses are without prejudice to its right to identify or produce at a later date any additional information that maybe discovered as a result of any subsequent investigation or review of documents or as a result of any subsequent review of

SHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
ILOXI, MS 39533-1925
228 374-2313

discovery. Plaintiff anticipates discovering and developing information between now and the time of trial that is not included in these Responses. Plaintiff does not waive its right to use such information at the time of trial or in connection with any motion or other proceeding.

III.

In addition, inadvertent identification or production of privileged information by Plaintiff in these Responses is not intended to be a waiver of any applicable privilege. Similarly, the production of such information is not intended to waive any objection to the admission of such information into evidence on motion or at time of trial.

IV.

Plaintiff is responding to Defendant's First Set of Discovery and to each Request therein as it interprets and understands those Requests. If Plaintiff subsequently asserts an interpretation of any Request that differs from the understanding of Plaintiff, Plaintiff reserves the right to supplement its objections and/or responses therein.

V.

Plaintiff makes these Responses solely for the purpose of, and in relation to, this action. Each Response herein is made subject to all appropriate objections (including, but not limited to, objections concerning competency, relevance, materiality, propriety, and admissibility) that would require the exclusion of any information or thing at the time of trial. All such objections and grounds therefore are reserved and may be interposed at the time of trial.

VI.

Plaintiff states that, except for facts explicitly admitted herein, no admission of any nature whatsoever is to be implied or inferred from these Responses. The fact that Plaintiff has responded to a Request should not be taken as an admission, or a concession of the existence, of any fact set

...SHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
...ILOXI, MS 39533-1925
228 374-2313

forth or assumed by such Request, that the information sought by the Request is relevant to this litigation or admissible, or that such Response constitutes evidence of any fact thus set forth or assumed.

## ANSWERS TO INTERROGATORIES

**Interrogatory 1:** For the property described in Paragraph V of Plaintiff's Complaint as approximately 75 acres of undeveloped land north of Interstate 10 on Highway 57 in Jackson County, Mississippi, ("property described in Paragraph V of Plaintiff's Complaint"), please provide the following information:

a. the price paid for the property by you;

b. the fair market value of the property at the date title was acquired by you;

c. specify any easements or rights of way related to the property, and identify all parties involved in those transactions; and

d. specify any reservations to a clear fee title that attaches or has attached to the property, including but not limited to the nature and date of each reservation.

**Response:**

a. Nine Hundred Sixty-Three Thousand Eight Hundred Two Dollars and Fifty-One Cents ($963,802.51)

b. Approximately One Million Six Hundred Sixty-Five Thousand Dollars ($1,665,000.00)

c. Singing River Electric Power Association 15 foot easement

d. None

**Interrogatory 2:** Please state with particularity all actions allegedly taken by defendant upon which you base your takings claim, the date such actions were taken, and every relevant fact on which your contention is based.

SHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

**<u>Response:</u>** On or about February 2001, it came to the attention of the Mississippi Sandhill Crane National Wildlife Refuge that the United States Navy was considering purchasing the Property to build a large housing development on the property formerly owned by the Plaintiff. On or about April 2001, the USFWS stated that there may be potential adverse impacts to the Sandhill crane, its habitat or the Mississippi Sandhill Crane National Wildlife Refuge resulting from the Plaintiff selling the Property to the United States Navy for the housing project. See letter from USFWS dated April 25, 2001.

In order to sell and fully benefit from the rights of ownership of the property at issue, conveyance of an off-site 77 acre property unto the Mississippi Sandhill Crane National Wildlife Refuge was required to serve as "setup" or "mitigation" for loss of the Sandhill Crane habitat on the property at issue, which would otherwise be lost and result in the invocation of an enforcement of certain sections of the Endangered Species Act as set forth in a letter from Larry Goldman, Field Supervisor, United States Fish & Wildlife Service dated August 3, 2001, and the USFSW's Biological Opinion dates February 12, 2002. On or about August 3, 2001, the United States Navy was advised by the USFWS to avoid the purchase of the Property.

The United States of America, Jackson County and the State of Mississippi and the public at-large have clearly benefitted from the activities of the Plaintiff with respect to the purchase and development of the Property in that the Property was purchased by the United States Navy for the express purpose of constituting a 188 family housing unit assigned to the Naval Station Pascagoula.

Thus the Plaintiff was required to sacrifice all economically beneficial use of the Property in the name of the common good. As a result of the USFWS' determination under the Endangered Species Act insofar as it establishes requirements for the development of critical habitats which preclude the development of the Property for any productive or beneficial use and which has denied

ISHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

the Plaintiff all economically viable use of the Property and interfered with the distinct investment backed expectations of the property and have affected the taking of the Plaintiff.

