# TAB NO. 27

## CHAPTER X—INTERSTATE COMMERCE COMMISSION

### SUBCHAPTER A—GENERAL RULES AND REGULATIONS

[Service Order No. 1271]

### PART 1033—CAR SERVICE

### Distribution of Freight Cars

AGENCY: Interstate Commerce Commission.

ACTION: Emergency order (Service Order No. 1271).

SUMMARY: There is a shortage of high capacity cars for transporting bulk shipments of fertilizer, grain, grain products, soybeans or soybeans products at stations on the Union Pacific Railroad. Simultaneously there is a surplus of smaller capacity cars suitable, except for size, for transporting such freight. Service Order No. 1771 authorizes the Union Pacific to substitute sufficient smaller cars for larger cars ordered to transport the shipment offered regardless of tariff requirements, requiring the use of the larger cars. Consent of the shipper is required before any substitution is made.

DATES: Effective August 3, 1977. Expires October 31, 1977.

FOR FURTHER INFORMATION CONTACT:

C. C. Robinson, Chief, Utilization and Distribution Branch, Interstate Commerce Commission, Washington, D.C. 20423. Telephone 202-275-7840, Telex 89-2742.

SUPPLEMENTAL INFORMATION: The order is printed in full below.

At a Session of the Interstate Commerce Commission, Railroad Service Board, held in Washington, D.C., on the 2nd day of August, 1977.

*It appearing*, That there is an acute shortage of freight cars on the Union Pacific Railroad Company for transporting shipments of fertilizer, grain, grain products, soybeans or soybean products; that certain tariff provisions require the use of cars of specified cubic or weight carrying capacities; that the carrier is unable to furnish sufficient such cars to transport shipments of such weights; that cars of lesser capacity are available; that such cars cannot be used because of certain tariff provisions; that there is immediate need to use every available car for transportation of these products; that the inability of the carrier to furnish sufficient large-capacity cars results in great economic loss; and that present regulations and practices with respect to the use, supply, control, movement, and distribution of freight cars are ineffective. It is the opinion of the Commission that an emergency exists requiring immediate action to promote car service in the interest of the public and the commerce of the people. Accordingly, the Commission finds that notice and public procedure are impracticable and contrary to the public interest, and that good cause exists for making this order effective upon less than thirty days' notice.

*It is ordered*, That:

**§ 1033.1271 Distribution of freight cars.**

(a) Subject to the concurrence of the shipper, the Union Pacific Railroad Company may substitute a sufficient number of smaller cars for larger cars ordered to transport shipments of fertilizer, grain, grain products, soybeans or soybean products regardless of tariff requirements specifying minimum cubic or weight carrying capacity. (See exceptions (b) and (c).)

(b) *Exception*. This order shall not apply to shipments subject to tariff provisions requiring the use of twenty-five or more cars per shipment.

(c) *Exception*. This order shall not apply to shipments subject to tariff provisions which require that cars be furnished by the shipper.

(d) *Rates and Minimum Weights Applicable*. The rates to be applied and the minimum weights applicable to shipments for which cars smaller than those ordered have been furnished and loaded as authorized by section (a) of this order shall be the rates and minimum weights applicable to the larger cars ordered.

(e) *Billing to be Endorsed*. The carrier substituting smaller cars for larger cars as authorized by section (a) of this order shall place the following endorsement on the bill of lading and on the waybills authorizing movement of the car:

Car of (______) cu. ft. and of (______) lbs. or greater capacity ordered. Smaller cars furnished authority ICC Service Order No. 1271.

(f) *Concurrence of Shipper Required*. Smaller cars shall not be furnished in lieu of cars of greater capacity without the consent of the shipper.

(g) *Exceptions*. Exceptions to this order may be authorized to railroads by the Railroad Service Board, Washington, D.C. 20423. Requests for such exception must be submitted in writing, or confirmed in writing, and must clearly state the points at which such exceptions are requested and the reason therefor.

