UNITED STATES COURT OF FEDERAL CLAIMS

(E-filed: July 31, 2007)

| | | |
|---|---|---|
| SCHOONER HARBOR VENTURES, INC., Plaintiff, | ) | No. 06-87 L |
| v. | ) | Honorable Marian Blank Horn |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**DEFENDANT'S STATEMENT OF SPECIFIC ISSUES OF LAW**

Pursuant to the Court's instructions given during the telephone status conference held on July 26, 2007, and the Order entered by the Court on the same date, Defendant United States of America hereby submits this Statement of Specific Issues of Law.

On July 25, 2007, the parties submitted a Joint Statement of Issues of Law identifying the following issue as an issue of law: Whether Plaintiff possessed, at the time of the alleged taking, a Fifth Amendment compensable right to sell its property to the United States without any conditions being imposed on the sale? See Joint Statement of Issues of Law filed July 25, 2007. The parties identified the following issue as a mixed issue of law and fact to the extent that factual information is required to resolve the legal issue: Whether Defendant's actions amount to a regulatory taking of an interest in Plaintiff's property without compensation, in violation of the Fifth Amendment of the United States Constitution? See Joint Statement of Issues of Law filed July 25, 2007. Defendant identified the following issue as a mixed issue of law and fact to the extent that factual information is required to resolve the legal issue: If Defendant's actions amount to an unconstitutional taking, what amount of compensation is Plaintiff due? See Joint

Statement of Issues of Law filed July 25, 2007. Additional information regarding each of these issues, whether the issues are appropriate for summary judgment, and a brief statement of facts and legal background are set forth below.[1/]

## I. Plaintiff's Complaint and Factual Background

Plaintiff filed this Fifth Amendment takings claim against the United States seeking to recover money it expended to facilitate the sale of property to the United States Department of the Navy ("Navy"). See Compl. ¶¶XI, XVI. Plaintiff alleges that it held title to approximately 75 acres of undeveloped land north of Interstate 10 on Highway 57 in Jackson County, Mississippi, and "desired to sell" this land "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶V, VIII. Plaintiff further alleges that, because the land "was located within a defined critical habitat of the Mississippi Sandhill Crane, a declared and published endangered species, development of the Property was not allowed." Compl. ¶ IX. Plaintiff claims that, "to continue with the sale to the Navy . . . Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to designated critical habitats on the Property." Compl. ¶ XX (citing the United States Fish and Wildlife Service's Biological Opinion ("BO") dated February 12, 2002, and attached to Plaintiff's Complaint as Exhibit C).[2/] As a result of its efforts to purchase off-site property, Plaintiff alleges

[1/] Defendant reserves the right to supplement the information provided in this Statement of Specific Issues of Law in its Motion for Summary Judgment on liability and accompanying brief due on September 20, 2004.

[2/] The BO is also included in Tab 1 of Joint Appendix the parties filed with the Court on July 25, 2007.

it was "required to sacrifice all economically beneficial use" of the land in violation of the Fifth Amendment to the United States Constitution.[3] Compl. ¶ XXI.

### A. Critical Habitat Designation and the Endangered Species Act ("ESA")

In 1972, the Mississippi sandhill crane was listed as a subspecies of the sandhill crane and was added to the United States' List of Endangered Fish and Wildlife on June 4, 1973. See 38 Fed. Reg. 14678 (June 4, 1973) included in the Joint Appendix ("JA") at Tab 26, p. JA 0166; see also Joint Stipulation of Facts ("JSF") p. 1, No. 1; JA Tab 1, p. JA 0005. On July 29, 1977, critical habitat for the Mississippi sandhill crane was designated. The rule was published in the Federal Register on August 8, 1977. JSF p. 2, No. 7; see also 42 Fed. Reg. 39985 (August 8, 1977) included in the JA at Tab 27, pp. JA 0167-0170. The property at issue in this lawsuit is located within the boundaries of the 1977 designation of critical habitat and is also adjacent to the Mississippi Sandhill Crane National Wildlife Refuge ("MSCNWR" or "Refuge"). JSF p. 2, No. 8; see also 42 Fed. Reg. 39985 (August 8, 1977), JA Tab 27, pp. JA 0169-0170; JSF p. 3, No. 18; JA Tab 1, p. JA 0004.

