UNITED STATES COURT OF FEDERAL CLAIMS

(E-filed: October 11, 2007)

| | | |
|---|---|---|
| SCHOONER HARBOR VENTURES, INC., | ) | |
| | ) | No. 06-87 L |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Honorable Marian Blank Horn |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

KELLE S. ACOCK
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Tel: 202-305-0428
Fax: 202-305-0267
Email: kelle.acock@usdoj.gov

Of Counsel:

VICKI MOTT
Department of the Interior
Office of the Solicitor
Atlanta, Georgia 30303

ALEACIA CHINKHOTA
Navy Litigation Office
Washington Navy Yard, D.C. 20374

# TABLE OF CONTENTS

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . . . . . 1

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FACTUAL AND STATUTORY BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Plaintiff's Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. The Mississippi sandhill crane, Critical Habitat Designation, and the ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. Relevant Property Conveyances and Background Information . . . . . . . . . . . . . . . . 6

IV. Plaintiff's Submission of Contested Issues of Fact . . . . . . . . . . . . . . . . . . . . . . . 12

**STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I. PLAINTIFF'S ALLEGED RIGHT TO SELL ITS PROPERTY TO THE NAVY FOR A SPECIFIC PURPOSE AND WITHOUT ANY CONDITIONS IS NOT A PROPERTY RIGHT PROTECTED BY THE FIFTH AMENDMENT . . . . . . . 14

A. Whether Plaintiff's Alleged Property Right Is Protected By the Fifth Amendment Is A Threshold Inquiry . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

B. Plaintiff Did Not Acquire the Alleged Right to Sell Property to the Navy for the Navy's Housing Development From Plaintiff's Deed or the Navy's Housing Proposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C. Plaintiff Did Not Acquire Any Property Right Protected By the Fifth Amendment From the Purchase Agreement . . . . . . . . . . . . . . . . . . . . . . 21

D. Plaintiff Is Barred From Alleging The United States Interfered With Plaintiff's Development Rights or Plaintiff's Right to Sell To A Purchaser Other Than the Navy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

E. Plaintiff Is Barred From Collaterally Attacking the BO . . . . . . . . . . . . . 26

II. THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF CANNOT ESTABLISH A REGULATORY TAKING OF ITS PROPERTY . . . . . . . . . . . 30

A. The Relevant Parcel As a Whole Consists of Plaintiff's Original 82-Acre Purchase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B. Plaintiff Cannot Establish a Categorical Taking of the Relevant Parcel as a Whole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C. Plaintiff Cannot Satisfy Its Burden to Establish a Regulatory Taking Under Penn Central . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

1. The Character of the Government Action Weighs in Favor of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

2. Plaintiff Cannot Establish It Had a Reasonable Investment-Backed Expectation to Sell Property to the United States Navy, Free From Any Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3. Weighing The Economic Impact of The Regulatory Restriction on the Relevant Parcel Compels a Finding That There has Been No Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

# TABLE OF AUTHORITIES

## CASES

Air Pegasus of D.C., Inc. v. United States
424 F.3d 1206(Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Allied-General Nuclear Servs. v. United States
839 F.2d 1572 (Fed. Cir.), cert. denied, 488 U.S. 819 (1988) . . . . . . . . . . . . . . . . . . . . . 13

American Pelagic Fishing Co. v. United States
379 F.3d 1363 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005) . . . . . . . . . . . . 19, 20

Anderson v. Liberty Lobby, Inc.
477 U.S. 242(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Appolo Fuels, Inc. v. United States
381 F.3d 1338 (Fed. Cir. 2004), cert. denied, 543 U.S. 1188 (2005) . . . . . . 31, 36, 39-40

Bass Enters. Prod. Co. v. United States
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Bd. of Regents of State Colleges v. Roth
408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972) . . . . . . . . . . . . . . . . . . . . . . 15

Boise Cascade Corp. v. United States
296 F.3d 1339 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003) . . . . . . . . . . . . . 24-25

Branch v. United States
69 F.3d 1571 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Celotex Corp. v. Catrett
477 U.S. 317(1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cienega Gardens v. United States
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Colvin Cattle Co. v. United States
468 F.3d 803 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

Commonwealth Edison Co. v. United States
271 F.3d 1327 (Fed. Cir. 2001) (en banc), cert. denied, 535 U.S. 1096 (2002) . . . . . . . 39

Conti v. United States
291 F.3d 1334 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003) . . . . . . . . . . . . 14-16

Creppel v. United States
41 F.3d 627 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Florida Rock Ind. v. United States
18 F.3d 1560 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Florida Rock Indus., Inc. v. United States
791 F.2d 893 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Forest Properties, Inc. v. United States
177 F.3d 1360 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 41

Gratz v. United States
25 Cl. Ct. 411 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Hoehne v. County of San Benito
870 F.2d 529 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Hughes Commc'n Galaxy, Inc. v. United States
271 F.3d 1060 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Knieper v. United States
38 Fed. Cl. 128 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Lingle v. Chevron U.S.A., Inc.
544 U.S. 528 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Lucas v. South Carolina Coastal Council
505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 32

Lyng v. Payne
476 U.S. 926 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

M&J Coal Co. v. United States
47 F.3d 1148 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 27

MacDonald, Sommer & Frates v. Yolo County
477 U.S. 340 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Maritrans v. United States
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 35, 36

Members of the Peanut Quota Holders Ass'n, Inc., v. United States
421 F.3d 1323 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 2967 (2006) . . . . . . . . . . . 18, 19

Norman v. United States
63 Fed. Cl. 231 (2004),aff'd, 429 F.3d 1081 (Fed. Cir. 2005)
cert. denied, 126 S.Ct. 2288 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 36

Palazzolo v. Rhode Island
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 39

Pam, S.p.A. v. United States
463 F.3d 1345 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Penn Central Transp. Co. v. City of New York
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, 3, 31, 35

Pennsylvania Coal Co. v. Mahon
260 U.S. 393 (1922) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Rith Energy, Inc. v. United States
247 F.3d 1355 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002) . . . . . . . . . . . . . 34, 42

Rith Energy, Inc. v. United States
270 F.3d 1347 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002) . . . . . . . . . . . . . 27, 38

Roth v. United States
73 Fed. Cl. 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ruckelshaus v. Monsanto Co.
467 U.S. 986 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Seiber v. United States
364 F.3d 1356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Sun Oil Co. v. United States
572 F.2d 786 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Sweats Fashions, Inc. v. Pannill Knitting Co.
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Tabb Lakes, Ltd. v. United States
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 34

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l
535 U.S. 302 (2002) . . . . . . . . . . 30, 33, 35, 36

Tennessee Valley Auth. v. Hill
437 U.S. 153 (1978) . . . . . . . . . . 37

United States v. Gen. Motors
323 U.S. 373 S. Ct. 357, 89 L.Ed. 311 (1945) . . . . . . . . . . 16

United States v. Riverside Bayview Homes, Inc.
474 U.S. 121 (1985) . . . . . . . . . . 26

Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City
473 U.S. 172 (1985) . . . . . . . . . . 24

STATUTES

16 U.S.C. § 1531(b) . . . . . . . . . . 36
16 U.S.C. § 1532(19) . . . . . . . . . . 5
16 U.S.C. § 1536(a)(2) . . . . . . . . . . 6, 37
16 U.S.C. § 1538(a)(1)(B) . . . . . . . . . . 4
16 U.S.C. §1539 . . . . . . . . . . 4
16 U.S.C.A. §1531 . . . . . . . . . . 2
28 U.S.C. § 1491 . . . . . . . . . . 4
42 U.S.C. § 4321 . . . . . . . . . . 19

RULES

RCFC 12(b)(1) . . . . . . . . . . 4
RCFC 56 . . . . . . . . . . 13
RCFC 56(c) . . . . . . . . . . 13
RCFC 56(e) . . . . . . . . . . 12, 26

REGULATIONS

50 C.F.R § 402.14(a) (2007) . . . . . . . . . . 9
50 CFR § 402.02 . . . . . . . . . . 6
50 CFR § 402.13(a) . . . . . . . . . . 6
50 CFR § 402.14(h) . . . . . . . . . . 6, 10
50 CFR § 402.14(l) . . . . . . . . . . 6

# LIST OF EXHIBITS

| **Exhibit Letter** | **Description** |
| --- | --- |
| A | Warranty Deed Transferring Approximately 82 acres of land from Alicia Swiney Pearce, as conservator on behalf of Henry Meyers, to Plaintiff |
| B | Declaration of Scott G. Hereford |
| C | Chart Compiled By Scott G. Hereford From Information Contained in the Mississippi Sandhill Crane National Wildlife Refuge's ("Refuge") Database Documenting Mississippi sandhill crane Observations |
| D | Refuge Photographs Taken At Meyer's Pond on June 9, 1998 |
| E | Declaration of Patric Harper |
| F | Excerpts from the Deposition Transcript of Steven Carter |
| G | September 25, 2007, E-mail Correspondence From Kelle Acock to Billy Guice and Lauren Duvernay |
| H | October 1, 2007 Letter From Kelle Acock to Billy Guice and Lauren Duvernay |
| I | Declaration of Jonathan R. Bartku |
| J | Negotiator's Report |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of Rules of the United States Court of Federal Claims ("RCFC"), Defendant, United States of America, hereby moves for summary judgment on Plaintiff's Fifth Amendment regulatory takings claim as there are no genuine issues of material fact, and Plaintiff's claim is appropriate for dismissal on two dispositive grounds. First, Plaintiff does not, as a matter of law, possess a protected property right under the Fifth Amendment to sell its property to the United States Department of the Navy ("Navy") for a specific use and without any conditions. Therefore, Plaintiff cannot satisfy its burden of establishing that a taking in violation of the Fifth Amendment occurred in this case, and Plaintiff's Complaint must be dismissed in its entirety.