**Interrogatory 3:** From the date you acquired the property described in Paragraph V of Plaintiff's Complaint, state what efforts, if any, were made by you to sell the property, or any portion of the property, including but not limited to when such efforts were made, and if the property was not sold as a result of those efforts, describe in detail why the efforts did not result in a sale of the property.

**Response:** Schooner Harbor Ventures, Inc. entered into an option contract to purchase the property sometime in the year of 1998. Immediately upon entering into this contract, Schooner Harbor Ventures, Inc. formulated a plan to market it as an industrial park since it was zoned I-1 and I-2. Schooner Harbor Ventures, Inc. prepared a plan showing parcels and roadways and approached the Economic Director for Jackson County about advertising the property as such. This went on for over a year but Schooner Harbor Ventures, Inc. received very little response. Schooner Harbor Ventures, Inc. was then approached by Kelly Singleton wanting to purchase the property. A contract was signed with a number of contingencies. Schooner Harbor Ventures, Inc. then purchased the property on January 6, 2000 for Nine Hundred Sixty-Three Thousand Eight Hundred Two Dollars and Fifty-One Cents ($963,802.51).

The situation with Mr. Singleton got involved as he also entered into a contract with a developer of apartments to sell part of this land to them when he purchased the property from Schooner Harbor Ventures, Inc. Because of the expected use of the property as commercial and residential, Schooner Harbor Ventures, Inc. went to the County Planning Commission in an effort to rezone the property to residential - Planned Unit Development (PUD). This was successful. The

USHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

process with Mr. Singleton continued for about two years with efforts to satisfy all of the contingencies involving providing water and sewer to the property.

In the meantime Schooner Harbor Ventures, Inc. entered into a contract with the Jackson County Port Authority to provide sewer to the property through a State Revolving Loan Program. The Authority would be responsible for building the project and Schooner Harbor Ventures, Inc. would reimburse the Authority each month for the payments to the State. This project was completed and sewer was run from the existing Industrial Park to the property. Schooner Harbor Ventures, Inc. then started paying the Port Authority about Eighteen Hundred Dollars ($1800.00) per month as per the agreement. On July 17, 2000, Schooner Harbor Ventures, Inc. sold 3.12 acres to BPI enterprises, Inc. for One Hundred Eighty Thousand Dollars ($180,000.00), On August 8, 2000, Schooner Harbor Ventures, Inc. sold 2.0 acres to Allan Brislin for One Hundred Thousand Dollars ($100,000.00) and 3.03 acres to Landall for One Hundred Fifty Thousand Dollars ($150,000.00).

Schooner Harbor Ventures, Inc. continued the process of resolving the contingencies with the Singleton contract. Water supply became an issue because the Port Authority could not get funds through the State to extend the water system because there was no existing development to serve. No water to the property would have killed the sale to Singleton as the lender for the apartment project required that an adequate water supply for domestic and fire purposes be available. Since the Port Authority failed to come through, Schooner Harbor Ventures, Inc. went to the bank and borrowed Two Hundred Fifty Thousand Dollars ($250,000.00) to construct a water well and tank to serve the property. Schooner Harbor Ventures, Inc. also entered into a contract with a contractor to improve and extend an existing road along the South property line to the East as part of one of the contingencies in the contract with Singleton. This cost about Sixty Thousand Dollars ($60,000.00).

ISHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

Schooner Harbor Ventures, Inc. continued working with Singleton but he was never satisfied that all of the contingencies were resolved and therefore did not close on the sale. The contract was considered void because it went past the time limitation originally set. This resulted in a lawsuit being filed by Singleton against Schooner Harbor Ventures, Inc.

Eventually, the Navy approached Schooner Harbor Ventures, Inc. about purchasing the property for a site to provide housing for its service people. This continued for about a year, during which time the Crane Refuge wrote a letter to the Navy telling them that Schooner Harbor Ventures, Inc.'s property was considered as critical habitat. This caused the Navy to reconsider Schooner Harbor Ventures, Inc.'s property and to turn to their number two site. Schooner Harbor Ventures, Inc. turned to everybody it could think of for help including Senator Trent Lott and Congressman Gene Taylor. The bank had already given Schooner Harbor Ventures, Inc. an extension on the loan but time was running out and they were about to foreclose on the property.