(h) *Rules and Regulations Suspended*. The operation of all rules, regulations, or tariff provisions is suspended insofar as they conflict with the provisions of this order.

(i) *Application*. The provisions of this order shall apply to intrastate, interstate, and foreign commerce.

(j) *Effective date*. This order shall become effective at 12:01 a.m., August 3, 1977.

(k) *Expiration date*. This order shall expire at 11:59 p.m., October 31, 1977, unless otherwise modified, changed, or suspended by order of this Commission.

(Secs. 1, 12, 15, and 17(2), 24 Stat. 379, 383, 384, as amended; 49 U.S.C. 1, 12, 15, and 17(2). Interprets or applies Secs. 1(10-17), 15(4), and 17(2), 40 Stat. 101, as amended, 54 Stat. 911 49 U.S.C. 1(10-17), 15(4), and 17(2).)

*It is further ordered*, That, a copy of this order and direction shall be served upon the Association of American Railroads, Car Service Division, as agent of all railroads subscribing to the car service and car hire agreement under the terms of that agreement, and upon the American Short Line Railroad Association; and that notice of this order be given to the general public by depositing a copy in the Office of the Secretary of the Commission at Washington, D.C., and by filing it with the Director, Office of the Federal Register.

By the Commission, Railroad Service Board, members Joel E. Burns, Robert S. Turkington, and John R. Michael. Member Robert S. Turkington not participating.

H. G. HOMME, Jr.,
*Acting Secretary*.

[FR Doc.77-22768 Filed 8-5-77;8:45 am]

---

### SUBCHAPTER B—PRACTICE AND PROCEDURES

[Ex Parte No. 327]

### PART 1109—REQUIREMENTS AND PROCEDURES RELATING TO RAILROAD REVITALIZATION AND REGULATORY REFORM ACT OF 1976

### Rate Incentives for Capital Investment

AGENCY: Interstate Commerce Commission.

ACTION: Correction.

SUMMARY: In the above captioned proceeding published at 42 FR, June 22, 1977, page 31602, the authority citation was inadvertently omitted. This correction is to show the proper authority citation.

FOR FURTHER INFORMATION CONTACT:

Mrs. Janice M. Rosenak, Deputy Director, Section of Rates, Interstate Commerce Commission, Washington, D.C. 20423. Phone No. 202-275-7428.

SUPPLEMENTARY INFORMATION: The above captioned document was issued under: Section 206 of the Railroad Revitalization and Regulatory Reform Act; Section 15(19) of the Interstate Commerce Act—49 U.S.C. 15(19), Public Law 94-210 and 5 U.S.C. 553 and 559, Administrative Procedure Act.

H. G. HOMME, Jr.,
*Acting Secretary*.

[FR Doc.77-22770 Filed 8-5-77;8:45 am]

---

## Title 50—Wildlife and Fisheries

## CHAPTER I—UNITED STATES FISH AND WILDLIFE SERVICE, DEPARTMENT OF THE INTERIOR

### Subchapter B—Taking, Possession, Transportation, Sale, Purchase, Barter, Exportation and Importation of Wildlife

### PART 17—ENDANGERED AND THREATENED WILDLIFE AND PLANTS

### Determination of Critical Habitat for Mississippi Sandhill Crane

AGENCY: U.S. Fish and Wildlife Service.

ACTION: Final rulemaking.

SUMMARY: The Director, U.S. Fish and Wildlife Service (hereinafter, the Director and the Service, respectively) hereby issues a rulemaking which determines Critical Habitat for the Mississippi sandhill crane (*Grus canadensis*

*pulla*). This rulemaking is issued pursuant to Section 7 of the Endangered Species Act of 1973 (16 U.S.C. 1531–1543; 87 Stat. 884; hereinafter the Act). In accordance with Section 7, all Federal agencies will be required to insure that actions authorized, funded, or carried out by them do not adversely affect this Critical Habitat.

EFFECTIVE DATE: September 7, 1977.