Once the Mississippi sandhill crane was listed as endangered in 1973, it became unlawful for any person to "take" the crane in violation of Section 9 of the ESA, as amended. See 16 U.S.C. § 1538(a)(1)(B). To "take" an endangered species, as that term is used in the ESA, means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19). Designation of critical habitat for the

---

[3] Plaintiff also alleges a violation of the Fourteenth Amendment and seeks declaratory relief from the Court. These claims are appropriately dismissed pursuant to RCFC 12(b)(1) because the Tucker Act, 28 U.S.C. ¶ 1491, does not provide this Court with jurisdiction over these claims.

Mississippi sandhill crane triggers Section 7 of the ESA, which requires all federal agencies to consult with the United States Fish and Wildlife Service ("FWS") to insure the agency's actions do not harm a listed species or result in the destruction or adverse modification of designated critical habitat. Section 7 of the ESA states in relevant part:

> "[e]ach federal agency *shall*, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ["action agency"], is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat of such species.") (emphasis added). 16 U.S.C. § 1536(a)(2).

**B. Relevant Property Conveyances and Background Information**

Plaintiff purchased the subject property in January 2000, from Alicia Swiney Pearce, as conservator on behalf of Henry Meyers. See JSF p. 3, Nos. 16-17; see also Joint Appendix ("JA") Tab 4, pp. JA 0042, Pl.'s Resp. to Req. for Admis. No 1. The unsigned settlement statement indicates Plaintiff paid approximately $964,000 for the property, which consisted of approximately 82 acres of land. See JSA p. 3, No. 17; see also JA Tab 32, pp. JA 0177-0179. Through a series of three transactions in July and August 2000, plaintiff sold approximately 8 acres of its original 82 acre parcel for approximately $430,000, leaving plaintiff with approximately 74.64 acres, which is the subject of Plaintiff's Complaint. JSF p. 4, Nos. 23-25, 27; see also JA Tab 4, pp. JA 0042-0044, Pl.'s Resp. to Req. for Admis. Nos. 1, 3-5.

From late 2000 through March 2001, the United States Department of the Navy ("Navy") began identifying undeveloped properties, also referred to as "sites", in Jackson County, Mississippi, that would be suitable to construct approximately 188 housing units to house Navy personnel and dependants assigned to Naval Station Pascagoula ("NS Pascagoula"). JSF p. 5,

No. 29; see also JA Tab 18, p. JA 0134; see also JA Tab 5, pp. JA 0055-0056. After identification and evaluation of approximately 30 sites, the Navy eliminated from consideration all but five sites. The property at issue in this lawsuit, referred to as "Site 28" by the Navy, was among the five remaining sites. JSF p. 5, No. 29-33; JA Tab 5, pp. JA 0073-0078; see also JSF p. 5, No. 31.

Through a series of correspondences between the Navy, the Navy's contractor, Ecology and Environment ("E&E"), the FWS, and the Refuge, the Navy was informed that, among other things, Site 28 was within the Mississippi sandhill crane's designated critical habitat and that 45 acres of prime habitat would be lost if the proposed housing development was constructed on Site 28. See JSF p. 7, No. 47; see also JA Tab 10, p. JA 0087. By letter dated July 9, 2001, Plaintiff advised the Navy that Plaintiff had met with the FWS regarding the FWS's concerns about possible impacts to the Mississippi sandhill crane as a result of the Navy's proposed development on Site 28. JA Tab 30, p. JA 0175; see also JSF p. 11, No. 73 (stipulating to the letter's authenticity). Plaintiff also informed the Navy that Plaintiff "expressed a desire" to work with the FWS to explore ways to offset adverse effects on the Navy's proposed use of Site 28 and believed "some workable solution" could be achieved to remove concerns of the FWS. JA Tab 30, p. JA 0175. Plaintiff added it was "working diligently to achieve this outcome, at no expense to the Navy, and fe[lt] comfortable that a workable solution [would] be achieved shortly." JA Tab 30, p. JA 0175.

On August 3, 2001, the FWS wrote a letter to the Navy and informed the Navy of a June 27th meeting with Plaintiff concerning the purchase of offsite lands. The letter further explored the possibility of the acquisition of an offsite parcel to offset the impact to the Mississippi

sandhill crane caused by the Navy's proposed housing development. JSF p. 8, No. 49; JA Tab 11, pp. JA 0088-0096. In the August 3rd letter, the FWS listed seven potential offsite parcels as options, in addition to on site (Site 28) requirements, such as a setback and chain link fence between the proposed development and the Refuge, to offset impacts to the Mississippi sandhill crane. JSF p. 8, No. 50; JA Tab 11, p. JA 0091. In the letter, the FWS also informed the Navy that a "may affect" situation existed within the meaning of Section 7 of the ESA as to Site 28.[4/] As a result of the "may affect" situation, the FWS recommended the Navy request formal consultation with the FWS on developing Site 28. JSF p. 8, No. 51; JA Tab 11, p. JA 0092. The Navy contacted the FWS by letter dated August 20, 2001, and requested formal section 7 consultation for Site 28. JSF p. 8, No. 52; JA Tab 12, p. JA 0097.