Second, even assuming Plaintiff can survive the first dispositive hurdle, Plaintiff cannot, as a matter of fact or law, establish that a taking occurred in this case because Plaintiff cannot prove a categorical taking or satisfy the three prongs of Penn Central Transp. Co. v. City of New York, 438 U.S. 104 (1978), required to prove a regulatory taking. Indeed, the undisputed facts demonstrate that Plaintiff purchased an 82-acre parcel of land in January 2000 for approximately $963,802 and, through a series of four transactions in 2000 and 2002, sold that land for approximately $2.33 million, notwithstanding Plaintiff's allegation that it was required to secure mitigation land at a cost of approximately $314,400 in order to sell its property to the Navy. Thus, Plaintiff has not been denied all economically beneficial use of its property and there has been no "categorical" regulatory taking. Moreover, all three prongs of the Penn Central analysis weigh heavily in Defendant's favor. For these reasons, summary judgment is appropriate, and Plaintiff's takings claim must be dismissed. A memorandum in support of this motion follows.

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Schooner Harbor Ventures, Inc., ("Plaintiff" or "Schooner Harbor") filed this Fifth Amendment regulatory takings claim against the United States seeking to recover money it expended to facilitate the sale of its property to the United States Department of the Navy ("Navy"). See Compl. ¶¶XI, XVI. In its Complaint, Plaintiff broadly alleges it had the right to sell and develop its property and specifically alleges that it "desired to sell" the property "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶V, VI, VIII. Plaintiff complains that, to enjoy its alleged right to sell its property to the Navy, "Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to designated critical habitats on the Property." Comp. ¶ XX. Plaintiff alleges it expended $312,500 to secure the acquisition of an off-site, or mitigation, parcel. Comp. ¶¶ XI; XVI; but see Joint Stipulation of Facts ("JSF")[1/] p. 11, No. 69 (Plaintiff expended approximately $314,406.65 to secure a mitigation parcel). Plaintiff subsequently sold its property to the Navy for $1.9 million. See JSF p. 10, Nos. 63-66.

Under no circumstances set forth in precedential case law, including recent decisions by the United States Court of Appeals for the Federal Circuit, does Plaintiff possess a protected property right under the Fifth Amendment to sell its property to the Navy for a specific purpose (the Navy's housing development) and without any conditions (purchase of a mitigation parcel). An analysis of the three possible sources of this alleged right - Plaintiff's deed, the Navy's

---

[1/]The parties filed a JSF and accompanying Joint Appendix ("JA") with this Court on July 25, 2007.

proposed housing development, and the Purchase Agreement between Plaintiff and the Navy - reveals that Plaintiff never acquired the alleged right to sell its property to the Navy for a specific use and without any conditions. Indeed, the Purchase Agreement expressly includes as an agreed term of the sale of its property to the Navy the very condition Plaintiff now claims is protected by the Fifth Amendment. See JSF p. 10, No. 65; Joint Appendix ("JA") Tab 19, p. JA 0135 ("[T]he vendor additionally agrees, as part of the aforementioned $1,900,000.00 consideration, to convey to the U.S. Department of the Interior Fish and Wildlife Service (Service) a separate parcel of land to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane."). Therefore, the undisputed, material facts demonstrate that the government's acquisition of the subject property did not "take" anything from Plaintiff. As there are no genuine issues of material fact and, for the reasons set forth below, summary judgment dismissing Plaintiff's Fifth Amendment regulatory takings claim on this ground is appropriate.

If the Court should find that Plaintiff possessed a protected property right to sell its property to the Navy, for a specific use and without any conditions, then Defendant moves for summary judgment to dismiss Plaintiff's takings claim because Plaintiff cannot, as a matter of fact or law, establish that the government's regulation under Section 7 of the Endangered Species Act of 1973, as amended, 16 U.S.C.A. §1531, *et. seq*. ("ESA") of the Navy's proposed use of Plaintiff's property as a housing development "went too far" and deprived Plaintiff of all economic use of its property. First, Plaintiff cannot establish that a categorical, or *per se*, taking occurred in this case because, despite the alleged requirement to secure a mitigation parcel, Plaintiff was able to sell all of its original 82-acre purchase (approximately 74.64 acres of which

was sold to the Navy and is the focus of Plaintiff's claim) for over $1 million more than Plaintiff paid for the original parcel. Second, Plaintiff cannot establish a regulatory taking occurred in the present case because Plaintiff cannot satisfy any required element of Penn Central Transp. Co. v. City of New York, 438 U.S. 104 (1978). Indeed, all three prongs of the Penn Central analysis weigh heavily in Defendant's favor.

## FACTUAL AND STATUTORY BACKGROUND

### I. Plaintiff's Complaint

Plaintiff filed its Complaint in this Court on February 3, 2006, alleging that it held title to approximately 75 acres of undeveloped land north of Interstate 10 on Highway 57 in Jackson County, Mississippi, and "desired to sell" this land "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶V, VIII. Plaintiff further alleges that, because the land "was located within a defined critical habitat of the Mississippi Sandhill Crane, a declared and published endangered species, development of the Property was not allowed." Compl. ¶ IX. Plaintiff claims that, "to continue with the sale to the Navy . . . Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to designated critical habitats on the Property." Compl. ¶ XX (citing the United States Fish and Wildlife Service's Biological Opinion ("BO") dated February 12, 2002, and attached to Plaintiff's Complaint as Exhibit C).[2/] As a result of its efforts to purchase off-site property, Plaintiff alleges it was divested of $312,500.00 and "required to sacrifice all economically

[2/] The BO is also included in Tab 1 of Joint Appendix the parties filed with the Court on July 25, 2007.

beneficial use" of the land in violation of the Fifth Amendment to the United States Constitution.[3] Compl. ¶¶ XI, XXI; but see JSF p. 11, No. 69 (Plaintiff expended approximately $314,406.65 to secure a mitigation parcel). Plaintiff now seeks reimbursement for the costs of securing that mitigation parcel by claiming that it had a protected property right under the Fifth Amendment to sell its property to the Navy for a specific use and without any conditions.

Plaintiff's Complaint does not specifically allege that it was not allowed to develop the property or that the United States interfered with Plaintiff's right to sell the property to an entity other than the Navy. See Compl. Indeed, Plaintiff never applied for an Incidental Take Permit ("ITP") pursuant to Section 10 of the ESA. See JSF p. 4, No. 21; see also 16 U.S.C. §1539. Thus, this action does not arise from Plaintiff's application for and subsequent denial of a permit under the ESA. Instead, Plaintiff essentially complains that, as a result of the Navy acting in its proprietary capacity and complying with Section 7 of the ESA, Plaintiff was required to secure a mitigation parcel in order to sell its property to the Navy.

## II. The Mississippi sandhill crane, Critical Habitat Designation, and the ESA

In 1972, the Mississippi sandhill crane was listed as a subspecies of the sandhill crane and was added to the United States' List of Endangered Fish and Wildlife on June 4, 1973. See 38 Fed. Reg. 14678 (June 4, 1973) included in the JA at Tab 26, p. JA 0166; see also JSF p. 1, No. 1; JA Tab 1, p. JA 0005. Once the Mississippi sandhill crane was listed as endangered, it became unlawful for any person to "take" the crane in violation of Section 9 of the ESA. See 16

---

[3] Plaintiff also alleges a violation of the Fourteenth Amendment and seeks declaratory relief from the Court. These claims are appropriately dismissed pursuant to RCFC 12(b)(1) because the Tucker Act, 28 U.S.C. § 1491, does not provide this Court with jurisdiction over these claims.

U.S.C. § 1538(a)(1)(B). To "take" an endangered species, as that term is used in the ESA, means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19).

In 1975, the FWS established the Mississippi Sandhill Crane National Wildlife Refuge ("Refuge"), which is located in Gautier, Jackson County, Mississippi. See JSF p. 1, No. 4; JA Tab 1, p. JA 0005; see also JSF p. 3, No.19; JA Tab 10, p. JA 0087. The Refuge's objectives include providing protection and management for the crane, protecting and preserving unique wetpine savanna communities, and providing environmental education, interpretation, and wildlife-oriented recreation. JSF pp. 2-3, Nos. 6, 19; JA Tab 28, pp. JA 0171-172.

On July 29, 1977, through a rulemaking, the FWS designated critical habitat for the Mississippi sandhill crane, and the rule was published in the Federal Register on August 8, 1977. JSF p. 2, No. 7; see also 42 Fed. Reg. 39985 (August 8, 1977) included in the JA at Tab 27, pp. JA 0167-0170. Specific coordinates delineating the designated critical habitat and a map depicting the designated critical habitat area were published with the rule. See JA 0169-170. The published rule noted, among other things, that based on the Director of the FWS's review and consideration of comments, data, and other information, "the areas delineated below are determined to be Critical Habitat for the Mississippi sandhill crane." JA 0169. The published rule added that "[T]he same area had been determined to be Critical Habitat in an emergency rule-making published on June 30, 1975 (40 FR 27601-27602)." JA 0168. The property at issue in this lawsuit is located within the boundaries of the 1977 designation of critical habitat and is also adjacent to the Refuge. JSF p. 2, No. 8; see also 42 Fed. Reg. 39985 (August 8, 1977), JA Tab 27, pp. JA 0169-0170; JSF p. 3, No. 18; JA Tab 1, p. JA 0004.

Pursuant to Section 7 of the ESA, all federal agencies are required to consult with the FWS to insure the agency's actions do not harm a listed species or result in the destruction or adverse modification of designated critical habitat. Section 7 of the ESA states in relevant part:

> "[e]ach federal agency *shall*, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ["action agency"], is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat of such species." (emphasis added).

16 U.S.C. § 1536(a)(2). The Section 7 interagency consultation process may begin through an informal process whereby the federal agency, also known as the action agency, in consultation with the FWS, determines whether the proposed action is "not likely to adversely affect a listed species." 50 CFR § 402.13(a). If the proposed action may affect a listed species or a species' critical habitat, formal consultation is required between the action agency and the consulting agency (here, FWS), provided there is no regulatory exception. Formal consultation is initiated by the action agency and may be terminated with the consulting agency's issuance of a biological opinion, which sets forth the FWS's determination as to whether the proposed action will jeopardize the continued existence of the species or destroy or adversely modify critical habitat. 50 CFR § 402.14(l); 50 CFR § 402.02; 50 CFR § 402.14(h).