Schooner Harbor Ventures, Inc. entered into discussion with the Crane people about what to do about the situation. Crane told Schooner Harbor Ventures, Inc. that they had a list of properties that they wanted to acquire but did not have the money. What it all boiled down to was that Crane would allow Schooner Harbor Ventures, Inc. to use its property if it would purchase one of the other properties they wanted and give it to them. Schooner Harbor Ventures, Inc. hired a real estate person to find and negotiate a deal for one of these parcels. This process was concluded when Schooner Harbor Ventures, Inc. purchased a parcel for Three Hundred Thousand Dollars ($300,000.00), paid a finder's fee to the real estate person, and sold the property to the Navy on May 3, 2002 for $1.9 Million Dollars.

**Interrogatory 4:** State the factual basis for Plaintiff's claim as set forth in Paragraphs X, XI, XVI, and XX of Plaintiff's Complaint that it was required to purchase and convey off-site or

JSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

mitigation property to the Mississippi Sandhill Crane National Wildlife Refuge in order to sell the property described in Paragraph V of Plaintiff's Complaint.

**Response:** On or about April 2001, the USFWS stated that there may be potential adverse impacts to the Sandhill crane, its habitat or the Mississippi Sandhill Crane National Wildlife Refuge resulting from the Plaintiff selling the Property to the United States Navy for the housing project. See letter from USFWS dates April 25, 2001. In order to sell and fully benefit from the rights of ownership of the property at issue, conveyance of an off-site 77 acre property unto the Mississippi Sandhill Crane National Wildlife Refuge was required to serve as "setup" or "mitigation" for loss of the Sandhill Crane habitat on the property at issue, which would otherwise be lost and result in the invocation of an enforcement of certain sections of the Endangered Species Act as set forth in a letter from Larry Goldman, Field Supervisor, United States Fish & Wildlife Service dated August 3, 2001, and the USFSW's Biological Opinion dates February 12, 2002.

**Interrogatory 5:** Please provide the legal description of the property you contend was taken by Defendant.

**Response:**

> A parcel of land situated in the Southeast 1/4 of the Northeast 1/4 of Section 7, the Northeast 1/4 of the Southeast 1/4 of Section 7, the Southwest 1/4 of the Northwest 1/4 of Section 8, and in the Northwest 1/4 of the Southwest 1/4 of Section 8, all in Township 7 South, Range 7 West, Jackson County, Mississippi, and being more particularly described as follows:
>
> Beginning at a concrete monument found at the Northeast corner of the Southeast 1/4 of the Northeast 1/4 of said Section 7, (Mississippi State Plane Coordinates - North 346921.24, East 1021361.34); Thence South 89 degrees 48 minutes 06 seconds West 278.25 feet to a ½" iron rod (North 346918.54, East 1021083.11); Thence South 00 degrees 10 minutes 57 seconds east 654.26 feet to a concrete monument (North 346264.31, East 1021089.28); Thence south 89 degrees 48 minutes 06 seconds West 644.67 feet to a concrete monument lying on the east margin of Mississippi Highway 57

JSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

(North 346258.05, East 1020444.64); Thence along said East margin of Mississippi Highway 57, South 03 degrees 25 minutes 22 seconds East 166.21' to a ½" iron rod (North 346092.20, East 10204555.60); Thence further along said East margin of Mississippi Highway 57, South 04 degrees 20 minutes 47 seconds East 583.79 feet to a concrete monument (North 345510.38, East 1020503.48); Thence North 85 degrees 39 minutes 13 seconds East 300.00 feet to a concrete monument (North 345534.98, East 1020802.47); Thence South 04 degrees 20 minutes 47 seconds East 730.95 feet to a concrete monument (North 344806.50, East 1020862.41); Thence South 85 degrees 39 minutes 13 seconds West 300.00 feet to a ½" iron rod lying on the East margin of Mississippi Highway 57 (North 344781.89, East 1020563.42); Thence along said East margin of Mississippi Highway 57, South 04 degrees 20 minutes 47 seconds East 50 feet to a ½" iron rod (North 344732.06, East 1020567.52); Thence North 85 degrees 39 minutes 13 seconds East 330.00 feet to a concrete monument (North 344759.12, East 1020896.41); Thence South 04 degrees 11 minutes 12 seconds East 80.00 feet to a ½" iron rod (North 344679.38, East 1020902.75); Thence South 85 degrees 39 minutes 13 seconds West 30.00 feet to a ½" iron rod (North 344676.92, East 1020872.85); Thence South 04 degrees 11 minutes 12 seconds East 387.94 feet t o a concrete monument lying on the North margin of Robinson Still Road (North 344290.20, East 1020903.59); Thence along said North margin of Robinson Still Road, South 88 degrees 59 minutes 49 seconds East 142.88 feet to a ½" iron rod (North 344288.59, East 1021046.46); Thence further along said North margin, North 89 degrees 02 minutes 28 seconds East 231.39 feet to a ½" iron rod (North 344293.90, East 1021277.79); Thence further along said North margin, North 85 degrees 49 minutes 39 seconds East 100.08 feet to a ½" iron rod (North 344301.81, East 1021377.56); Thence further along said North margin, south 10.02 feet to a ½" iron rod (North 344291.79, East 1021377.62); Thence further along said North margin, North 85 degrees 49 minutes 39 seconds East 92.25 feet to a ½" iron rod (North 344299.08, East 1021469.58); Thence further along said North margin,, South 89 degrees 50 minutes 39 seconds East 576.77 feet to a concrete monument (North 344301.11, East 1022046.35); Thence North 2627.80 feet to a ½" iron rod (North 346928.86, East 1022029.94); Thence South 89 degrees 42 minutes 18 seconds West 668.63 feet to the point of beginning, containing 74.64 acres or 3,251,430 square feet.

JSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

**Interrogatory 6:** For the property you contend was taken by Defendant, please provide a precise description of the interest in that property you contend was taken by Defendant, including but not limited to:

a. the type of property interest allegedly taken (for example, fee simple or easement);

b. the date (include month, day and year) on which the interest was allegedly taken;

c. whether you are claiming a permanent or temporary taking;

d. whether you are claiming a physical or regulatory taking; and

e. the factual basis for determining your answers to Interrogatory 6 (a) - (d).

**Response:**

a. Fee simple

b. August 3, 2001 as this was the date The US Fish and Wildlife Service recommended that the Navy avoid the property of the Plaintiff and that if the property was to be purchased mitigation land would be required.

c. Permanent

d. Regulatory taking as the Plaintiff purchased the subject property with the expectation of future development and the government's regulatory restraint interfered with Plaintiff's investment-backed expectations.

**Interrogatory 7:** For the property you contend was taken by defendant, please provide the following information:

a. the fair market value of the property prior to the date that the property interest identified in response to Interrogatory 6(a) was allegedly taken;

b. the fair market value of the property after the date that the property interest identified in response to Interrogatory 6(a) was allegedly taken;

c. the factual basis for determining the fair market value prior to the alleged date of taking identified in response to Interrogatory 6(b); and

d. the factual basis for determining the fair market value after the alleged date of taking identified in response to Interrogatory 6(b).

USHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

**Response:** Plaintiff has not received the appraisal report from its expert witness. Plaintiff will forward all appraisals as they are received. Plaintiff reserves the right to supplement this request.

**Interrogatory 8:** Regarding the three (3) parcels labeled **"SOLD"** and located east of Mississippi Highway 57 as depicted on page 2 of Exhibit H produced with Plaintiff's Initial Disclosures, please provide the following information:

a. all persons involved in the transaction(s) selling the parcels, including but not limited to the person acquiring ownership of the parcels; and

b. the consideration paid for the parcels.

**Response:**

1. a. Allen L. Brislin 2.0 acres
   b. One Hundred Thousand Dollars ($100,000.00)

2. a. Landall, LLC 3.0 acres
   b. One Hundred Fifty Thousand Dollars ($150,000.00)

3. a. BPI Enterprises, Inc. 3.12 acres
   b. One Hundred Eighty Thousand Dollars ($180,000.00)

**Interrogatory 9:** Please identify each and every legal, regulatory, or administrative action, application, process or procedure (including but not limited to permits, development plans, etc.) related to the property described in Paragraph V of Plaintiff's Complaint (other than this litigation).

**Response:** Environmental Assessment; Comments in accordance with the Fish and Wildlife Coordination Act (48 Stat. 401, as amended; 16 USC *et. seq.*) and the Endangered Species Act of 1973 (87 Stat. 884, as amended; 16 USC 1531 *et seq.*); Requirement to obtain mitigation land in order to sell subject property.

**Interrogatory 10:** For the property referenced in Paragraph V of Plaintiff's Complaint, the off-site 77 acre property referenced in Paragraph X of Plaintiff's Complaint, and for any other

SHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

property considered for purchase and conveyance by Plaintiff to serve as "setup" or "mitigation," please list every appraisal that has been conducted or is being conducted, including the reason for each appraisal, and the name, address, and occupation of each appraiser.