FOR FURTHER INFORMATION CONTACT:

Mr. Keith M. Schreiner, Associate Director, Federal Assistance, Fish and Wildlife Service, U.S. Department of the Interior, Washington, D.C. 20240 (202-343-4646).

SUPPLEMENTARY INFORMATION:

BACKGROUND

In the FEDERAL REGISTER of September 3, 1975 (40 FR 40521–40522), the Fish and Wildlife Service published a proposed determination of Critical Habitat for the Mississippi sandhill crane (*Grus canadensis pulla*). This Critical Habitat was described as being a five-sided area of land, water, and airspace in Jackson County, Mississippi, between the West Pascagoula River and the Jackson-Harrison County line, and bounded by the following coordinates: 30°33′ N 88°37′ W, 30°25′ N 88°37′ W, 30°22′ N 88°44′ W, 30°29′ N 88°51′ W, 30°33′ N 88°51′ W.

SUMMARY OF COMMENTS

The Governor of Mississippi expressed opposition to the designation of the entire proposed area as Critical Habitat, though he indicated that a smaller area might be acceptable. Also opposing the designation as proposed were 15 local governmental and commercial organizations, and approximately 477 private citizens, most of whom had signed petitions on the matter.

The Mississippi Game and Fish Commission responded favorably to a determination of Critical Habitat which would assist in the preservation of the Mississippi sandhill crane, but did not comment on the necessity of including the entire proposed area. Also favoring the proposal in general were eight major National and local conservation organizations, including Monitor, Inc., which expressed the views of 14 additional organizations; and 26 private citizens. The U.S. Forest Service concurred that the approximately 150 acres of land administered by it within the designated area should be included as Critical Habitat. The Mississippi Wildlife Federation favored the designation of a smaller area as Critical Habitat. Approximately ten other parties wrote to provide or request information, without indicating a position on the matter.

BASIS FOR DETERMINATION

The proposal of September 3, 1975, involved a relatively large area which corresponded roughly to the overall range of the Mississippi sandhill crane. The same area had been determined to be Critical Habitat in an emergency rulemaking published on June 30, 1975 (40 FR 27501–27502). The area delineated below in the final determination of Critical Habitat represents a considerable reduction. The decision to make this reduction was based on a more thorough assessment of available biological data, particularly that provided by the Mississippi Sandhill Crane Recovery Team. After reviewing this information, it became apparent that much of the land area in the original proposal is of little or no known use to the crane. There are winter feeding sites in farmland to the north of the Critical Habitat zones delineated below, but these sites are scattered over a large area, and their use by the cranes varies with the crops and other factors. Nonetheless, all Federal agencies should be aware of the presence of the feeding sites and other areas of sporadic, but possibly important use, within the overall zone originally proposed in the FEDERAL REGISTER of September 3, 1975, as described above and bounded by the following coordinates: 30°33′ N 88°37′ W, 30°25′ N 88°37′ W, 30°22′ N 88°44′ W, 30°29′ N 88°51′ W, 30°33′ N 88°51′ W. Federal agencies are required by Section 7 of the Endangered Species Act of 1973 to insure that their actions do not jeopardize the continued existence of Endangered species, and this requirement should be considered with respect to any actions within or near the area delineated above.

The Critical Habitat areas delineated below include all known breeding, summer feeding, and roosting sites of the Mississippi sandhill crane. Also included are the flight paths connecting the more important sites. At present these areas are the only ones that can be said with certainty to be necessary for the survival and recovery of the crane, and that can be specifically delineated as Critical Habitat. Should more precise information become available regarding other sites within the originally proposed zone, or should range expansions or reintroductions of the crane occur, the recognized Critical Habitat could be increased.

EFFECTS OF THE RULEMAKING

Most of the persons who commented on the proposal apparently were confused regarding the meaning and implications of a Critical Habitat designation. For example, many persons expressed concern that the designation would automatically halt or greatly restrict all human activities and development within the entire designated area. Many

seemed to think that Section 7 provisions would apply to the actions of all parties, not just Federal agencies. Perhaps most unfortunately, many persons apparently thought that the Fish and Wildlife Service could arbitrarily determine or not determine, enlarge or reduce a Critical Habitat area based on non-biological factors.