On August 29, 2001, Plaintiff, Rena Ford, and Lamar Criswell entered into an option contract for purchase of an offsite parcel. JSF p. 8, No. 53; see also JA Tab 13, p. JA 0098-0106. The option contract set forth that Rena Ford agreed to exchange 77 acres of land ("Ford tract") with Lamar Criswell "in accordance with Section 1031 of the Internal Revenue code, so as to incur no tax liability or expense on her part." JSF p. 8, No. 54; see also JA Tab 13, p. JA 0099; JA Tab 31, p. JA 0176. Lamar Criswell agreed to exchange his property with Rena Ford, so that Lamar Criswell "may, in turn make a conveyance to Mississippi Sandhill Crane National Wildlife Refuge, for the consideration of $300,000.00" to be paid by plaintiff should plaintiff

[4/] Pursuant to regulation, under Section 7 of the ESA, the Regional Director of the FWS "may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation." 50 C.F.R § 402.14(a) (2007). However, formal consultation is not required if the agency and regional director concur "that the proposed action is not likely to adversely affect any listed species or critical habitat." 50 C.F.R § 402.14(b)(1) (2007).

choose to exercise the option. JSF p. 9, No. 55; see also JA Tab 13, pp. JA 0099-0100; JA Tab 31, p. JA 0176.

On September 20, 2001, the FWS wrote the Navy a letter confirming initiation of the formal consultation process. JSF p. 9, No. 56; JA Tab 14, pp. JA 0107-0108. By letter dated January 15, 2002, the FWS requested a 30 day extension from the Navy to issue its Biological Opinion ("BO") regarding the impacts of the Navy's proposed housing development on Site 28 to the Mississippi sandhill crane. See JSF p. 9, No. 57; see also JSF p. 9, No. 60; JA Tab 15, p. JA 0109. Plaintiff contacted the Navy by letter dated January 17, 2002, and informed the Navy that plaintiff "is still very much interested in the sale" of Site 28 to the Navy for $1.9 million. JSF p. 9, No. 58; JA Tab 16, pp. JA 0111. Plaintiff also notified the Navy that its option to purchase offsite property expired on February 29, 2002. JSF p. 9, No. 59; JA Tab 16, pp. JA 0111.

On February 12, 2002, the FWS issued its BO. See JSF p. 9, No. 60; see also JA Tab 1, pp. JA 0001-0019. The BO analyzed the proposed action, which included an assessment of the impacts of the Navy's proposed development of Site 28 based on the understanding that, simultaneous with the proposed sale of Plaintiff's property to the Navy, Plaintiff would purchase and convey an offsite parcel to the FWS. See JA Tab 1, p. JA 0004. The BO concluded that the proposed action was "not likely to jeopardize the continued existence of the Mississippi sandhill crane or destroy or adversely modify designated critical habitat." JA Tab 1, p. JA 0014. The BO also included an Incidental Take Statement ("ITS") indicating that if the Navy implemented reasonable and prudent measures, including reducing onsite noise and visual disturbance,

pollution, and the likelihood of Navy personnel intruding onto the Refuge, then the impact of incidental take on the crane would be minimized. JA Tab 1, p. JA 0014-0017.

On March 28, 2002, Plaintiff wrote to Mr. Beau Gex, District Chief of Staff to Congressman Gene Taylor, informing Mr. Gex of occurrences regarding Site 28, including, among other things, the issuance of the BO "with a favorable decision being rendered" and a negotiated price with the Navy's Real Estate Division for the purchase of Site 28. JA Tab 29, p. JA 0173-0174; see also JSF p. 12, No. 74 (stipulating to the letter's authenticity). Plaintiff noted that the "final package" had been sent to Washington for final approval by the Commander in Chief, U.S. Atlantic Fleet. JA Tab 29, p. JA 0174. Plaintiff stated it would "appreciate any efforts you can make on our behalf to find out when this process might come to a conclusion." Id.