## III. Relevant Property Conveyances and Background Information

In 1998, Plaintiff entered into an option contract to purchase approximately 82 acres of property ("original purchase") located on Highway 57 and north of Interstate 10 in Jackson County, Mississippi, from Alicia Swiney Pearce, as conservator on behalf of Henry Meyers. JSF p. 2, No. 9; JA Tab 2, p. JA 0024. Plaintiff planned to market the property as an industrial park.

JSF p. 2, No. 10; JA Tab 2, p. JA 0024. To that end, Plaintiff showed its plan to the economic director for Jackson County and received little response. JSF p. 2, No. 11; JA Tab 2, p. JA 0024.

Plaintiff purchased the property from Pearce in January 2000. See JSF p. 3, Nos. 16-17; see also JA Tab 4, pp. JA 0042, Pl.'s Resp. to Req. for Admis. No 1. The unsigned settlement statement indicates Plaintiff paid approximately $963,802 for the property, which consisted of approximately 82 acres of land. See JSA p. 3, No. 17; see also JA Tab 32, pp. JA 0177-0179. Through a series of three transactions in July and August 2000, Plaintiff sold approximately 8 acres of its original 82-acre parcel for approximately $430,000, leaving Plaintiff with approximately 74.64 acres, which is the subject of Plaintiff's Complaint. JSF p. 4, Nos. 23-25, 27; see also JA Tab 4, pp. JA 0042-0044, Pl.'s Resp. to Req. for Admis. Nos. 1, 3-5.

From late 2000 through March 2001, the Navy began identifying undeveloped properties, also referred to as "sites," in Jackson County, Mississippi, that would be suitable to construct approximately 188 housing units to house Navy personnel and dependants assigned to Naval Station Pascagoula ("NS Pascagoula"). JSF p. 5, No. 29; see also JA Tab 18, p. JA 0134; see also JA Tab 5, pp. JA 0055-0056. After identification and evaluation of approximately 30 sites, the Navy eliminated from consideration all but five sites. The property at issue in this lawsuit, referred to as "Site 28" by the Navy, was among the five remaining sites. JSF p. 5, No. 29-33; JA Tab 5, pp. JA 0073-0078; see also JSF p. 5, No. 31.

Through a series of communications between the Navy; the Navy's contractor, Ecology and Environment ("E&E"); the FWS; and the Refuge, the Navy was informed that, among other things, Site 28 was within the designated critical habitat of the Mississippi sandhill crane, a "highly endangered species," and 45 acres of prime habitat would be lost if the proposed housing

development was constructed on Site 28. See JSF p. 7, Nos. 43, 47; see also JA Tabs 9, 10, pp. JA 0085, 0087. By letter dated April 4, 2001, the FWS also expressed concern to E&E that the housing project, if located on either Site 8, 28, or 29, could impact the crane, its habitat, and/or the Refuge. See JSF p. 7, No. 43; JA Tab 9, p. JA 0085. In the letter, the FWS noted the Mississippi sandhill crane's historic usage of Site 28 for nesting and foraging and the impacts to the crane were the housing project to be built on Site 28. See JSF p. 7, No. 44; JA Tab 9, pp. JA 0085-0086. Given these impacts, the FWS recommended that the Navy "seriously consider avoidance" of Sites 8, 28, and 29. See JSF p. 7, No. 44; JA Tab 9, p. JA 0086.

By letter dated July 9, 2001, Plaintiff advised the Navy that Plaintiff had met with the FWS regarding the FWS's concerns about possible impacts to the Mississippi sandhill crane as a result of the Navy's proposed development on Site 28. JA Tab 30, p. JA 0175; see also JSF p. 11, No. 73 (stipulating to the letter's authenticity). Plaintiff also informed the Navy that Plaintiff "expressed a desire" to work with the FWS to explore ways to offset adverse effects on the Navy's proposed use of Site 28 and believed "some workable solution" could be achieved to remove concerns of the FWS. JA Tab 30, p. JA 0175. Plaintiff added it was "working diligently to achieve this outcome, at no expense to the Navy, and fe[lt] comfortable that a workable solution [would] be achieved shortly." JA Tab 30, p. JA 0175; see also Exhibit ("Ex.") I-J (Plaintiff confirmed to the Navy that Plaintiff would secure a mitigation parcel at no expense to the Navy or the FWS).

On August 3, 2001, the FWS wrote a letter to the Navy and informed the Navy of a June 27th meeting with Plaintiff concerning the purchase of offsite lands. The letter further explored the possibility of the acquisition of an offsite parcel, listed seven potential offsite parcels as

options in addition to on site measures on Site 28, such as a setback and chain link fence between the proposed development and the Refuge, to offset impacts to the Mississippi sandhill crane. See JSF p. 8, No. 49; JA Tab 11, pp. JA 0088-0096; JSF p. 8, No. 50; JA Tab 11, p. JA 0091. In the letter, the FWS also informed the Navy that a "may affect" situation existed within the meaning of Section 7 of the ESA as to Site 28 and recommended that the Navy request formal consultation with the FWS on developing Site 28.[4/] JSF p. 8, No. 51; JA Tab 11, p. JA 0092. The Navy contacted the FWS by letter dated August 20, 2001, and requested formal section 7 consultation for Site 28. JSF p. 8, No. 52; JA Tab 12, p. JA 0097.

On August 29, 2001, Plaintiff, Rena Ford, and Lamar Criswell entered into an option contract for purchase of an offsite parcel. JSF p. 8, No. 53; see also JA Tab 13, p. JA 0098-0106. The option contract set forth that Ford agreed to exchange 77 acres of land ("Ford tract") with Criswell "in accordance with Section 1031 of the Internal Revenue code, so as to incur no tax liability or expense on her part." JSF p. 8, No. 54; see also JA Tab 13, p. JA 0099. Criswell agreed to exchange his property with Ford, so that Criswell "may, in turn make a conveyance to Mississippi Sandhill Crane National Wildlife Refuge, for the consideration of $300,000.00" to be paid by Plaintiff should Plaintiff choose to exercise the option. JSF p. 9, No. 55; see also JA Tab 13, pp. JA 0099-0100.

On September 20, 2001, the FWS wrote the Navy a letter confirming initiation of the formal consultation process. JSF p. 9, No. 56; JA Tab 14, pp. JA 0107-0108. Plaintiff contacted

---

[4/] Pursuant to regulation, under Section 7 of the ESA, the Regional Director of the FWS "may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation." 50 C.F.R § 402.14(a) (2007).

the Navy by letter dated January 17, 2002, and informed the Navy that Plaintiff "is still very much interested in the sale [of Site 28] at the aforementioned price of $1.9 million." JSF p. 9, No. 58; JA Tab 16, pp. JA 0111. Plaintiff also notified the Navy that its option to purchase offsite property expired on February 29, 2002. JSF p. 9, No. 59; JA Tab 16, pp. JA 0111.

On February 12, 2002, the FWS issued its BO. See JSF p. 9, No. 60; see also JA Tab 1, pp. JA 0001-0019. The BO analyzed the Navy's proposed action, which was the Navy's proposed development of Site 28 with the Plaintiff's purchase and conveyance of an offsite parcel to the FWS. See JA Tab 1, p. JA 0004. The BO concluded that the proposed action was "not likely to jeopardize the continued existence of the Mississippi sandhill crane or destroy or adversely modify designated critical habitat." JA Tab 1, p. JA 0014. The BO also included an Incidental Take Statement providing that, if the Navy implemented reasonable and prudent measures, including reducing onsite noise and visual disturbance, pollution, and the likelihood of Navy personnel intruding onto the Refuge, the impact of incidental take on the crane would be minimized. JA Tab 1, pp. JA 0014-0017.

On March 28, 2002, Plaintiff wrote to Beau Gex, District Chief of Staff to Congressman Gene Taylor, informing Gex of occurrences regarding Site 28, including, among other things, the issuance of the BO "with a favorable decision being rendered" and that a price had been negotiated with the Navy's Real Estate Division for the purchase of Site 28. JA Tab 29, p. JA 0173-0174; see also JSF p. 12, No. 74 (stipulating to the letter's authenticity). Plaintiff noted that the "final package" had been sent to Washington for final approval by the Navy's Commander in Chief, U.S. Atlantic Fleet. JA Tab 29, p. JA 0174. Plaintiff further stated in the

letter that it would "appreciate any efforts you can make on our behalf to find out when this process might come to a conclusion." Id.

On April 17, 2002, the Navy signed the Agreement for Purchase of Real Property ("Purchase Agreement") that was previously executed by Plaintiff two days earlier. See JSF p. 10, No. 63; see also JA Tab 19, pp. JA 0135-0141. Per the Purchase Agreement, Plaintiff, as vendor, agreed to sell approximately 74.64 acres to the United States for $1.9 million. See JSF p. 10, No. 64; see also JA Tab 19, p. JA 0135. The Purchase Agreement stated, "[T]he vendor additionally agrees, as part of the aforementioned $1,900,000.00 consideration, to convey to the U.S. Department of the Interior Fish and Wildlife Service (Service) a separate parcel of land to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane." JSF p. 10, No. 65; see also JA Tab 19, p. JA 0135. Plaintiff transferred the property at issue to the United States through the Navy by warranty deed on May 3, 2002. See JSF p. 10, No. 66; see also JA Tab 20, pp. JA 0142-0149.