**Response:** No appraisals have been or are being conducted of any property considered for mitigation.

**Interrogatory 11:** With respect to trial of this case, identify each person, corporation, partnership, or other entity that has volunteered or that Plaintiff has retained to assist in this litigation.

**Response:** John Myers, Appraiser, 622 Washington Avenue, Ocean Springs, Mississippi, 39564, Phone 228-872-2857.

**Interrogatory 12:** Please identify all persons having information used to respond to any of these Interrogatories, specifying the Interrogatory(ies) for which such persons provided information.

**Response:** Larry Rumsey and Steven Carter of Schooner Harbor Ventures, Inc. responded to each of the above interrogatories.

## RESPONSE TO DOCUMENT REQUESTS

**Request 1:** Produce all documents or other tangible things identified, related, or referred to in Defendant's First Set of Interrogatories.

**Response:**

1. Letter from Larry Goldman dated August 3, 2001, previously produced.
2. Letter from Sabrina Keen dated April 25, 2001, previously produced.
3. USFSW's Biographical Opinion dates February 12, 2002, previously produced.
4. Option for Exchange/Conveyance of Real Property, previously produced.
5. Survey of property at issue, previously produced.

ISHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

**Response:** Plaintiff did not obtain any appraisals for property considered for mitigation.

**Request 18:** Produce all appraisals of any property considered by Plaintiff for purchase and conveyance as "setup" or "mitigation" property.

**Response:** Plaintiff did not obtain any appraisals for property considered for mitigation.

Respectfully submitted, this the 14th day of September, 2006.

**SCHOONER HARBOR VENTURES, INC.**
**Plaintiff**

**By:** ______________________
**WILLIAM LEE GUICE III**
**MS BAR NO. 5059**
**RUSHING & GUICE, P.L.L.C.**
**P. O. BOX 1925**
**BILOXI, MS 39533-1925**
**228-875-5263 VOICE**
**228-875-5987 FAX**

**CERTIFICATE OF SERVICE**

I, William Lee Guice III, attorney for Plaintiff, hereby certify that I have forwarded by United States mail, postage pre-paid, a true and correct copy of the above and foregoing document to the following persons:

KELLIE S. ACOCK, ESQ.
UNITED STATES DEPT. OF JUSTICE
P. O. BOX 663
WASHINGTON, DC 20044-0663

So certified, this the 14th day of September, 2006.

______________________
**WILLIAM LEE GUICE III**

JSHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

**AFFIDAVIT**

**STATE OF MISSISSIPPI**

**COUNTY OF JACKSON**

HAVING COME BEFORE ME on this the 14th day of September, 2006, and being first duly sworn by me, the undersigned authority, Notary Public in and for said county and state, STEVEN CARTER, President of SCHOONER HARBOR VENTURES, INC., who after being authorized to do so, did upon oath state that he has read the foregoing PLAINTIFF'S ANSWER TO FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS in this matter and that all statements of fact contained herein are true and correct to the best of his knowledge.

**STEVEN CARTER**

SWORN TO AND SUBSCRIBED BEFORE ME, this the 14th day of September, 2006.

**NOTARY PUBLIC**

My Commission Expires:

MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES MARCH 30, 2010
BONDED THRU STEGALL NOTARY SERVICE

USHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313

**AFFIDAVIT**

**STATE OF MISSISSIPPI**

**COUNTY OF JACKSON**

HAVING COME BEFORE ME on this the 14th day of September, 2006, and being first duly sworn by me, the undersigned authority, Notary Public in and for said county and state, LARRY RUMSEY, Secretary/Treas. of SCHOONER HARBOR VENTURES, INC., who after being authorized to do so, did upon oath state that he has read the foregoing PLAINTIFF'S ANSWER TO FIRST SET OF INTERROGATORIES AND DOCUMENT REQUESTS in this matter and that all statements of fact contained herein are true and correct to the best of his knowledge.

[signature]
**LARRY RUMSEY**

SWORN TO AND SUBSCRIBED BEFORE ME, this the 14th day of September, 2006.

[signature] Saundra L. Seymour
**NOTARY PUBLIC**

My Commission Expires:
MISSISSIPPI STATEWIDE NOTARY PUBLIC
MY COMMISSION EXPIRES OCT 6, 2009
BONDED THRU STEGALL NOTARY SERVICE

ISHING & GUICE, P.L.L.C.
ATTORNEYS AT LAW
P.O. BOX 1925
BILOXI, MS 39533-1925
228 374-2313