It should be realized that Critical Habitat is not created by a government agency; it already exists in nature, and in most cases has existed for countless centuries. All species of wildlife have their own Critical Habitat, a term which has been interpreted (40 FR 17764 as meaning habitat necessary to the normal needs or survival of a species. Although such habitat does exist, its precise location and perimeters are not generally known to the public and government agencies. The function of the Fish and Wildlife Service is to biologically delineate such habitat, with easily identified boundaries, so that other Federal agencies may conveniently refer to this information in following their responsibilities under Section 7. Although disagreements may arise regarding what habitat is actually necessary for a species, or how to most accurately delineate an area, the final determination must express a consensus of the best biological information that is available.

A Critical Habitat designation points out specific areas within the United States where Federal agencies may have to assess their actions relative to possible effects on Endangered species. This requirement itself is the only direct meaning of a Critical Habitat determination. No specific kinds of actions would be affected, regardless of the extent of the Critical Habitat, unless such actions actually could be considered detrimental to the species involved. For more information, please contact the "Proposed Provisions for Interagency Cooperation" in the FEDERAL REGISTER of January 26, 1977.

NATIONAL ENVIRONMENTAL POLICY ACT

An environmental assessment has been prepared and is on file in the Service's Office of Endangered Species in Washington, D.C. The assessment is the basis for a decision that the determinations of this rulemaking are not major Federal actions that would significantly affect the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.

FINAL RULEMAKING

The Director has considered all comments and data submitted in response to the proposed determination of Critical Habitat for the Mississippi sandhill crane. The Director also has considered other information received by the Service, both prior to and subsequent to the publication of the proposed Critical Habitat determination in the FEDERAL REGISTER of September 3, 1975. Based on this review, the areas delineated below are determined to be Critical Habitat for the Mississippi sandhill crane.

This rulemaking is issued under the authority contained in the Endangered Species Act of 1973 (16 U.S.C. 1531–1543; 87 Stat. 884), and was prepared by Dr. Ronald M. Nowak, Office of Endangered Species.

NOTE.—The Fish and Wildlife Service has determined that this document does not contain a major proposal requiring preparation of an Economic Impact Statement under Executive Order 11949 and OMB Circular A-107.

Dated: July 29, 1977.

LYNN A. GREENWALT,
*Director,*
*Fish and Wildlife Service.*

Accordingly, § 17.95(b), Part 17, Subpart I, Title 50 of the Code of Federal Regulations is amended by adding the following Critical Habitat description after the Critical Habitat description for the American peregrine falcon.

**Subpart I—Interagency Cooperation**

**§ 17.95 Critical Habitat—Fish and Wildlife.**

* * * * *

(b) Birds.

* * * * *

Mississippi Sandhill Crane (*Grus canadensis pulla*).

MISSISSIPPI. Areas of land, water, and airspace in Jackson County, with the following components (St. Stephens Base Meridian): T6S R6W Sec. 31; T6S R7W E½ of E½ Sec. 34, Sec. 35–36, S½ Sec. 32; T6S R8W Sec. 27, those portions of Sec. 28–31 south of Seaman Road, Sec. 32–34; T7S R6W N½ of N½ Sec. 3, Sec. 6; T7S R7W Sec. 2–11, Sec. 13–16, Sec. 20–22, W½ Sec. 23, W½ of E½ Sec. 23, NE¼ of NE¼ Sec. 23, N½ of N½ Sec. 24, that portion of the SW¼ of SW¼ Sec. 30 south of the Louisville and Nashville Railroad, W½ of W½ Sec. 31, W½ Sec. 37, that portion of the E½ Sec. 37 north of U.S. Interstate Highway 10; T7S R8W Sec. 1–3, that portion of Sec. 4 north of U.S. Interstate Highway 10, Sec. 5–6, those portions of Sec. 7–8 north of U.S. Interstate Highway 10, Sec. 10–12, W½ of W½ Sec. 14, Sec. 15, that portion of Sec. 25 south of the Louisville and Nashville Railroad, that portion of the SE¼ of Sec. 26 south of the Louisville and Nashville Railroad and southeast of Davis Bayou, N½ of NE¼ Sec. 35, Sec. 36.