On April 17, 2002, the Navy executed an Agreement for Purchase of Real Property ("Purchase Agreement"), previously executed by Plaintiff on April 15, 2002. See JSF p. 10, No. 63; see also JA Tab 19, pp. JA 0135-0141. Per the Purchase Agreement, Plaintiff, as vendor, agreed to sell approximately 74.64 acres to the United States for $1,900,000.00. See JSF p. 10, No. 64; see also JA Tab 19, p. JA 0135. The Purchase Agreement stated, "[T]he vendor additionally agrees, as part of the aforementioned $1,900,000.00 consideration, to convey to the U.S. Department of the Interior Fish and Wildlife Service (Service) a separate parcel of land to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane." JSF p. 10, No. 65; see also JA Tab 19, p. JA 0135. Plaintiff transferred the property at issue to the United States through the Navy by warranty deed on May 3, 2002. See JSF p. 10, No. 66; see also JA Tab 20, pp. JA 0142-0149.

That same day, Plaintiff paid Lamar Criswell $300,000 in order to secure Criswell's transfer of 77 acres of property to the FWS pursuant to the option contract entered into by Plaintiff, Ford, and Criswell. See JSF p. 10, No. 67; see also JA Tab 23, p. JA 0153, Pl.'s Resp. to Def.'s Req. for Admis. No. 9; JA Tab 31, p. JA 0176; JA Tab 13. Criswell then transferred 77 acres of property to the United States "for the use and benefit of the U.S. Fish and Wildlife Service of the Department of the Interior," pursuant to the option contract. See JSF p. 11, No. 68; see also JA Tab 21, pp. JA 0150-0151; JA Tab 31, p. JA 0176; JA Tab 13. In connection with Criswell's transfer of property to the FWS, Plaintiff expended the following sums: $10,500 to Jim Horne to negotiate purchase of the property to be donated to the FWS, $2,000 finder's fee to John M. "Cappy" Ford, and $1906.65 in closing costs. JSF p. 11, No. 69; see also JA Tab 25, pp. JA 0163-0165; JA Tab 23, p. JA 0153-0155, Plt's Resp. to Def.'s Req. for Admis. Nos. 10, 12. Deducting the purchase price of the Criswell property and these related expenses from the $1.9 million sum that Plaintiff received from the Navy for its property yields a figure of $1,585,593.35.

## II. Whether Plaintiff's Alleged Right to Sell Its Land to the United States Without Any Conditions Being Imposed on the Sale Is a Property Interest Protected by the Fifth Amendment

In its Complaint, Plaintiff broadly alleges it had the right to sell and develop the property at issue and specifically alleges that it "desired to sell" the property "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶V, VI, VIII. Plaintiff specifically complains that, to enjoy its alleged right to sell the property to the Navy, "Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to

designated critical habitats on the Property." Comp. ¶ XX. However, the alleged right to sell its property to the United States Navy without any conditions is not a right acquired by Plaintiff when it purchased the property in 2000. Additionally, the undisputed facts demonstrate that the government's acquisition of the subject property did not "take" anything from Plaintiff. To the extent that Plaintiff acquired any right to sell the subject property to the Navy, those rights are included in the Purchase Agreement, which specifically sets forth the terms of the sale. That Purchase Agreement is a contract and does not confer rights on Plaintiff that are protected by the Fifth Amendment. As there are no genuine issues of material fact and, for the reasons set forth below, summary judgment dismissing Plaintiff's Fifth Amendment takings claim is appropriate.

The Federal Circuit has established a two-part test to evaluate whether governmental action amounts to a taking of private property for Fifth Amendment purposes. Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002); M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995). "First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment [and] [s]econd, once a court has determined that a property interest exists, it must determine whether a taking occurred." Conti, 291 F.3d at 1339; see also M&J Coal, 47 F.3d at 1154. As noted by the Federal Circuit in Air Pegasus of D.C. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005), "[w]e do not reach this second step without first identifying a cognizable property interest."

Therefore, in every Fifth Amendment takings case, the issue of whether the plaintiff possesses a protected property interest is a threshold element of the plaintiff's claim. See Air Pegasus, 424 F.3d at 1212 ("First, as a threshold matter, the court must determine whether the claimant has established a property interest for the purposes of the Fifth Amendment.") quoting

Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Maritrans v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment.") (citation omitted)); Buse Timber & Sales, Inc. v. United States, 45 Fed. Cl. 258, 262 (1999) ("In order to successfully bring a Fifth Amendment takings claim, plaintiff must first demonstrate the existence of a 'legally cognizable property interest.'"). If a plaintiff cannot establish a cognizable property interest, plaintiff’s takings claim fails. See Am. Pelagic, 379 F.3d at 1372 (“If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts task is at an end”); Conti, 291 F.3d at 1339 (“However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in Penn Central”).