That same day, in accordance with the terms of its Purchase Agreement with the Navy, Plaintiff paid Lamar Criswell $300,000 in order to secure Criswell's transfer of 77 acres of property to the FWS pursuant to the option contract entered into by Plaintiff, Ford, and Criswell. See JSF p. 10, No. 67; see also JA Tab 23, p. JA 0153, Pl.'s Resp. to Def.'s Req. for Admis. No. 9; JA Tab 31, p. JA 0176; JA Tab 13. Criswell then transferred 77 acres of property to the United States "for the use and benefit of the U.S. Fish and Wildlife Service of the Department of the Interior," pursuant to the option contract. See JSF p. 11, No. 68; see also JA Tab 21, pp. JA 0150-0151; JA Tab 13. In connection with Criswell's transfer of the property to the FWS, Plaintiff expended the following sums: $10,500 to Jim Horne to negotiate purchase of the

property to be donated to the FWS, $2,000 finder's fee to John M. "Cappy" Ford, and $1,906.65 in closing costs ("related expenses"). JSF p. 11, No. 69; see also JA Tab 25, pp. JA 0163-0165; JA Tab 23, pp. JA 0153-0155, Plt's Resp. to Def.'s Req. for Admis. Nos. 10, 12. Deducting the purchase price of the Criswell property and the related expenses from the $1.9 million sum that Plaintiff received from the Navy for its property yields a figure of $1,585,593.35.

The Navy subsequently developed Site 28 as personnel housing. See JSF p. 11, No. 72.

## IV. Plaintiff's Submission of Contested Issues of Fact

On September 21, 2007, Plaintiff filed its Submission of Contested Issued of Fact in which Plaintiff lists 57 items purporting to be contested issues of material fact. Plaintiff fails to provide any citations to the record to support any of the items contained in its submission and many items listed in the submission are not factual assertions, but conclusory restatements of the issues involved in this action.[5/] Moreover, no item listed in Plaintiff's submission presents a material issue of fact related to the dispositive issues presented in Defendant's motion. Therefore, Plaintiff's submission does not set forth competent evidence to overcome Defendant's Motion for Summary Judgment. See RCFC 56(e) (in responding to a motion for summary judgment, ". . . an adverse party may not rest upon the mere allegations or denials of the adverse

[5/]Defendant contacted counsel for Plaintiff by e-mail dated September 25, 2007, and requested citations or supplemental information by September 27, 2007. See Ex. G. Defendant subsequently contacted counsel for Plaintiff by letter dated October 1, 2001, and requested that Plaintiff contact Defendant if Plaintiff intended to provide citations or supplemental information. See Ex. H. To date, Defendant has not received a response from Plaintiff regarding this matter.

party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."). Nevertheless, Defendant will address Plaintiff's submission in more detail below.[6]

**STANDARD OF REVIEW**

Summary judgment is a "salutary method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (internal quotation marks omitted). In this regard, the summary judgment procedure "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

Summary judgment is appropriate under RCFC 56 when there are no genuine issues of material fact in dispute, and the moving party is entitled to a judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude entry of summary judgment." Id. at 248; see also Knieper v. United States, 38 Fed. Cl. 128, 134 (1997) ("Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment."). Moreover, summary judgment may be awarded in a takings case. See Allied-General Nuclear Servs. v. United States, 839 F.2d 1572 (Fed. Cir.)

---

[6] Defendant believes the cursory allegations contained in Plaintiff's submission under the heading "Damages" are also insufficient to overcome summary judgment. Additionally, Defendant's Motion for Summary Judgment addresses liability, not just compensation. Therefore, Defendant reserves the right to further respond to these allegations if liability is established.

(affirming summary judgment of takings claim), cert. denied, 488 U.S. 819 (1988); Tabb Lakes, Ltd. v. United States, 10 F.3d 796 (Fed. Cir. 1993) (same).

## ARGUMENT

### I. PLAINTIFF'S ALLEGED RIGHT TO SELL ITS PROPERTY TO THE NAVY FOR A SPECIFIC PURPOSE AND WITHOUT ANY CONDITIONS IS NOT A PROPERTY RIGHT PROTECTED BY THE FIFTH AMENDMENT

In its Complaint, Plaintiff specifically alleges that it "desired to sell" the subject property "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶V, VI, VIII. Plaintiff complains that, to enjoy its alleged right to sell the property to the Navy for the Navy's housing development, "Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to designated critical habitats on the Property." Comp. ¶ XX. Plaintiff, however, never acquired the alleged right to sell its property to the Navy for the Navy's housing development. As there are no genuine issues of material fact and, for the reasons set forth below, summary judgment dismissing Plaintiff's Fifth Amendment regulatory takings claim is appropriate.

#### A. Whether Plaintiff's Alleged Property Right Is Protected By the Fifth Amendment Is A Threshold Inquiry

The Federal Circuit has established a two-part test to evaluate whether governmental action amounts to a taking of private property for Fifth Amendment purposes. Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003); M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995). "First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment [and] [s]econd, once a court has determined that a property interest exists, it must determine whether a

taking occurred." Conti, 291 F.3d at 1339; see also M&J Coal, 47 F.3d at 1154. As noted by the Federal Circuit in Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005), "we do not reach this second step without first identifying a cognizable property interest."

Therefore, in every Fifth Amendment takings case, the issue of whether the Plaintiff possesses a protected property interest is a threshold element of the Plaintiff's claim. See Air Pegasus, 424 F.3d at 1212 ("First, as a threshold matter, the court must determine whether the claimant has established a property interest for the purposes of the Fifth Amendment.") (quoting Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005)); Maritrans v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment.") (citation omitted). If a plaintiff cannot establish a cognizable property interest, plaintiff's takings claim fails. See Am. Pelagic, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts task is at an end"); Conti, 291 F.3d at 1339 ("However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in Penn Central").

In determining whether a plaintiff possesses a property right that is protected by the Fifth Amendment, courts begin with the maxim that

> [t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for

> purposes of establishing a cognizable taking. Lucas [v. South Carolina Coastal Council, 505 U.S. 1003,] 1030 [(1992)]. These existing rules often involve and define "the citizen's relation to the physical thing, as the right to possess, use and dispose of it." United States v. Gen. Motors, 323 U.S. 373, 378, 65 S. Ct. 357, 89 L.Ed. 311 (1945).

Conti, 291 F.3d at 1340. Stated another way, the threshold inquiry into whether a plaintiff possesses a protected or cognizable property interest requires the court to determine whether the particular property interest that a plaintiff contends has been taken is "a stick in the bundle of property rights" possessed by the plaintiff. Am. Pelagic, 379 F.3d at 1376; M&J Coal, 47 F.3d at 1154 (noting that the court must first determine whether the use proscribed by the governmental action was part of the owner's title to begin with) (citing Lucas, 505 U.S. at 1027.

According to this legal framework, the Court's inquiry into whether Plaintiff possessed a protected property interest at the time of the alleged taking must begin with identifying the property right alleged to have been taken and examining the source of that alleged right. See Air Pegasus, 424 F.3d at 1217 (limiting review to the right alleged by plaintiff - "not merely a right to access . . . , but a right to access *navigable* airspace from its heliport"). Here, Plaintiff alleges a taking of its right to sell its property to the Navy for a housing development without the requirement to secure a mitigation parcel to offset adverse impacts to the Mississippi sandhill crane or its habitat. See Compl. ¶¶V, VI, VIII, XX. There are three potential sources of Plaintiff's alleged right to sell its property to the Navy without any conditions: Plaintiff's deed, the Navy's housing program, and the Purchase Agreement that Plaintiff entered into with the Navy. As explained below, none of these three sources provided Plaintiff with the right it alleges to have been taken: the right to sell its property to the Navy for a specific use and without any conditions.

**B. Plaintiff Did Not Acquire the Alleged Right to Sell Property to the Navy for the Navy's Housing Development From Plaintiff's Deed or the Navy's Housing Proposal**

As noted, Plaintiff acquired fee simple to approximately 82 acres of land by deed dated January 6, 2000. See Ex. A.[7] Between July and August of the same year, Plaintiff sold approximately 8 acres of that land for approximately $430,000. See JSF p. 4, Nos. 23-25. Plaintiff subsequently sold the remaining land to the Navy for use as a proposed housing development. The Purchase Agreement executed by Plaintiff and the Navy stated that Plaintiff agreed to convey its remaining 74.64 acres of land plus additional off-site acreage in exchange for $1.9 million. See JSF p. 10, Nos. 64-65. That Agreement was implemented in April and May of 2002. See JSF p. 10, Nos. 63, 66.

Defendant does not dispute that fee simple title to land is a property interest with a "rich tradition of protection at common law" that has long been regarded as a property interest protected by the Constitution. Lucas, 505 U.S. at 1016 n.7. However, Plaintiff's takings claim in the present case is premised on the assertion that it had the right to sell and develop the property at issue, which included a specific, unconditional right to sell the property "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶VIII. Plaintiff asserts that, to enjoy its alleged right to sell the property to the Navy, "Plaintiff would be required to purchase off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to

[7] The Warranty Deed transferring the property from Pearce, as conservator, to Plaintiff was not included in the Joint Appendix filed the parties on July 25, 2007. It was attached to Defendant's Statement of Specific Issues of Law as Exhibit A and is also attached to this motion as Exhibit A.

designated critical habitats on the Property." Comp. ¶ XX. Plaintiff cannot establish that this alleged right - to sell property to the Navy for a specific use and without any conditions - is a right protected by the Fifth Amendment because the right to sell the subject property to the Navy for a specific purpose and without any conditions is not a stick in the bundle of rights that Plaintiff acquired when it purchased the subject property.

A review of the deed by which Plaintiff acquired the subject property shows that Plaintiff did not acquire such a specific right when it purchased the subject property. See Ex. A. Moreover, Plaintiff could not have acquired the specific right to sell the subject property to the Navy - with or without conditions - when it purchased the subject property in 2000 because the Navy's search for undeveloped sites to construct housing did not begin until late 2000. See JSF, pp. 3, 5, Nos. 5, 29. Thus, the alleged right to sell property to the Navy could not have existed at the time Plaintiff acquired its deed in January 2000.