Case 1:06-cv-00087-MBH Document 19-11 Filed 07/25/2007 Page 5 of 19






[FR Doc.77-22722 Filed 8-5-77;8:45 am]

# TAB NO. 28




- Visitor Center
- The Cranes
- Carnivorous Plants
- What's New?
- Refuge Habitats
- Management
- Staff & Volunteers
- Related Sites

**The Visitor Center is closed due to construction of New Visitor Center**
**Tentative Opening September 2007**

The Mississippi Sandhill Crane National Wildlife Refuge is one of more than 500 national wildlife refuges administered by the U.S. Fish and Wildlife Service. It was established in 1975 to safeguard the critically endangered Mississippi sandhill crane and its unique disappearing habitat.

The refuge consists of more than 19,000 acres in four units and is now part of the Gulf Coast National Wildlife Refuge Complex. The Refuge Complex Manager also administers Grand Bay National Wildlife Refuge (Mississippi/Alabama) and Bon Secour National Wildlife Refuge (Alabama).

The refuge objectives are to:
(1) provide protection and management for the cranes,
(2) protect and preserve unique wet pine savanna communities, and
(3) provide environmental education, interpretation, and wildlife-oriented recreation.

Our refuge bird checklist is now updated and online!

Please see our tribute to Jake Valentine 1917-2000, "father" of the refuge.

For more information, contact:
Refuge Complex Manager, Mississippi Sandhill Crane NWR,
7200 Crane Lane, Gautier, MS, 39553

Phone: (228) 497-6322

e-mail: MississippiSandhillCrane@fws.gov

This site was created by the National Wetlands Research Center, Lafayette, LA. and is maintained by Mississippi Sandhill Crane NWR.

Home - - Visitor Center - - The Cranes - - Carnivorous Plants - - What's New?

Refuge Habitats - - Management - - Staff & Volunteers - - Related Sites

Region 4 Southeast Region **U.S. Fish & Wildlife Service, Southeast Region Home Page**

# TAB NO. 29

# Schooner Harbor Ventures, Inc.

A Land Company

910 Howard Avenue, Biloxi, MS 39530
Tel: (228) 432-9344 ♦ Fax (228) 432-1189
e mail: roni@rumsey engineering.com

March 28, 2002

Honorable Congressman Gene Taylor
2424 14th Street
Gulfport, MS 39501

Attn: Beau Gex, District Chief of Staff

Re: Naval Station Pascagoula Housing Project, Jackson County, MS

Subject: Status of Project

Dear Mr. Gex:

I appreciate the time you spent with me last night at the town meeting in D'Iberville discussing this important project. To bring you up to date, a short review would be in order.

Around July of last year the U.S. Navy contacted us (Schooner Harbor Ventures, Inc. ) concerning the purchase of approximately 75 acres of land we own on Highway 57 just North of I-10 in Jackson County. The Navy plans to construct a family housing project on this property for its personnel stationed at the Naval Station. They have identified this site as Site 28. Since this date, the following has occurred:

1. A boundary and topographic survey and title work has been conducted on the property.

2. Soil investigations have been conducted by a private geotechnical firm.

2. An Architect has been utilized to evaluate various factors of the site.

3. A environmental review of the site has been conducted by Ecology and Environment, Inc. ( a private environmental consultant).

4. A Biological Opinion has been conducted by the U.S. fish and Wildlife Service with a favorable opinion being rendered.

Pascagoula Naval Station Family Housing, Jackson County, MS
March 28, 2002
Page -2-

5. An Archaeological and "Cultural Resource Survey has been conducted by a private consultant.

6. We have basically negotiated a price with the Real Estate division in Charleston although an official offer has not been received.