In determining whether a plaintiff possesses a property right that is protected by the Fifth Amendment, courts begin with the maxim that,

> [t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, “existing rules and understandings” and “background principles” derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. Lucas [v. South Carolina Coastal Council, 505 U.S. 1003,] 1030 [(1992)]. These existing rules often involve and define “the citizen’s relation to the physical thing, as the right to possess, use and dispose of it.” United States v. Gen. Motors, 323 U.S. 373, 378, 65 S. Ct. 357, 89 L.Ed. 311 (1945).

Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003). Stated another way, the threshold inquiry into whether a plaintiff possesses a protected or

cognizable property interest requires the court to determine whether the particular property interest which plaintiff contends has been taken is "a stick in the bundle of property rights" possessed by the plaintiff. American Pelagic, 379 F.3d at 1376; M&J Coal, 47 F.3d at 1153 (noting that the court must first determine whether the use proscribed by the governmental action was part of the owner's title to begin with) (citing Lucas v. South Carolina Coastal Council, Inc., 505 U.S. 1003, 1027 (1992)).

According to this legal framework, this Court's inquiry into whether Plaintiff possessed a protected property interest at the time of the alleged taking must begin with the identification of the property right alleged to have been taken and an examination of the source of that alleged right. There are two potential sources of Plaintiff's alleged right to sell its property to the Navy without any conditions. The first potential source is the documentation by which Plaintiff acquired the subject property. The second potential source is the Purchase Agreement that it entered into with the Navy. As explained below, neither source provided Plaintiff with the right it alleges to have been taken: the right to sell its property to the United States Navy for a specific price without any conditions being imposed on the sale.

Plaintiff acquired fee simple to approximately 82 acres of land by deed dated January 6, 2000. See Ex. A.[5/] Between July and August of the same year, Plaintiff sold approximately 8 acres of that land for approximately $430,000. Plaintiff subsequently sold the remaining land to the Navy for use as a proposed housing development. The Purchase Agreement stated Plaintiff

[5/] The Warranty Deed transferring the property from Pearce, as conservator, to Plaintiff was not included in the Joint Appendix filed the parties on July 25, 2007. It is attached to Defendant's Statement of Specific Issues of Law as Exhibit A.

agreed to convey its remaining 74.64 acres of land plus additional off-site acreage in exchange for $1.9 million. That Agreement was implemented in April and May of 2002.

Defendant does not dispute that fee simple title to land is a property interest with a "rich tradition of protection at common law" that has long been regarded as a property interest protected by the Constitution. Lucas, 505 U.S. at 1016 n.7. However, Plaintiff's takings claim in the present case is premised on the assertion that it had the right to sell and develop the property at issue, which included a specific right to sell the property "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶VIII. Plaintiff specifically complains that, to enjoy its alleged right to sell the property to the Navy, "Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to designated critical habitats on the Property." Comp. ¶ XX. However, Plaintiff cannot establish that this specific right - to sell property to the Navy without any conditions- is a right protected by the Fifth Amendment because the right to sell the subject property to the Navy for a specific purpose, at a specific price and without any conditions is not a stick in the bundle of rights that Plaintiff acquired when it purchased the land in question. A review of the deed by which Plaintiff acquired the subject property shows that Plaintiff did not acquire such a specific right when it purchased the subject property. See Ex. A. In addition, although the right to use the subject property and the right to sell or convey that property that are generally considered to be sticks in the bundle of rights associated with fee simple ownership of land, those "sticks" do not include the right to make a specific use of, or derive a specific benefit from the property. While not involving fee ownership of land, a recent decision from the Federal Circuit, Members of the

Peanut Quota Holders Association, Inc., v. United States, 421 F.3d 1323 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 2967 (2006), is instructive.

In Peanut Quota Holders, the plaintiffs claimed a Fifth Amendment regulatory taking as a result of a statutory provision disqualifying the plaintiffs from receiving expected loan rates and future peanut quotas. Peanut Quota Holders, 421 F.3d at 1326. In affirming the trial court's grant of summary judgment dismissing the plaintiff's claims, the Federal Circuit acknowledged that the plaintiffs had a property interest in the peanut quotas, but held that "the fact that quota holders expected to continue to derive benefits from the program does not create rights to compensation from the government." Id. at 1335. In its analysis, the Federal Circuit noted that the peanut quotas were subject to alternation or elimination because the quotas were part of a government program that the government could withdraw or qualify as it chooses. Id. at 1334-35.