Although the right to use, sell, or convey property are generally considered to be sticks in the bundle of rights associated with fee simple ownership of land, those "sticks" do not include the right to derive a specific benefit from, or make a specific use of the property. While not involving fee ownership of land, recent decisions from the Federal Circuit illustrate this principle. In Members of the Peanut Quota Holders Ass'n, Inc., v. United States, 421 F.3d 1323 (Fed. Cir. 2005), cert. denied, 126 S. Ct. 2967 (2006), the plaintiffs claimed a Fifth Amendment regulatory taking as a result of a statutory provision disqualifying the plaintiffs from receiving expected loan rates and future peanut quotas. Id. at 1326. In affirming the trial court's grant of summary judgment dismissing the plaintiff's claims, the Federal Circuit acknowledged that the plaintiffs had a property interest in the peanut quotas, but held that "the fact that quota holders

expected to continue to derive benefits from the program does not create rights to compensation from the government." Id. at 1335. In its analysis, the Federal Circuit noted that the peanut quotas were subject to alteration or elimination because the quotas were part of a government program that the government could withdraw or qualify as it chooses. Id. at 1334-35.

Plaintiff in the present case held a fee interest in land as property, similar to the quotas held as property in Peanut Quota Holders, but any specific benefit Plaintiff expected to derive from its anticipated sale of property to the Navy resulted from the Navy's proposal to build housing for NS Pascagoula. Implementation of the proposal required the Navy to comply with numerous legal requirements, including the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et. seq*., and Section 7 of the ESA. In addition, similar to the program in Peanut Quota Holders, the Navy's proposal could be changed, modified, or even eliminated at any time. Therefore, like the plaintiffs in Peanut Quota Holders, any benefit conferred on Plaintiff as a result the Navy's proposed housing development did not, as a matter of law, create a right to compensation from the government in the event that benefit was modified or even eliminated.

The right to make a specific use of property, among other issues, was considered in American Pelagic Fishing Co. v. United States, 379 F.3d 1363 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005), and Colvin Cattle Co. v. United States, 468 F.3d 803 (Fed. Cir. 2006). In American Pelagic, the plaintiff owned a fishing vessel and held permits from the United States allowing the plaintiff to fish for Atlantic mackerel in the Exclusive Economic Zone ("EEZ") of the United States in the Atlantic Ocean. American Pelagic, 379 F.3d at 1367-68. Congress subsequently revoked the plaintiff's existing fishing permits and prevented acquisition of new permits. Id. at 1368-69. The plaintiff sued the United States for a Fifth Amendment taking

alleging, among other things, that the permits were "appurtenant to the use and operation" of its fishing vessel. Id. at 1373. Although it was undisputed that the plaintiff possessed a property right in its vessel, the Federal Circuit reversed the trial court and held that the use of the plaintiff's vessel to fish for Atlantic mackerel in the EEZ "does not equate to a cognizable property interest for the purposes of a takings analysis." Id. at 1377. The court relied in part on its finding that the government could revoke or modify the permits. Id. at 1374.

The plaintiff in Colvin Cattle alleged a Fifth Amendment taking of its ranch, water rights, and grazing rights as a result of the government's cancellation of the plaintiff's grazing permit. Colvin Cattle, 468 F.3d at 806. There was no dispute the plaintiff possessed property rights in its ranch and water rights, but the plaintiff claimed that the right to graze was inherent in its water rights. Id. In affirming the trial court, the Federal Circuit held that "grazing is not a stick in the bundle of rights that [the plaintiff] has ever acquired." Id. at 808. The court also rejected the plaintiff's claim that its ranch had been taken because, even if the ranch lost value as a result of losing the grazing permit, that loss in value was not a result of "governmental restrictions on a constitutionally cognizable property interest." Id.

Similarly, Plaintiff in the present case cannot establish that the alleged right to sell its property to the Navy for a housing development is a right that is inherent in its fee simple ownership of land. Plaintiff did not acquire this specific right from its deed, nor did the Navy's development proposal confer such a right. Moreover, the Navy's proposed housing development was just that - a proposal that could be changed, modified, or even cancelled at any time. Therefore, Plaintiff's acquisition of the subject property never included a right to sell that property to the Navy, for the Navy's housing development, at a particular price, and without any

conditions. Accordingly, the right allegedly taken is not a property right that Plaintiff actually possessed.

### C. Plaintiff Did Not Acquire Any Property Right Protected By the Fifth Amendment From the Purchase Agreement

The only other potential source of the property right Plaintiff alleges to have been taken from it is the Purchase Agreement that Plaintiff entered into with the Navy. Here, the Navy entered the marketplace in search of property to acquire for its proposed housing development. After identification and evaluation of numerous sites, the Navy selected Site 28 – the parcel owned by Plaintiff – for its housing development. See JSF p. 9, No. 61; JA Tab 18. After completion of the Navy's formal consultation with the FWS, which culminated in the FWS's issuance of the BO finding that the Navy's proposed action would neither jeopardize the crane nor destroy or adversely modify its critical habitat, Plaintiff sold the property at issue in this lawsuit to the Navy in April 2002. See JSF p. 10, Nos. 63-65; JA Tab 20. Pursuant to the Purchase Agreement, Plaintiff agreed to sell the subject property to the United States for $1.9 million. See JSF p. 10, No. 64; see also JA Tab 19, p. JA 0135. The Purchase Agreement further stated, "[T]he vendor additionally agrees, as part of the aforementioned $1,900,000.00 consideration, to convey to the U.S. Department of the Interior Fish and Wildlife Service (Service) a separate parcel of land to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane." JSF p. 10, No. 65 (emphasis added); see also JA Tab 19, p. JA 0135. Plaintiff subsequently transferred the property at issue consisting of approximately 74.64 acres to the United States through the Navy by warranty deed on May 3, 2002. JSF p. 10, No. 66; see also JA Tab 20, pp. JA 0142-0149.

These undisputed facts reveal two critical points. First, the Purchase Agreement itself did not give Plaintiff a unilateral right to sell its property to the Navy for a set price and without any conditions. To the contrary, the terms of the sale as set forth in the Purchase Agreement include the condition for which Plaintiff now complains - conveyance of a separate parcel to the FWS to offset impacts caused by the Navy's proposed housing development. See JA Tab 19, p. JA 0135. Accordingly, pursuant to the express language of the Purchase Agreement, Plaintiff did not acquire a right to sell its land to the Navy without any conditions.

Second, the undisputed facts demonstrate that the government was acting in its proprietary capacity, not its regulatory capacity, when it contracted with Plaintiff for the purchase of the subject property. The terms of that acquisition are set forth in the Purchase Agreement, and the undisputed facts show that the terms of this contract were performed by both sides. Plaintiff conveyed its 74.64-acre parcel to the Navy and arranged for the transfer of additional off-site acreage to offset the impacts of its proposed housing development. The Navy, in turn, paid Plaintiff $1.9 million for these lands. The only rights Plaintiff had with respect to the sale of the subject property to the Navy are the rights set forth in its contract with the Navy. This type of transaction is an illustration of the United States acting in its proprietary, not sovereign capacity. See Gratz v. United States, 25 Cl. Ct. 411, 420 (1992) (plaintiffs entered into a contract with the government, and "[t]he Government loaned plaintiffs money in exchange for plaintiffs' promise to repay and store sufficient collateral . . . . This transaction is a classic illustration of the Government's acting in a proprietary capacity. Each side incurred rights and responsibilities."). In other words, the government and the Plaintiff were simply parties to a contract.

To the extent that Plaintiff is asserting that its contractual rights have been interfered with, this interference may give rise to a breach of contract claim, but not a takings claim. See Sun Oil Co. v. United States, 572 F.2d 786, 818 (Ct. Cl. 1978) (a takings theory "has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a takings claim.") (citation omitted); Hughes Commc'n Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) ("Takings claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protections of private property rights.") (citation omitted). Any rights created by the Purchase Agreement are not private property rights that are protected by the Fifth Amendment. Plaintiff's remedy, if any, is a contractual one rather than a constitutional one.[8/]

### D. Plaintiff Is Barred From Alleging the United States Interfered With Plaintiff's Development Rights or Plaintiff's Right to Sell To A Purchaser Other Than the Navy

As noted, Plaintiff broadly alleges that it had the right to sell and develop the property at issue and specifically alleges that it "desired to sell" the property "to the United States of America and the United States Navy" to be used for a Navy housing project. See Compl. ¶¶V, VI, VIII. In Plaintiff's Submission of Contested Issues of Fact, Plaintiff speculates as to the extent private development would have been allowed on the property and the conditions that

---

[8/]Of course, Plaintiff has not alleged any breach of the Purchase Agreement, nor could it given that the Agreement was implemented according to its terms.

could have been imposed. See Pl. Submission of Contested Issues of Fact, pp. 2-3, 4-5, Nos. 7, 11-12, 15, 29-31, 33. Plaintiff, again, provides no citations to the record to support its assertions. To the extent Plaintiff's claim can be construed as one alleging the government interfered with its own development rights or its right to sell to a purchaser other than the Navy, this claim must be rejected as a matter of law because it is not ripe for this Court's review.