7. The Navy has requested RFP's ( Request For Proposals ) from design build firms who have visited the site to prepare their proposals.

8. The Commanding Officer of the Pascagoula Naval Station, Lt. Commander T.L. LaCavera has signed off on the Final Environmental Assessment and written a letter recommending this site and forwarded these documents to the Commander in Chief, U.S. Atlantic Fleet (N4654) via the Commander, Navy Region Southeast (N46E4).

During this time we have been in constant contact with the Southern Division, Naval Facilities Engineering Command in Charleston, specifically the environmental and real estate division. The people in these divisions, Mr. Davis and Mr. Bartlett have been extremely courteous and helpful throughout this process. At this time, it is our understanding that the final package with a request for a Finding of No Significant Impact ( FONZI ) has been sent to Washington and now is in the office of the Commander in Chief, U.S. Atlantic Fleet for final signature and approval. Schooner Harbor Ventures, Inc., as owners of the land, have had to negotiate and enter into contracts with other private property owners to purchase land as offsite mitigation for this project. These contracts involve time limitations.

Mr. Gex, we are anxious as to the timetable for completion of this process because of these time limitations. We would appreciate any efforts you can make on our behalf to find out when this process might come to a conclusion.

Sincerely,
SCHOONER HARBOR VENTURES, INC.

Lawrence C. Rumsey, Vice President

# TAB NO. 30

# Schooner Harbor Ventures, Inc.

A Land Company

910 Howard Avenue, Biloxi, MS 39530
Tel: (228) 432-9344 ♦ Fax (228) 432-1189
e mail: rcei@rumsey engineering.com

July 9, 2001

SOUTHNAVSACENGECOM
Attn: Code 064, Richard Davis
P.O. Box 190010
2155 Eagle Drive
North Charleston, SC 29419-9010

Re: Property Located on Highway 57, 0.3 Miles North of I-10, Jackson County, MS (Site 28)

Subject: Impacts to Sandhill Cranes, Ref. Letter of April 25, 2001 from U.S. Fish and Wildlife

Dear Mr. Davis:

We are writing this letter is response to written comments from Sabrina Keen, Refuge Manager of the Mississippi Sandhill Crane Refuge in Gautier, MS., specifically the letter dated April 25, 2001.

Please be advised that Schooner Harbor Ventures, Inc. has met with Ms. Keen and a biologist from their Daphne, AL office regarding their concerns with possible impacts to the Sandhill Crane by development of the 80 acres just West and adjacent to their refuge. It is our understanding that the Navy is considering this property for a future residential development and Ms. Keen, in response to your request, has expressed concerns about effects on the use of this property as it is considered as critical habitat by their biologists. We have expressed a desire to work with Ms Keen and the Fish and Wildlife Service to explore ways to help offset these adverse effects. We are currently looking at several parcels of land which the biologists have classified as critical habitat in the hope that possibly some of this land can used as mitigation.

In our meeting with Ms. Keen and their biologist, it was felt that some workable solution could be found to remove their concerns in this regard. Please be advised that we are working diligently to achieve this outcome, at no expense to the Navy, and feel comfortable that a workable solution will be achieved shortly. Please feel free to contact or call us if you have any questions concerning this property.

Sincerely,
SCHOONER HARBOR VENTURES, INC.

Lawrence C. Rumsey, Vice President

# TAB NO. 31

# Site 28 (Pascagoula Housing) Land Acquisition [Sequence according to Carter/Rumsey Option]

| | Starts with | Ends up with |
|---|---|---|
| Navy | Navy cash ($TBD) | Site 28 (75 ac) |
| Carter/Rumsey | Site 28 (75 ac) | * Navy cash ($TBD)<br>* - $300,000 |
| Rena Ford | Mitigation land (77 ac) | Lot 4 (80 ac) |
| Lamar Criswell | Lot 4 (80 ac) | * $300,000<br>* Tax credit from donation |
| USF&WS | Nothing | Mitigation land (77 ac) |



# TAB NO. 32

OMB NO. 2502-0265

A.