Similarly, any alleged right Plaintiff claims in the present case to sell the property at issue to the Navy must result from the Navy's program to build housing for Naval Station ("NS") Pascagoula, not Plaintiff's deed. Implementation of the program required the Navy to comply with numerous legal requirements, including the National Environmental Policy Act ("NEPA") and the ESA, and the program could be changed, modified, or even eliminated at any time. Therefore, like the plaintiffs in Peanut Quota Holders, any benefit conferred on Plaintiff as a result of its participation in this program does not, as a matter of law, create a right to compensation from the government.

The second potential source of the property right Plaintiff alleges to have been taken from it is the Purchase Agreement that Plaintiff entered into with the Navy. Specifically, the

Navy entered the marketplace in search of property to acquire for its proposed housing development. After identification and evaluation of numerous sites, the Navy selected Site 28 – the parcel owned by Plaintiff – for its housing development. After completion of the Navy's formal consultation with the FWS to ensure that its proposed development would be in compliance with the ESA, Plaintiff sold the property at issue in this lawsuit to the Navy in April 2002. Pursuant to the Purchase Agreement, Plaintiff agreed to sell the subject property to the United States for $1,900,000.00. See JSF p. 10, No. 64; see also JA Tab 19, p. JA 0135. The Purchase Agreement further stated, "[T]he vendor additionally agrees, as part of the aforementioned $1,900,000.00 consideration, to convey to the U.S. Department of the Interior Fish and Wildlife Service (Service) a separate parcel of land to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane." JSF p. 10, No. 65; see also JA Tab 19, p. JA 0135. Plaintiff subsequently transferred the property at issue consisting of approximately 74.64 acres to the United States through the Navy by warranty deed on May 3, 2002. JSF p. 10, No. 66; see also JA Tab 20, pp. JA 0142-0149.

These undisputed facts reveal two critical points. First, the Purchase Agreement itself did not give Plaintiff a unilateral right to sell its property to the Navy for a set price and without any conditions. To the contrary, the terms of the sale as set forth in the Purchase Agreement include the condition for which Plaintiff now complains - conveyance of a separate parcel to the FWS to offset impacts caused by the Navy's proposed housing development. See JA Tab 19, p. JA 0135. Accordingly, pursuant to the express language of the Purchase Agreement, Plaintiff did not acquire a right to sell its land to the Navy without any conditions.

Second, the undisputed facts demonstrate that the government was acting in its proprietary capacity when it contracted with Plaintiff for the purchase of the subject property. The terms of that acquisition are set forth in the Purchase Agreement, and the undisputed facts show that the terms of this contract were met by both sides. Plaintiff conveyed its 74.64-acre parcel to the Navy and arranged for the transfer of additional off-site acreage to offset the impacts of its proposed housing development. The Navy, in turn, paid Plaintiff $1.9 million for these lands. The only rights Plaintiff had with respect to the sale of the subject property to the Navy are the rights set forth in its contract with the Navy. This type of transaction is an illustration of the United States acting in its proprietary, not sovereign capacity. See Gratz v. United States, 25 Cl. Ct. 411, 420 (1992) (plaintiffs entered into a contract with the government, and "[t]he Government loaned plaintiffs money in exchange for plaintiffs' promise to repay and store sufficient collateral . . . .This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities.").

To the extent that Plaintiff is asserting that its contractual rights have been interfered with, this interference may give rise to a breach of contract claim, but not a takings claim. See Sun Oil Co. v. United States, 215 Ct. Cl. 716, 770 (1978) (a takings theory "has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a takings claim."); Hughes Communications Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) ("Takings claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts

themselves, rather than from the constitutional protections of private property rights.”). Therefore, any rights created by the Purchase Agreement are not private property rights that are protected by the Fifth Amendment. Plaintiff’s remedy, if any, is a contractual one rather than a constitutional one.

In sum, plaintiff alleges that it possessed the right to sell its property to the Navy for a specific price and without any conditions. Plaintiff, however, did not acquire this right when it purchased its original 82-acre parcel, nor did it acquire this right when it entered into the Purchase Agreement to sell the property to the Navy. Indeed, the Purchase Agreement specifically states the opposite - that Plaintiff agreed to purchase off-site land to offset impacts caused by the Navy’s proposed housing development. To the extent Plaintiff is asserting that its contractual rights have been interfered with, this interference may give rise to a breach of contract claim, but not a takings claim. For these reasons, Plaintiff does not possess a protected property right under the Fifth Amendment to sell the property at issue to the Navy for a housing development, much less to sell property to the Navy without any conditions. As a result, summary judgment is appropriate, and Plaintiff’s claim must be dismissed.