The Supreme Court has insisted that a plaintiff with a regulatory takings claim present a record clearly demonstrating that the agency has reached a final, definitive decision precluding substantial economic use of the property. See Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985) (no taking where local administrative action did not "conclusively determine whether respondent [would] be denied all reasonable beneficial use of its property") (emphasis added); MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 352 (1986) (no taking where lower courts' holdings "leave open the possibility that some development will be permitted") (emphasis added); see also Hoehne v. County of San Benito, 870 F.2d 529, 533 (9th Cir. 1989) ("[T]o prove that a final [permitting] decision was indeed reached, the facts of the case must be clear, complete, and unambiguous."). The Federal Circuit has elaborated that "the initial denial of a permit is still a necessary trigger for a ripe takings claim." Boise Cascade Corp. v. United States, 296 F.3d 1339, 1347 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

Here, it is undisputed that Plaintiff never applied for an ITP pursuant to Section 10 of the ESA. See JSF p. 4, No. 21. It is also undisputed Plaintiff never contacted the FWS regarding whether development would impact any federally listed species. See JSF p. 4, No. 22. Indeed, Patric Harper, the Daphne, Alabama Field Office Biologist who prepared the BO and is

employed by one of FWS's offices with decision-making authority for Section 4, 7, and 10 matters, did not ever speak to Plaintiff about whether an ITP would be required were Plaintiff to develop the property or about the types of conditions, if any, that would be placed on a Section 10 ITP permit. See Ex. E, Declaration of Patric Harper ("Harper Decl."), ¶¶ 1, 3-4, 7. Because Plaintiff never applied for a permit, and therefore no permit was denied, Plaintiff cannot, as a matter of law, now claim a taking based on regulatory restrictions that might affect a proposal to develop the property at issue. See Boise Cascade, 296 F.3d at 1348 (No taking occurred because the government never denied the permit).

Moreover, any argument that an ITP issued pursuant to Seciton 10 of the ESA would have included the same terms and conditions as the BO issued to the Navy would be speculative. To reach this conclusion, the Court must assume that, had Plaintiff applied for a permit, the proposed action would have been the same as the proposed action analyzed in the BO, and that the impacts to the Mississippi sandhill crane would have been the same. Additionally, Steven Carter, President of Schooner Harbor, testified during his deposition that the Refuge indicated Plaintiff "may have to go through the same steps" regardless of the purchaser, but also confirmed that Plaintiff desired to sell its property to the Navy, and that the BO was specific to the Navy's development. See Ex. F, Deposition Transcript of Steven Carter ("Carter Dep."), p. 104, ll. 12-25; p. 105, ll. 1-2 (emphasis added). When asked if he believed Plaintiff could sell the property to an entity other than the Navy if a mitigation parcel was acquired, Carter responded, "Well, I don't know that because that's - we weren't traveling down that road. That's a hypothetical - I mean we weren't there." Ex. E, Carter Dep., p. 105, ll. 11-16. When asked whether the terms of

the BO allowed development of the property at issue, Carter responded, "It could be developed by the Navy. I think it [the BO] was specific to the Navy." Id. at p. 109, ll. 16-24.

For the foregoing reasons, this Court lacks jurisdiction to hear any claim set forth by Plaintiff regarding its own right to develop the property or its right to sell the property to a purchaser other than the Navy because such a claim is not ripe.[9]

**E. Plaintiff Is Barred From Collaterally Attacking the BO**

Notwithstanding the fact that Plaintiff attached a copy of the BO to its Complaint as Exhibit C, Plaintiff now contests information contained in the BO regarding whether development of the property would result in a take of the Mississippi sandhill crane, whether the Mississippi sandhill crane utilized the property at issue, and Plaintiff's knowledge of these issues. See Compl., Ex. C.; see also Pl. Contested Issues of Fact, pp. 1-2, 6-8, Nos. 6, 9, 14, 20-28, 42-57; JA Tab 1, pp. JA 0004, 0006. Again, Plaintiff does not provide any factual basis or cite to any evidence in the record to support its contentions. Id. At most, Plaintiff questions, without any basis, the accuracy of the radio-telemetry device used by Refuge personnel to locate the Mississippi sandhill crane. See Pl. Contested Issues of Fact, pp. 7-8, Nos. 49-52, 57. Plaintiff's cursory allegations are insufficient to preclude granting Defendant's Motion for

---

[9] To the extent that Plaintiff's takings claim is premised on the belief that it had a unilateral right to use its property for any purpose or that it had a right to sell its property free of any regulatory restrictions, the claim is incorrect as a matter of law and must be rejected. See Compl. ¶ VI (broadly alleging Plaintiff "had the right to sell and develop the Property."). It is well settled that the "mere assertion of regulatory jurisdiction by a government body does not constitute a regulatory taking." United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 126 (1985). Moreover, the requirement that a property owner "obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense . . . Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." Id. at 126-27.

Summary Judgment. See RCFC 56(e) ("adverse party may not rest upon mere . . . allegations or denials. . .").

Moreover, Plaintiff's allegations regarding the content of the BO must be rejected for three additional reasons. First, Plaintiff cannot challenge an underlying agency action (here, the BO) as part of its Fifth Amendment takings claim. It is a long-standing rule that Plaintiff must accept, or at least assume, the validity of the underlying agency action in order to bring its takings claim. The Federal Circuit has stated, "in a takings case we assume the underlying governmental action was lawful, and we decide only whether the governmental action in question constituted a taking for which compensation must be paid." Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002). Indeed, this Court does not have jurisdiction over a challenge to underlying agency actions. See M & J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995) ("Neither the Court of Federal Claims nor this court may entertain a collateral challenge to the validity of OSM's actions.") (citing Florida Rock Indus., Inc. v. United States, 791 F.2d 893, 898-99 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987)). Therefore, Plaintiff's collateral challenge to the validity of the BO is jurisdictionally barred and must be dismissed.

Second, because Plaintiff must assume the validity of the underlying agency action, whether the Mississippi sandhill crane used the property at issue and whether development of the property would result in the take of the species are not material or relevant to whether Plaintiff can satisfy its burden to prove a regulatory taking occurred in this case. Specifically, whether development of the property would result in take of the species and the Mississippi sandhill crane's usage of the property have no relevance to whether Plaintiff possessed a property right

protected by the Fifth Amendment, whether Plaintiff can establish an economic wipe-out of the value of its property, or whether Plaintiff can satisfy the elements of Penn Central.

Finally, regardless of Plaintiff's cursory allegations, two Refuge records indicate the Mississippi sandhill crane utilized the property at issue since at least 1985. First, the Refuge maintained a database record of Mississippi sandhill crane observations in various locations, including the property at issue. The Declaration of Scott G. Hereford ("Hereford Decl."), the Refuge's Biologist with a speciality in the biology of the Mississippi sandhill crane, as well as a chart generated from the Refuge's database are attached to this motion as Exhibits B and C, respectively. In his declaration, Hereford explains how the Refuge maintained the database record, how he generated the chart attached as Exhibit C, and the steps Refuge personnel follow to ensure quality data collection from radio-transmitters. See Ex. B, Hereford Decl. ¶¶ 5-7.

The chart Hereford compiled displays documented observations of the Mississippi sandhill crane's usage of the subject property, referred to at that time as the "Meyer's Property," since 1985. See Ex. B Hereford Decl. ¶¶ 5, 7; Ex. C. The chart reveals that, beginning in 1987, approximately 13 years prior to Plaintiff's purchase of the property, most of the observations of the Mississippi sandhill crane's usage of the subject property were visual observations, and beginning in 1988, all of the observations of the Mississippi sandhill crane's usage of the subject property, except one, were visual. See Ex. C, p. US00465-467. The chart also documents a visual observation of a nest and two eggs located at the pond on the property at issue. Ex. C, p. US00465.

The Refuge also maintained three photographic slides of a Mississippi sandhill crane nest, known as Nest 98-21, located on the property at issue in 1998. Copies of the photographs

developed from the photographic slides are attached as Exhibit D. Hereford also explains in his declaration that the photographs were taken on June 9, 1998, of Mississippi sandhill crane Nest 98-21 located on the Meyer property. See Ex. B, Hereford Decl. ¶¶ 8-9. Hereford states that he was familiar with the Meyer property on June 9, 1998, and that the photographs fairly and accurately depict the scene and occurrences at Meyer's pond on that date. See Ex. B, Hereford Decl. ¶ 9. Specifically, the first photograph depicts Tracy Grazia, formerly a Biological Technician at the Refuge, and Hereford kneeling at the edge of the pond on the property to inspect the nest. Ex. B, Hereford Decl. ¶ 8. Grazia is measuring the width and length of the eggs in the nest, and Hererford is recording the data. Id. The second photograph shows Grazia measuring the nest while Hereford records her findings, and the last photograph depicts Grazia and Hereford at the nest. Id.

In sum, Plaintiff specifically alleges that it possessed the right to sell its property to the Navy, for the Navy’s housing development, and without any conditions. Plaintiff, however, did not acquire this right when it purchased its original 82-acre parcel, nor did it acquire this right when it entered into the Purchase Agreement to sell the property to the Navy. Indeed, the Purchase Agreement specifically states the opposite - that Plaintiff agreed to purchase off-site land to offset impacts caused by the Navy’s proposed housing development. To the extent Plaintiff asserts that there was interference with its contractual rights, this interference may give rise to a breach of contract claim, but not a takings claim. Plaintiff’s remaining cursory allegations regarding the validity of the BO and its own unfettered right to develop the property are jurisdictionally barred. For these reasons, Plaintiff does not possess a protected property right under the Fifth Amendment to sell the property at issue to the Navy for a housing

development, much less to sell property to the Navy without any conditions. As a result, summary judgment is appropriate, and Plaintiff's claim must be dismissed.

## II. THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF CANNOT ESTABLISH A REGULATORY TAKING OF ITS PROPERTY

The threshold question of whether the right allegedly taken from Plaintiff is a property right protected by the Fifth Amendment is dispositive in this case for the reasons set forth above, and Plaintiff's Complaint should be dismissed on this ground alone. If, however, the Court should find that Plaintiff's alleged right to sell its property to the Navy, for a specific use, and without any conditions is a protected property right, then Defendant moves in the alternative for summary judgment because Plaintiff cannot, as a matter of fact or law, establish that a regulatory taking occurred in the present case.

### A. The Relevant Parcel As a Whole Consists of Plaintiff's Original 82-Acre Purchase

In considering whether the government is liable for a regulatory taking, the Court must first define the "relevant parcel," otherwise known as the "parcel as a whole," since the "'test for regulatory taking requires [the court] to compare the value that has been taken from the property with the value that remains in the property.'" Forest Properties, Inc. v. United States, 177 F.3d 1360, 1365 (Fed. Cir. 1999) (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)). As the Supreme Court recently confirmed in Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency:

> Taking jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court

> focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole ....