U.S. DEPARTMENT OF HOUSING & URBAN DEVELOPMENT

**SETTLEMENT STATEMENT**

B. TYPE OF LOAN

1.☐FHA 2.☐FmHA 3.☐CONV. UNINS. 4.☐VA 5.☐CONV. INS.

6. FILE NUMBER 23736

7. LOAN NUMBER

8. MORTGAGE INS CASE NUMBER

C. NOTE: *This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "[POC]" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.*

1.0 3/98 (SCHOONER.PFD/23736/9)

D. NAME AND ADDRESS OF BORROWER
Schooner Harbor Ventures, Inc.
Highway 57 & Robinson Still
Vancleave, MS 39565

E. NAME AND ADDRESS OF SELLER
Alicia Swiney Pearce, as
Conservator for Henry Meyers
9300 Highway 57
Vancleave, MS 39565
TIN: 64-6217603

F. NAME AND ADDRESS OF LENDER
The Peoples Bank
P.O. Box 487
Biloxi, MS 39533-0487

G. PROPERTY LOCATION
Highway 57 & Robinson Still
Vancleave, MS 39565
Jackson County, Mississippi

H. SETTLEMENT AGENT 64-0542332
Page, Mannino, Peresich & McDermott

PLACE OF SETTLEMENT
759 Vieux Marche Mall
Biloxi, MS 39530

I. SETTLEMENT DATE
January 6, 2000

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract Sales Price | 963,802.51 | 401. Contract Sales Price | 963,802.51 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to Borrower (Line 1400) | 5,789.90 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| *Adjustments For Items Paid By Seller in advance* | | *Adjustments For Items Paid By Seller in advance* | |
| 106. City/Town Taxes to | | 406. City/Town Taxes to | |
| 107. County Taxes to | | 407. County Taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| *120. GROSS AMOUNT DUE FROM BORROWER* | 969,592.41 | *420. GROSS AMOUNT DUE TO SELLER* | 963,802.51 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER:** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (See Instructions) | |
| 202. Principal Amount of New Loan(s) | 991,419.90 | 502. Settlement Charges to Seller (Line 1400) | 1,069.92 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first Mortgage | |
| 205. | | 505. Payoff of second Mortgage | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. Credit to Purchase Price | 40,000.00 | 508. Credit to Purchase Price | 40,000.00 |
| 209. | | 509. | |
| *Adjustments For Items Unpaid By Seller* | | *Adjustments For Items Unpaid By Seller* | |
| 210. City/Town Taxes to | | 510. City/Town Taxes to | |
| 211. County Taxes 01/01/00 to 01/07/00 | 3.61 | 511. County Taxes 01/01/00 to 01/07/00 | 3.61 |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| *220. TOTAL PAID BY/FOR BORROWER* | 1,031,423.51 | *520. TOTAL REDUCT. AMT DUE SELLER* | 41,073.53 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER:** | | **600. CASH AT SETTLEMENT TO/FROM SELLER:** | |
| 301. Gross Amount Due From Borrower (Line 120) | 969,592.41 | 601. Gross Amount Due To Seller (Line 420) | 963,802.51 |
| 302. Less Amount Paid By/For Borrower (Line 220) | ( 1,031,423.51) | 602. Less Reductions Due Seller (Line 520) | ( 41,073.53) |
| *303. CASH ( FROM ) ( X TO ) BORROWER* | 61,831.10 | *603. CASH ( X TO ) ( FROM ) SELLER* | 922,728.98 |