## III. Whether Defendant’s Actions Amount to a Regulatory Taking of an Interest in Plaintiff’s Property Without Compensation, in Violation of the Fifth Amendment of the United States Constitution?

Defendant submits that the threshold question of whether the right allegedly taken from Plaintiff is a property right protected by the Fifth Amendment is dispositive in this case for the reasons set forth above. If, however, Plaintiff is able to establish that its alleged right to sell its property to the Navy at a specified price and without any conditions is a protected property right, Defendant believes that the question of whether a taking of that interest occurred is also a

question of law that should be resolved at summary judgment based on the undisputed facts of the case. Defendant is prepared to address these additional issues in its motion for summary judgment should the Court wish to have all issues briefed.

**A. Whether a categorical taking occurred in this case**

As a result of its efforts to purchase off-site property, Plaintiff alleges it was "required to sacrifice all economically beneficial use" of the land in violation of the Fifth Amendment to the United States Constitution. Compl. ¶ XXI; see also Compl. ¶¶ I, XXIV. To the extent Plaintiff's allegation could be construed as a categorical, or *per se*, takings claim pursuant to Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992), the claim is appropriate for summary judgment and must be dismissed because Plaintiff cannot, as a matter of fact or law, establish a *per se* taking occurred in this case.

"A 'categorical' taking is, by accepted convention, one in which *all* economically viable use, i.e., all economic value" of land, "has been taken by regulatory imposition." Palm Beach Isles Associates v United States, 231 F.3d 1354, 1357 (Fed. Cir. 2000) (emphasis in original); see also Lucas, 505 U.S. 1003. If a regulation categorically prohibits all economically beneficial use of land--destroying its economic value for private ownership--the regulation has an effect equivalent to a permanent physical occupation. Palm Beach Isles, 231 F.3d at 1361 citing Lucas, 505 U.S. at 1015. The Supreme Court has emphasized that a *per se* taking is limited to the extraordinary circumstances when no productive or economically beneficial use of the land is permitted. Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 330 (2002)

Here, the undisputed facts establish that Plaintiff's original purchase consisted of 82

acres. The unsigned settlement statement indicates Plaintiff paid approximately $964,000 for the property. See JSA p. 3, No. 17; see also JA Tab 32, pp. JA 0177-0179. Through a series of three transactions in July and August 2000, plaintiff sold approximately 8 acres of its original parcel for approximately $430,000, leaving plaintiff with approximately 74.64 acres. JSF p. 4, Nos. 23-25, 27; see also JA Tab 4, pp. JA 0042-0044, Pl.'s Resp. to Req. for Admis. Nos. 1, 3-5. Plaintiff sold the remaining acreage to the Navy for $1,900,000 in April 2002. JSF p. 10, No. 64; see also JA Tab 19, p. JA 0135. As a result of these four transactions, plaintiff cannot, as a matter of law, establish that the entire parcel was deprived of all beneficial use. Indeed, Plaintiff disposed of its original 82 acre purchase for approximately $2,330,000, over $1,000,000 more than the amount Plaintiff paid for the original parcel.

### C. Whether Plaintiff can satisfy its burden to establish a regulatory taking under Penn Central

In order to determine whether a regulatory restriction has gone "too far," the court must balance three factual inquires under Penn Central Transportation Company v. New York City, 438 U.S. 104 (1978). Those factors are "the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." Palazzolo v. Rhode Island, 533 U.S. 606, 617 (2001) citing Penn Cent., 438 U.S. at 124. To determine whether a regulatory taking has occurred, the court must also focus on "the parcel as a whole." Tahoe-Sierra, 535 U.S. at 327.

#### 1. Whether the character of the government action prong weighs in Defendant's favor

In the present case, there can be no dispute that the regulation, under the ESA, of the Navy's proposed use of land located within designated critical habitat for the endangered

Mississippi sandhill crane as a housing development serves an important public purpose - the protection of an endangered species and its habitat. See Bass Enterprises Prod. Co. v. United States, 381 F.3d at 1370 (evaluation of the character of the government action involves an inquiry into "the purpose and importance of the public interest underlying [the] regulatory imposition."). Indeed, the ESA was passed in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such . . . species . . . ." 16 U.S.C. § 1531(b); see, e.g., Tennessee Valley Authority v. Hill, 437 U.S. 153, 184 (1978) (in passing the ESA, Congress was acting to "halt and reverse the trend toward species extinction. . .").