535 U.S. 302, 327 (2002) (quoting Penn Central, 438 U.S. at 130-31); see also Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1346 (Fed. Cir. 2004), cert. denied, 543 U.S. 1188 (2005). Indeed, the Supreme Court has squarely held that it is improper to consider only that portion of a plaintiff's property that is restricted by regulation when determining whether a regulatory taking has occurred. Appolo Fuels, 381 F.3d at 1346 (noting that "defining the property interest taken in terms of the very regulation being challenged is circular") (quoting Tahoe-Sierra, 535 U.S. at 331). Moreover, the case law could not be more clear: "[t]he Supreme Court has long held that the regulatory takings analysis, with respect to both categorical takings and partial takings, must be applied to the 'parcel as a whole.'" Appolo Fuels, 381 F.3d at1346 (citing Penn Central, 438 U.S. at 130-31).

The Court of Federal Claims has previously set forth the following factors to consider in determining the parcel as a whole: "(1) the degree of continuity, (2) the dates of acquisition, (3) the extent to which the parcel has been treated as a single unit, and (4) the extent to which protected lands increase the value of remaining lands." Norman v. United States, 63 Fed. Cl. 231, 254 (2004), aff'd, 429 F.3d 1081 (Fed. Cir. 2005), cert. denied, 126 S.Ct. 2288 (2006) (citing Ciampitti v. United States, 22 Cl.Ct. 310, 318 (1991)). As applied to the present case, these factors require that the relevant parcel as a whole consist of Plaintiff's original 82-acre purchase. Plaintiff purchased a single, contiguous parcel of land consisting of approximately 82-acres on one date and in one transaction. See JSF pp. 2, 3, Nos. 9, 16; JA Tabs 2, 4 pp. JA 0024, JA 0042. Although Plaintiff sold approximately 8 acres of its original 82-acre parcel through a

series of three transactions in July and August 2000, Plaintiff's original acquisition of a single, contiguous unit of property through one transaction occurring on one date cannot be disregarded. Moreover, Plaintiff sold the alleged "protected land"- the remaining 74.64 acres, which is the subject of Plaintiff's Complaint - to the Navy for approximately $1.9 million, nearly $1 million more than the unsigned settlement statement indicates Plaintiff paid for the original 82-acre parcel. For these reasons, Plaintiff's regulatory takings claim is properly measured against Plaintiff's original 82-acre purchase.[10/]

**B. Plaintiff Cannot Establish a Categorical Taking of the Relevant Parcel as a Whole**

As a result of its efforts to purchase off-site property to facilitate the sale of its property to the Navy, Plaintiff alleges it was "required to sacrifice all economically beneficial use" of the land in violation of the Fifth Amendment to the United States Constitution. Compl. ¶ XXI; see also Compl. ¶¶ I, XXIV. To the extent Plaintiff's allegation could be construed as a categorical, or *per se*, takings claim pursuant to Lucas, the claim is appropriate for summary judgment and must be dismissed because Plaintiff cannot, as a matter of fact or law, establish a *per se* taking occurred in this case.

"A 'categorical' taking is, by accepted convention, one in which *all* economically viable use, i.e., all economic value" of the land, "has been taken by regulatory imposition." Palm Beach Isles, 231 F.3d at 1357; see also Lucas, 505 U.S. 1003. If a regulation categorically prohibits all economically beneficial use of land--destroying its economic value for private

[10/] Even if the Court were to disregard Plaintiff's earlier sale of approximately 8 acres, the outcome is the same - despite any alleged regulatory restrictions that might affect the use of the property, Plaintiff was able to sell its property for significantly more than its purchase price.

ownership--the regulation has an effect equivalent to a permanent physical occupation. Palm Beach Isles, 231 F.3d at 1361 (citing Lucas, 505 U.S. at 1015). The Supreme Court has emphasized that a *per se*

taking is limited to the extraordinary circumstances when no productive or economically beneficial use of the land is permitted. Tahoe-Sierra, 535 U.S. at 330.

Here, the unsigned settlement statement indicates Plaintiff paid approximately $963,802 for its original 82-acre purchase. See JSA p. 3, No. 17; see also JA Tab 32, pp. JA 0177-0179. Through a series of three transactions in July and August 2000, Plaintiff sold approximately 8 acres, or about 10% of its original parcel for approximately $430,000, a recovery of approximately 44.6 % of Plaintiff's purchase price. See JSF p. 4, Nos. 23-25, 27; see also JA Tab 4, pp. JA 0042-0044, Pl.'s Resp. to Req. for Admis. Nos. 1, 3-5. These three transactions also left plaintiff with approximately 74.64 acres of land, which Plaintiff thereafter sold to the Navy for $1.9 million, nearly $1 million more than Plaintiff paid to purchase the entire 82-acre parcel. See JSF p. 4, No. 27; JA Tab 4, pp. JA 0042-0044, Pl.'s Resp. to Req. for Admis. Nos. 1, 3-5; JSF p. 10, No. 64; see also JA Tab 19, p. JA 0135.

As a result of these four transactions, Plaintiff cannot, as a matter of law, establish that it was deprived of all economically beneficial use of the entire parcel. Instead, this is a case in which an economically beneficial use of the property at issue was permitted under the applicable regulatory scheme. Specifically, Plaintiff was able to sell all of its original 82-acre purchase for approximately $2.33 million, about $1.33 million more than the amount Plaintiff paid for the original parcel. Even after deducting Plaintiff's expenses of $314,406.65 to secure a mitigation parcel from $2.33 million, Plaintiff netted $2,015,593.40. Under any analysis, this case simply

does not present one of those extraordinary circumstances where Plaintiff was deprived of all economically beneficial use of its land. See Tahoe-Sierra, 535 U.S. at 330; see also Rith Energy, Inc. v. United States, 247 F.3d 1355, 1363 (Fed. Cir. 2001), cert. denied, 536 U.S. 958 (2002), ("'the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored'") (quoting Florida Rock Indus., Inc. v. United States, 791 F.2d 893, 905 (Fed. Cir. 1986). Accordingly, contrary to Plaintiff's allegations, there has been no categorical or *per se* regulatory taking of its property.

**C. Plaintiff Cannot Satisfy Its Burden to Establish a Regulatory Taking Under Penn Central**

In addition to Plaintiff's inability as a matter of fact and law to establish a categorical taking, Plaintiff cannot satisfy the elements of Penn Central necessary to prove the alleged government regulation in the present case "went too far." See Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 800 (Fed. Cir. 1993) (whether the government is liable for a regulatory taking turns on whether the regulation goes "too far" in restricting a landowner's ability to use his property). In determining whether a regulatory action goes "too far," courts have identified three factors of particular significance in the ad hoc takings inquiry: "(1) the extent to which the regulation has interfered with . . . reasonable investment-backed expectations; (2) the economic impact of the regulation on the claimant; and (3) the character of the governmental action at issue." Norman, 429 F.3d at 1091-92 (citing Penn Central, 438 U.S. at 124); Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005) ("The Penn Central factors – though each has given rise to vexing subsidiary questions – have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules). These three factors must always be considered in

terms of the relevant parcel, or parcel as a whole. Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004) (noting that the Penn Central "factors are considered in terms of the 'parcel as a whole'") (citing Penn Central, 438 U.S. at 130-31)).

Here, Plaintiff merely restates the Penn Central factors in its Submission of Contested Issues of Fact and fails to set forth any factual support or citations to the record to support its regulatory takings claim. See Pl. Submission of Contested Issues of Fact, pp. 5-6, Nos. 36-41. Plaintiff's only submission specifically addressing a Penn Central factor questions whether Plaintiff had reasonable investment-backed expectations based on a letter from the FWS to the Navy's contractor one year after Plaintiff purchased the property that did not list the Mississippi sandhill crane as occurring on the property. See Pl. Submission of Contested Issues of Fact, p. 6, No. 39. As explained in more detail below, reasonable investment-backed expectations are based on the regulatory regime in place at the time Plaintiff acquired its property interest, not correspondence between two federal agencies engaged in informal consultation. For the following reasons, Plaintiff's regulatory takings claim must be dismissed.

**1. The Character of the Government Action Weighs in Favor of the United States**

An evaluation of the character of the government action involves an inquiry into "the purpose and importance of the public interest underlying [the] regulatory imposition." Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1370 (Fed. Cir. 2004) (quoting Maritrans, Inc. v. United States, 342 F.3d 1344, 1356 (Fed. Cir. 2003); see also Tahoe-Sierra, 535 U.S. at 323 (advocating examination of the "purpose and economic effects" of the government's action); Palazzolo v. Rhode Island, 533 U.S. 606, 633-34 (2001) (O'Connor, J., concurring); Norman, 63 Fed. Cl. at 282 ("The court lastly considers the purpose and importance of the public interest

reflected in the regulatory imposition."). This evaluation entails an inquiry "into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." Maritrans, 342 F. 3d at 1356 (quoting Creppel v. United States, 41 F.3d 627, 631 (Fed. Cir. 1994). This is because "no individual has a right to use his property so as to create a nuisance or otherwise harm others." Keystone, 480 U.S. at 492 n.20; see also Tahoe-Sierra, 535 U.S. at 352; Appolo Fuels, 381 F.3d at 1347. Further, whether the regulatory activity is more akin to "a public program that adjusts the benefits and burdens of economic life to promote the common good," is relevant to the inquiry of the character of the government action. Branch v. United States, 69 F.3d 1571, 1579 (Fed. Cir. 1995) (quoting Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 225 (1986)); see Maritrans, 342 F.3d at 1356 ("[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.") (citation omitted).