SHVI 0630

JA 0177

HUD-1 (3-86) RESPA, HB4305.2

## L. SETTLEMENT CHARGES

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| **700. TOTAL COMMISSION Based on Price** $ @ % | | |
| *Division of Commission (line 700) as Follows:* | | |
| 701. $ to | | |
| 702. $ to | | |
| 703. Commission Paid at Settlement | | |
| 704. to | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee 0.4975 % to The Peoples Bank | 4,932.40 | |
| 802. Loan Discount % to | | |
| 803. Appraisal Fee to | | |
| 804. Credit Report to | | |
| 805. Future Release Fee to The Peoples Bank | 7.50 | |
| 806. Mortgage Ins. App. Fee to | | |
| 807. Assumption Fee to | | |
| 808. | | |
| 809. | | |
| 810. | | |
| 811. | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest From 01/06/00 to 02/01/00 @ $ /day ( 26 days %) | | |
| 902. Mortgage Insurance Premium months | | |
| 903. Hazard Insurance Premium 1.0 years | | |
| 904. | | |
| 905. | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard Insurance months @ $ per month | | |
| 1002. Mortgage Insurance months @ $ per month | | |
| 1003. City/Town Taxes months @ $ per month | | |
| 1004. County Taxes months @ $ per month | | |
| 1005. Assessments months @ $ per month | | |
| 1006. months @ $ per month | | |
| 1007. months @ $ per month | | |
| 1008. months @ $ per month | | |
| **1100. TITLE CHARGES** | | |
| 1101. Settlement or Closing Fee to | | |
| 1102. Abstract or Title Search to Page, Mannino, Peresich & McDermott | 75.00 | 75.00 |
| 1103. Title Examination to | | |
| 1104. Title Insurance Binder to | | |
| 1105. Recording Fees to Page, Mannino, Peresich & McDermott | 25.00 | 25.00 |
| 1106. Review of Title to Page, Mannino, Peresich & McDermott | 272.50 | 272.50 |
| 1107. Attorney's Fees to Page, Mannino, Peresich & McDermott | 477.50 | 477.50 |
| *(includes above item numbers:* ) | | |
| 1108. Title Insurance to | | |
| *(includes above item numbers:* ) | | |
| 1109. Lender's Coverage $ | | |
| 1110. Owner's Coverage $ | | |
| 1111. | | |
| 1112. | | |
| 1113. | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording Fees: Deed $ ; Mortgage $ ; Releases $ | | |
| 1202. City/County Tax/Stamps: Deed ; Mortgage | | |
| 1203. State Tax/Stamps: Deed ; Mortgage | | |
| 1204. | | |
| 1205. | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Survey to | | |
| 1302. Pest Inspection to | | |
| 1303. 1999 Jackson County Taxes to Jackson County Chancery Clerk | | 219.92 |
| 1304. | | |
| 1305. | | |
| **1400. TOTAL SETTLEMENT CHARGES (Enter on Lines 103, Section J and 502, Section K)** | 5,789.90 | 1,069.92 |

By signing page 1 of this statement, the signatories acknowledge receipt of a completed copy of page 2 of this two page statement.

Certified to be a true copy.

Page, Mannino, Peresich & McDermott
Settlement Agent

SHVI 0631

( 23736 / 23736 / 9 )

# ACKNOWLEDGMENT OF RECEIPT OF SETTLEMENT STATEMENT

**Borrower:** Schooner Harbor Ventures, Inc.
**Seller:** Alicia Swiney Pearce, as Conservator for Henry Meyers
**Lender:** The Peoples Bank
**Settlement Agent:** Page, Mannino, Peresich & McDermott
(228)374-2100
**Place of Settlement:** 759 Vieux Marche Mall
Biloxi, MS 39530
**Settlement Date:** January 6, 2000
**Property Location:** Highway 57 & Robinson Still
Vancleave, MS 39565
Jackson County, Mississippi

---

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Schooner Harbor Ventures, Inc.

BY:__________________________
President

ATTEST:

__________________________
Secretary/Treasurer

Alicia Swiney Pearce, as Conservator for Henry Meyers

BY:__________________________

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

__________________________
Page, Mannino, Peresich & McDermott
Settlement Agent

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

SHVI 0632



HUD-1 (3-86) RESPA, HB4305.2