**2. Whether Plaintiff can establish a reasonable investment-backed expectation to sell property to the United States Navy, free from any conditions**

It is well settled that courts must evaluate the extent to which the challenged governmental action has interfered with the reasonable investment-backed expectations of the property owner. Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. at 495; Connolly v. Pension Benefit Guar. Corp., 475 U.S. at 227; Rith Energy, Inc. v. United States, 270 F.3d 1347, 1350 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002). The Supreme Court has noted, however, that an investment-backed expectation must be reasonable -- it "must be more than a 'unilateral expectation or an abstract need.'" Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)). Additionally, a plaintiff's reasonable investment-backed expectations are shaped by the regulatory regime in place on the date it acquired its property interest. See Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1348 (Fed. Cir. 2004), cert. denied, 543 U.S. 1188 (2005); see also

Palazzolo, 533 U.S. at 632-33 (Connor, J., concurring). Further, "[t]he reasonable expectations test does not require that the law existing at the time of processing would impose liability." Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1357 (Fed. Cir. 2001), cert. denied, 535 U.S. 1096 (2002). Rather "[t]he critical question is whether *extension* of existing law could be foreseen as reasonably possible." Appolo Fuels, 381 F.3d at 1350 (emphasis added) (citations omitted).

Here, the regulatory regime was in place more than two decades prior to Plaintiff's purchase of the original 82 acre parcel. It is undisputed that the Mississippi sandhill crane was listed as endangered in 1973, that critical habitat for the Mississippi sandhill crane was designated in 1977, and that the property at issue is located within the boundaries of that designation. This information was also published in the Federal Register. See Roth v. United States, 73 Fed. Cl. 144, 150 ("plaintiffs were given constructive and actual notice by publication in the Federal Register . . . .") (citing Lyng v. Payne, 476 U.S. 926 (1986) and Pam, S.p.A. v. United States, 463 F.3d 1345, 1349 (Fed. Cir. 2006). There can also be no dispute that the Navy is required to consult with the FWS pursuant to Section 7 of the ESA if its proposed development activities may affect a listed species or its critical habitat. Given these factors, the extension of existing ESA regulations could be foreseen as reasonably possible, and Plaintiff cannot claim that it held a reasonable investment-backed expectation to sell the property at issue to the Navy without regard to the impact of the ESA on the proposed use of that property.

**3. Whether Plaintiff can establish that the economic impact of thepurchase of off-site property compels a finding that a taking occurred in the present case**

Addressing the economic impact element in Cienega Gardens, the Federal Circuit

explained that "[w]hat has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." 331 F.3d 1319, 1340 (Fed. Cir. 2003); Forest Properties, Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (citations omitted), cert. denied, 528 U.S. 951 (1999) ("The 'economic impact of the regulation upon the claimant' is 'measured by the change, if any, in the fair market value caused by the regulatory imposition.'") quoting Florida Rock Ind. v. United States, 18 F.3d 1560, 1567 (1994). The undisputed facts of the case demonstrate that Plaintiff cannot demonstrate serious financial loss as a result of securing an off-site parcel to off-set impacts to the Mississippi sandhill crane's critical habitat from the Navy's proposed housing development. As noted previously, Plaintiff was able to dispose of its original 82 acre purchase through a series of four transactions totaling approximately $2,330,000, over $1,000,000 more than the amount Plaintiff paid for the original parcel. Therefore, Plaintiff cannot establish "serious financial loss."

## IV. If Defendant's Actions Amount to an Unconstitutional Taking, What Amount of Compensation is Plaintiff Due?

Should Plaintiff survive the threshold question of proving a protected property interest and satisfy its burden to establish a regulatory taking occurred in this case, then the Court must determine what amount of compensation Plaintiff is due. Defendant believes an in-depth exploration of this issue would be more appropriate after the liability phase of this case has been concluded.

Respectfully submitted: July 31, 2007

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

__s/ Kelle S. Acock_________ __________
KELLE S. ACOCK

Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Tel: 202-305-0428
Fax: 202-305-0267
Email: kelle.acock@usdoj.gov

Of Counsel:

VICKI MOTT
Department of the Interior
Office of the Solicitor
Atlanta, Georgia 30303

MARY RAIVEL
Navy Litigation Office
Washington Navy Yard, D.C. 20374