Here, there can be no dispute that the Navy's consultation with the FWS served an important public purpose - the protection of an endangered species and its critical habitat. See Bass Enters., 381 F.3d at 1370 (evaluation of the character of the government action involves an inquiry into "the purpose and importance of the public interest underlying [the] regulatory imposition."). Indeed, the ESA was passed in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "to provide a program for the conservation of such . . . species . . . ." 16 U.S.C. § 1531(b); see, e.g., Tennessee Valley Auth. v. Hill, 437 U.S. 153, 184 (1978) (in passing the ESA, Congress was

acting to "halt and reverse the trend toward species extinction"). Moreover, the 1973 listing of the Mississippi sandhill crane as endangered was to be "implemented without delay in order to minimize the threats to the continued existence of these animals. . . ." JA Tab 26, p. JA 0166; see also 38 Fed. Reg. 14678 (June 4, 1973). Further, the designation of critical habitat for the endangered Mississippi sandhill crane does not single out any particular property owner to bear any particular burden. Pursuant to the ESA and the rule published in the Federal Register, "all Federal agencies will be required to insure that the actions authorized, funded, or carried out by them do not adversely affect this Critical Habitat." JA Tab 27, p. JA 0168; see also 16 U.S.C. § 1536(a)(2) (requiring each federal agency to insure that its actions are not likely to jeopardize the existence of any endangered species or result in the destruction or adverse modification of the critical habitat of such species).

Finally, the FWS worked with Plaintiff to balance the agency's concerns regarding potential adverse impacts to the Mississippi sandhill crane and its critical habitat against Plaintiff's desire to sell its property to the Navy for the Navy's housing project. Plaintiff acknowledged these efforts on at least two occasions. By letter dated July 9, 2001, Plaintiff informed the Navy that Plaintiff "expressed a desire" to work with the FWS to explore ways to offset adverse effects on the Navy's proposed use of Site 28 and believed "some workable solution" could be achieved to remove concerns of the FWS. JA Tab 30, p. JA 0175. Plaintiff added it was "working diligently to achieve this outcome, at no expense to the Navy, and fe[lt] comfortable that a workable solution [would] be achieved shortly." JA Tab 30, p. JA 0175.

Plaintiff subsequently contacted the Navy by letter dated January 17, 2002, and informed the Navy that Plaintiff "is still very much interested in the sale" of Site 28 to the Navy for $1.9

million. JSF p. 9, No. 58; JA Tab 16, pp. JA 0111. Approximately two months later, on March 28, 2002, Plaintiff wrote to Congressman Taylor's office noting the issuance of the BO "with a favorable decision being rendered" and that a price had been negotiated with the Navy's Real Estate Division for the purchase of Site 28. JA Tab 29, p. JA 0173-0174; see also JSF p. 12, No. 74 (stipulating to the letter's authenticity).

For the foregoing reasons, Supreme Court and Federal Circuit precedent require that the nature of the government action in this case weighs in favor of Defendant. There can be no dispute that protecting the endangered Mississippi sandhill crane and its critical habitat serves an important public purpose. Moreover, this protection is more akin to a public program, and Plaintiff acknowledges the FWS's efforts to balance any concerns of Plaintiff against carrying out this important public purpose.

**2. Plaintiff Cannot Establish It Had a Reasonable Investment-Backed Expectation To Sell Property to the United States Navy, Free From Any Conditions**

In determining whether there has been a regulatory taking, it is well settled that courts must evaluate the extent to which the challenged governmental action has interfered with the reasonable investment-backed expectations of the property owner. Keystone, 480 U.S. at 495; Connolly, 475 U.S. at 227; Rith Energy, 270 F.3d at 1350. The Court has noted, however, that an investment-backed expectation must be reasonable -- it "must be more than a 'unilateral expectation or an abstract need.'" Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-06 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)).

A plaintiff's reasonable investment-backed expectations are shaped by the regulatory regime in place on the date it acquired its property interest. See Appolo Fuels, 381 F.3d at 1348;

see also Palazzolo, 533 U.S. at 632-33 (Connor, J., concurring). Further, "[t]he reasonable expectations test does not require that the law existing at the time of processing would impose liability." Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1357 (Fed. Cir. 2001) (en banc), cert. denied, 535 U.S. 1096 (2002). Rather "[t]he critical question is whether extension of existing law could be foreseen as reasonably possible." Appolo Fuels, 381 F.3d at 1350 (citations omitted).

In this case, it is undisputed that the Mississippi sandhill crane was listed as endangered in 1973, that critical habitat for the Mississippi sandhill crane was designated in 1977, and that the property at issue in this lawsuit is located within the boundaries of that 1977 designation. See JSF pp. 1, 2 Nos. 1, 7-8. This information was published in the Federal Register in 1973 and 1977. 38 Fed. Reg. 14678 (June 4, 1973); 42 Fed. Reg. 39985 (August 8, 1977). In addition, in 1975, the FWS established the Mississippi Sandhill Crane National Wildlife Refuge in Gautier, Jackson County, Mississippi. JSF p. 2, No. 8. The subject property is adjacent to this Refuge.

In 1998 – more than two decades after the Mississippi sandhill crane was listed as endangered and critical habitat for the crane was designated – Plaintiff entered into an option contract for the purchase of the subject property, which is located within the critical habitat area. Two years later, Plaintiff exercised that option and purchased the subject property. At the time that Plaintiff optioned the subject property and at the time of its subsequent purchase of the property, Plaintiff knew or should have known that the development of the property might be subject to regulatory restrictions under the ESA given the presence of the endangered Mississippi sandhill crane on the property and the fact that the property was physically located within the crane's designated critical habitat. See Roth v. United States, 73 Fed. Cl. 144, 150

("plaintiffs were given constructive and actual notice by publication in the Federal Register . . . .") (citing Lyng v. Payne, 476 U.S. 926, 942-43 (1986) and Pam, S.p.A. v. United States, 463 F.3d 1345, 1349 (Fed. Cir. 2006). Accordingly, any expectation that the subject property could be developed without regard to the impact of such development on the endangered crane and without any regulatory restrictions was not a reasonable one.

Moreover, as a result of the property's location within the boundaries of designated critical habitat for the Mississippi sandhill crane, if the Navy or any other federal agency wanted to acquire that property for a housing development or any other use, that agency was required under Section 7 of the ESA to consult with the FWS regarding that proposed use of the subject property. This legal requirement was in place more than two decades prior to Plaintiff's purchase of the original 82 acre parcel and its subsequent sale to the Navy. As a result of the existence of this regulatory system, Plaintiff cannot now claim that, as a matter of law, it had a reasonable expectation of selling the property to the Navy for the Navy's housing project, much less that it had a "historically rooted expectation" to sell the property to the Navy free from the regulatory restrictions that it now complains of. To the contrary, there is no question that, if Plaintiff desired to sell its property to the Navy, the government's regulation of the Navy's proposed use on the subject property was at least "easily foreseen, not necessarily as a certainty, but as a reasonable possibility." Appolo Fuels, 381 F.3d at 1350 (quoting Commonwealth Edison, 271 F.3d at 1356). Under these circumstances, at the time that Plaintiff acquired its fee interest in the 82-acre parcel of land at issue in this case, Plaintiffs did not have a reasonable investment-backed expectation of selling its property to the Navy, free from any government regulation and without regard to the potential impact of the Navy's proposed development of the

subject property on the endangered Mississippi sandhill crane. The regulatory regime at issue in this case was in place more than two decades prior to Plaintiff's purchase of the original 82-acre parcel, the presence of the endangered crane on the subject property was known or knowable, and Plaintiff should have reasonably anticipated the government's regulation of the Navy's proposed use of Plaintiff's property.

#### 3. Weighing The Economic Impact of The Regulatory Restriction on the Relevant Parcel Compels a Finding That There Has Been No Taking

Addressing the economic impact element in Cienega Gardens v. United States, 331 F.3d 1319, 1340 (Fed. Cir. 2003), the Federal Circuit explained that "[w]hat has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." See also Forest Properties, Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999), cert. denied, 528 U.S. 951 (1999) ("The 'economic impact of the regulation upon the claimant' is 'measured by the change, if any, in the fair market value caused by the regulatory imposition.'") (quoting Florida Rock Ind. v. United States, 18 F.3d 1560, 1567 (1994). The undisputed facts of the present case demonstrate that Plaintiff cannot show serious financial loss as a result of any regulatory restrictions allegedly imposed under the ESA.

As noted, Plaintiff purchased the property in January 2000 for $963,802. Within two and a half years, Plaintiff sold all of its original 82-acre purchase through a series of four transactions for a total sum of approximately $2.33 million, some $1.366 million more than Plaintiff's purchase price. Plaintiff sold approximately 74 acres to the Navy, under a Purchase Agreement in which Plaintiff agreed to secure an offsite parcel to off-set impacts to the Mississippi sandhill crane and its critical habitat from the Navy's proposed housing development. Deducting

Plaintiff's expenses of $314,406.65 to secure the acquisition of a mitigation parcel from the $2.33 million figure yields $2,015,593.40, which is approximately $1 million more than the amount Plaintiff paid for the original parcel. These undisputed, material facts establish that Plaintiff cannot, as a matter of fact or law, prove "serious financial loss." See Rith Energy, 247 F.3d at 1363 (plaintiff's ability to recover its investment cannot be ignored). Accordingly, the economic impact factor of the Penn Central analysis weighs heavily in favor of Defendant.

In sum, the undisputed, material facts preclude Plaintiff from establishing a regulatory taking occurred in this case under Penn Central. Each of the three factors weigh in Defendant's favor. Therefore, Plaintiff's regulatory takings claim must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that its motion for summary judgment be granted, and Plaintiff's Complaint be dismissed.

Dated: October 11, 2007

Respectfully Submitted,

RONALD J. TENPAS
Acting Assistant Attorney General
Environment & Natural Resources Division

s/ Kelle S. Acock

_______________________________
KELLE S. ACOCK
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663
Tel: 202-305-0428
Fax: 202-305-0267
Email: kelle.acock@usdoj.gov

Of Counsel:
VICKI MOTT
Department of the Interior
Office of the Solicitor

ALEACIA CHINKHOTA
Navy Litigation Office