# In the United States Court of Federal Claims

**No. 06-87L**
**Filed: April 15, 2008**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * | * | |
| **SCHOONER HARBOR VENTURES, INC.,** | * | |
| **Plaintiff,** | * | **Motion for Summary Judgment; Fifth Amendment Taking; Compensable Property Interest.** |
| **v.** | * | |
| **UNITED STATES,** | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * * * * * | * | |

**William Lee Guice III**, Biloxi, Mississippi, for the plaintiff.

**James David Gettee**, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendant. Of counsel, **Vicki Mott**, United States Department of the Interior, Office of the Solicitor, Atlanta Georgia, and **Aleacia Chinkhota**, United States Department of the Navy Litigation Office, Washington, D.C.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

The Mississippi Sandhill Crane, a nonmigratory subspecies of the sandhill crane, was added to the United States' List of Endangered Native Fish and Wildlife on June 4, 1973. See 38 Fed. Reg. 14,678 (June 4, 1973). In 1975, the United States Fish and Wildlife Service ("FWS") acquired 1,708 acres to establish the Mississippi Sandhill Crane National Wildlife Refuge ("Refuge") in Gautier, Mississippi, to protect and manage the Mississippi Sandhill Crane, to protect and preserve unique, wetpine savanna communities for crane habitat and roosting, and to provide education, interpretation, and wildlife-oriented recreation. Additional acreage was subsequently purchased, and as of February 12, 2002, the Refuge had a current total acreage of 19,273 acres.

On July 29, 1977, the FWS designated a Critical Habitat for the Mississippi Sandhill Crane, in Jackson County, Mississippi, pursuant to Section 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536, and published the Rule in the Federal Register on August 8, 1977. See 42 Fed. Reg. 39,985 (Aug. 8, 1977). The Rule provided that "[i]n

accordance with Section 7, all Federal agencies will be required to insure that actions authorized, funded, or carried out by them do not adversely affect this Critical Habitat." 42 Fed. Reg. 39,985, 39,986. "A Critical Habitat designation points out specific areas within the United States where Federal Agencies may have to assess their actions relative to possible effects on Endangered species. This requirement itself is the only direct meaning of a Critical Habitat determination. No specific kinds of actions would be affected, regardless of the extent of the Critical Habitat, unless such actions actually could be considered detrimental to the species involved." 42 Fed. Reg. 39,985, 39,987.

In 1998, the plaintiff in this case, Schooner Harbor Ventures, Inc., entered into an option contract to purchase eighty-two acres of property located on Highway 57, north of Interstate 10, in Jackson County, Mississippi. The property is located within the boundaries of the Mississippi Sandhill Crane's Critical Habitat, as designated in 1977. See 42 Fed. Reg. 39,985, 39,988 (Aug. 8, 1977). The property also is adjacent to the Mississippi Sandhill Crane Natural Wildlife Refuge.

The plaintiff planned to market the property as an industrial park. The plaintiff showed its plan to the economic director for Jackson County, but received little response. The plaintiff also entered into a contingent contract to sell the property to Kelly Singleton, who planned to develop the property, but the contract was never consummated. On January 6, 2000, the plaintiff exercised the option and purchased the property for $963,802.51.

Following its purchase of the property, the plaintiff executed three separate contracts to sell portions of the property for commercial development. On July 17, 2000, the plaintiff sold approximately 3.12 acres to BPI Enterprises, Inc. for $180,000.00. On August 8, 2000, the plaintiff sold approximately 3.03 acres to Landall, LLC for $150,000.00, and approximately two acres to Allen L. Brislin for $100,000.00. The three properties were commercially developed as a gas station, a restaurant, and a hotel. Following these sales, the plaintiff was left with approximately 74.64 of the initial 82 acres of property. The remaining 74.64 acres ("Site 28") are the subject of the plaintiff's complaint.

The plaintiff bought and sold the property without contacting FWS to ascertain whether any subsequent proposed developments or alterations to the property would impact any federally listed species, including the Mississippi Sandhill Crane. Further, the plaintiff has never applied to the FWS for an incidental take permit, in accordance with Section 10 of the Endangered Species Act of 1973, 16 U.S.C. § 1539, regarding the property.

Beginning in late 2000, the U.S. Department of the Navy ("Navy") identified approximately thirty undeveloped properties, referred to as "sites," in Jackson County, Mississippi, for future development of 188 housing units ("Project") for Navy personnel and their dependants assigned to Naval Station Pascagoula ("Naval Station"). In evaluating each site, the Navy considered travel time to the Naval Station, available acreage, water and sewer availability, cost feasibility, and compatibility with community

codes. The Navy evaluated twenty-nine sites to some degree, and eliminated all but five sites from further consideration. The plaintiff's property, identified as Site 28, was among the five remaining sites.

To comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4347, the Navy was required to prepare an Environmental Assessment for the Project. On January 31, 2001, the Navy's contractor, Ecology and Environment, Inc. ("E & E"), sent a letter to the FWS Daphne, Alabama ("FWS Daphne") field office informing FWS of the Project and seeking input regarding any issues or concerns that FWS may have with the five sites the Navy was considering. The FWS responded by letter on February 27, 2001, informing E & E that Sites 8 and 28 were close to and "may result in some impact on the Refuge." The FWS requested that E & E provide additional information regarding Sites 8 and 28, if the two sites were being seriously considered for the Project. The FWS Daphne field office also sent E & E a letter on February 20, 2001 listing the species that may occur on four of the five sites the Navy was considering. The Mississippi Sandhill Crane was not listed in the letter.

In March 2001, the Navy published its final planning study regarding the five potential sites, including Site 28, which it was seriously considering for the Project. The FWS Daphne field office wrote E & E a letter providing additional information regarding the Refuge's concerns with three of the five remaining sites, Sites 8, 28, and 29. The letter stated that the Mississippi Sandhill Crane is a "highly endangered" species, and expressed the FWS's concern that locating the Project on Sites 8, 28, or 29 could impact the Mississippi Sandhill Crane, its habitat, and the Refuge. The FWS recommended that the Navy "seriously consider avoidance of these three sites." Specifically, in regards to Site 28, the letter noted the Mississippi Sandhill Crane's historic usage of Site 28 for nesting and foraging, and concluded that if Site 28 were to be selected for the project it would impact the Mississippi Sandhill Crane.

On April 25, 2001, the Refuge sent a letter to the Navy providing additional information regarding impact to the Refuge for Sites 8 and 28. The letter stated that Site 28 was within the Mississippi Sandhill Crane's designated Critical Habitat and that if the Project were to be located on Site 28, forty-five acres of prime habitat for the Mississippi Sandhill Crane would be lost. The letter also stated that if Site 28 were to be selected for the Project, the Refuge would require a thirty-foot setback, two-to-one replacement habitat for Crane foraging, and an eight-foot fence[1] at the edge of the property.

On July 9, 2001, the plaintiffs informed the Navy, by letter, that it had met with the FWS Daphne field office to address the concerns of the FWS regarding possible impacts to the Mississippi Sandhill Crane if Site 28 were to be developed. Plaintiff stated that FWS "expressed concerns about effects on the use of this property as it is considered as critical habitat by their biologists." The plaintiffs expressed their desire to work with the FWS "to explore ways to help offset these adverse effects," and declared that

[1] The April 25, 2001 letter indicates a requirement for an eight-foot fence, not a thirty-foot fence as indicated in the joint stipulation of facts submitted by the parties.

plaintiffs were "looking at several parcels of land which the biologists have classified as critical habitat in the hope that possibly some of this land can [be] used as mitigation."

The FWS Daphne field office wrote a letter to the Navy on August 3, 2001, informing the Navy of contact between the Refuge Manager and the plaintiffs regarding the acquisition of an off-site parcel to offset the potential impact to the Mississippi Sandhill Crane caused by the Project. The letter listed seven potential off-site parcels which could be acquired to replace the Mississippi Sandhill Crane habitat, and reiterated that the requirements regarding setback and a fence would be in addition to acquisition of an off-site parcel. The letter also informed the Navy that the FWS believed that a "may affect" situation existed within the meaning of Section 7 of the Endangered Species Act and, therefore, the FWS recommended that the Navy request formal consultation with FWS regarding Site 28. The Navy requested formal Section 7 consultation for Site 28 on August 20, 2001. On September 20, 2001, the FWS Daphne, Alabama field office wrote a letter to the Navy confirming initiation of the formal consultation process.

On August 29, 2001, the plaintiff entered into an option contract to purchase an off-site parcel. The contract provided, in relevant part, that Lamar Criswell and Rena Ford would exchange similar properties in an I.R.C. § 1031 exchange of like-kind property, and that Mr. Criswell would convey seventy-seven acres of land to the Refuge for the consideration of $300,000.00, to be paid by the plaintiff if the plaintiff chose to exercise the option. Plaintiff sent a letter to the Navy on January 17, 2002, informing the Navy that the plaintiff "is still very much interested in the sale" of Site 28 to the Navy for the purchase price of $1,900,000.00, and notified the Navy that plaintiff's option to purchase the off-site property expired on February 29, 2002.

On January 15, 2002, the FWS Daphne field office requested a thirty-day extension from the Navy to provide its Biological Opinion on Site 28. The FWS field office issued its Biological Opinion on February 12, 2002, reviewing the impacts of the Navy's proposed housing development on Site 28 to the Mississippi Sandhill Crane. The FWS Biological Opinion concluded that:

> After reviewing the current status of the Mississippi sandhill crane, the environmental baseline for the action area, the effects of the Navy's proposed housing development, the beneficial effects of obtaining additional Refuge land, and the cumulative effects, it is the Service's biological opinion that the proposed action is not likely to jeopardize the continued existence of the Mississippi sandhill crane or destroy or adversely modify designated critical habitat. Although critical habitat will be impacted in one location (Site 28 and adjacent Refuge), it will be enhanced, protected, and managed in another location by acquisition of another property of equivalent or better habitat value. This action will reduce the adverse effect to critical habitat to the point where it will not result in an overall adverse modification of critical habitat. The Service believes that there will be no jeopardy to the continued existence of the crane because the nesting pair of cranes that utilized the project site will

> presumably relocate to another nesting site, the amount of lost crane habitat is a small percentage of the cranes [sic] overall range, and benefits will be realized by acquisition and management of the offsite property.

On April 10, 2002, the Navy published its final "Environmental Assessment for the Proposed Construction of 188 Family Housing Units, Naval Station Pascagoula, Pascagoula, Mississippi." The final assessment selected Site 28 as the Navy's preferred site for its housing development. The final assessment also included the Navy's "Finding of No Significant Impact for the Proposed Construction of 188 Family Housing Units, Naval Station, Pascagoula, Pascagoula, Mississippi."

The plaintiff executed an "Agreement for Purchase of Real Property" on April 15, 2002, which the Navy subsequently executed on April 17, 2002. The Agreement provided that the Navy would purchase 74.64 acres of land located in Jackson County, Mississippi, Site 28, from the plaintiff, as vendor, for $1,900,000.00. The Agreement also provided that "the vendor additionally agrees, as part of the aforementioned $1,900,000.00 consideration, to convey to the U.S. Department of the Interior Fish and Wildlife Service (Service) a separate parcel of land to offset the impacts caused by the Navy's construction of its housing development in designated critical habitat for the Mississippi sandhill crane." On May 3, 2002, when the plaintiff sold Site 28 to the United States, plaintiff's outstanding loan relating to the property was approximately $854,782.96.

On May 3, 2002, plaintiff, by warranty deed, transferred approximately 74.64 acres, Site 28, to the United States, acting by and through the Navy. On May 6, 2002, the plaintiff executed a "Release of Deed of Trust" regarding the property.

On May 3, 2002, the plaintiff exercised its option to purchase the off-site parcel by paying Mr. Criswell $300,000.00 to secure Mr. Criswell's transfer of 77 acres of property to the FWS. Pursuant to the option contract between the plaintiff, Ms. Ford and Mr. Criswell, Mr. Criswell transferred the off-site parcel to the United States "for the use and benefit of the U.S. Fish and Wildlife Service of the Department of the Interior." Plaintiff expended the following sums in connection with Mr. Criswell's transfer of the off-site parcel to FWS: $10,500.00 to Jim Horne for negotiation of the purchase of the property donated to FWS; $2,000.00 to John M. "Cappy" Ford for a finder's fee; and $1,906.65 for closing costs. The Navy subsequently developed Site 28.

## DISCUSSION

Plaintiff Schooner Harbor Ventures, Inc. filed a complaint in this court alleging that the United States Fish and Wildlife Service ("FWS") had engaged in a taking, in violation of the plaintiff's Fifth Amendment and Fourteenth Amendment[2] rights under the United States Constitution, by requiring that the plaintiff expend money to facilitate the

[2] Appropriately, the plaintiff never again raised its Fourteenth Amendment claim, nor would this court have jurisdiction over such a claim.

sale of property to the United States Department of the Navy ("Navy"). The plaintiff asserted that the FWS effectively had deprived the plaintiff of all productive and beneficial use of the property and had interfered with the plaintiff's investment-backed expectations.

The defendant moved for summary judgment, arguing that plaintiff's Fifth Amendment takings claim should be dismissed because the plaintiff does not possess a protected property right to sell its property to the Navy for a specific use and without any conditions, nor can the plaintiff establish that it suffered a regulatory taking. The plaintiff responded by asserting that it had a compensable property interest and the "right" to freely transfer its property by virtue of its fee simple interest in the property. Plaintiff also asserted that the requirement to purchase off-site lands forced it "to sacrifice all economically beneficial use of the Property in the name of the common good." The defendant replied, asserting that the United States does not dispute that the plaintiff has the right to alienate its property, but reiterated that the plaintiff's right of alienation does not include the right to sell its property to the government at a specific price, and without conditions.

The parties jointly have agreed that the preliminary issue in this case is "[w]hether Plaintiff possessed, at the time of the alleged taking, a Fifth Amendment compensable right to sell its property to the United States without any conditions being imposed on the sale." This court finds that the plaintiff does not possess such a property right and, therefore, grants the defendant's motion for summary judgment.

The defendant has filed a motion for summary judgment. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (2005); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Avenal v. United States, 100 F.3d 933, 936 (Fed. Cir. 1996), reh'g denied (1997); Creppel v. United States, 41 F.3d 627, 630-31 (Fed. Cir. 1994); Atwood-Leisman v. United States, 72 Fed. Cl. 142, 147 (2006). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine

whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 Fed. Appx. 507 (2002), published at 317 F.3d 1331 (Fed. Cir. 2003); Becho, Inc. v. United States, 47 Fed. Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Rothe Dev. Corp. v. United States Dep't of Defense, 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> [S]aves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (citing Pure Gold, Inc. v. Syntex, Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992); see also U.S. Steel Corp. v. Vasco Metals Corp., 394 F.2d 1009, 1011 (C.C.P.A. 1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir- 2001), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix, Ltd. v. Block-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994)), reh'g denied and en banc suggestion declined (1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir. 2007), petition for cert. filed (Mar. 27, 2008) (No. 07-1234); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); see also B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. B.F. Goodrich Co. v. United States Filter Corp., 245 F.3d at 593; Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration or otherwise stated in favor of the non-moving party. DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); see also Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Telenor Satellite Servs. v. United States, 71 Fed. Cl. 114, 119 (2006).

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Fla. Rock Indus., Inc. v. United States, 45 Fed. Cl. 21, 24 (1999). There is a "clear principle of natural equity that the individual whose property is thus sacrificed [for the public good] must be indemnified." Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. (13 Wall.) 166, 179 (1871).

Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000.00 that is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). Therefore, "a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took its private property for public use without just compensation. See Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). A takings claim requires a two-step analysis in which a court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged taking. The question of whether plaintiffs owned a compensable property interest presents "a question of law based on factual underpinnings." Walcek v. United States, 303 F.3d 1349, 1354 (Fed. Cir.) (citing Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied sub nom. E. Minerals Int'l, Inc. v. United States, 535 U.S. 1077 (2002)), reh'g and reh'g en banc denied (2002). A takings plaintiff must have a legally cognizable property interest, such as the right of possession, use or disposal of the property. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v.

Gen. Motors Corp., 323 U.S. 373 (1945)); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001); Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573, 1580 (Fed. Cir.), reh'g denied (1993). Then, if the plaintiff does possess a property interest, the court decides if the governmental action at issue constituted a taking of that property. See Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003); Wyatt v. United States, 271 F.3d at 1099-1100; Karuk Tribe of Cal. v. Ammon, 209 F.3d at 1374.

If a plaintiff has a valid property interest, the government "takes" that interest by destroying, physically occupying, or excessively regulating it for a public purpose. Boyle v. United States, 200 F.3d 1369, 1374 (Fed. Cir. 2000). Furthermore, "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." Brown v. Legal Found. of Wash., 538 U.S. 216, 233 (2003) (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 321-23 (2002)) (citations omitted). Consistent with this notion, the United States Supreme Court has noted that most takings cases fall within two distinct classes:

> Where the government authorizes a physical occupation of property (or actually takes title), the Takings Clause generally requires compensation. But where the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole. The first category of cases requires courts to apply a clear rule; the second necessarily entails complex factual assessments of the purposes and economic effects of government actions.

Yee v. City of Escondido, Cal., 503 U.S. 519, 522-23 (1992) (citations omitted); accord Abrahim-Youri v. United States, 139 F.3d 1462, 1465 (Fed. Cir. 1997) (physical takings are "based on an outright governmental seizure or occupation of private property," while regulatory takings are "based on a regulatory imposition that constrains an owner's continuing use of property"), cert. denied sub nom. Gurney v. United States, 524 U.S. 951, reh'g denied, 524 U.S. 970 (1998).

The Federal Circuit has established a two-part test to determine whether governmental actions amount to a taking of private property under the Fifth Amendment. Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir. 1995)). "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003)); see also M & J Coal Co. v. United States, 47 F.3d at 1154 ("First, a court should inquire into the nature of the land owner's estate to determine whether the use interest proscribed by

the governmental action was part of the owner's title to begin with, *i.e.*, whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner." (citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1027-27 (1992))). "It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001) and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992)). Therefore, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end," Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Maritrans Inc. v. United States, 342 F.3d at 1352), and the court does not address the second step, Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1281 and Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002)), reh'g and reh'g en banc denied (2005). Only if there is to be a next step, "after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 (citing Chancellor Manor v. United States, 331 F.3d 891, 902 (Fed. Cir.), reh'g denied, 81 Fed. Appx. 333 (2003)).

With regard to the first inquiry, "the Constitution does not itself create or define the scope of 'property' interests protected by the Fifth Amendment." Air Pegasus of D.C., Inc. v. United States, 424 F.3d at 1213; see also Conti v. United States, 291 F.3d at 1334 (citing Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)). "Instead, 'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." Air Pegasus of D.C., Inc. v. United States, 424 F.3d at 1213 (quoting Maritrans Inc. v. United States, 342 F.3d at 1353); Conti v. United States, 291 F.3d at 1340 (quoting Lucas v. South Carolina Coastal Council, 505 U.S. at 1030)). "These existing rules often involve and define 'the citizen's relation to the physical thing, as the right to possess, use and dispose of it.'" Conti v. United States, 291 F.3d at 1340 (quoting United States v. Gen. Motors Corp., 323 U.S. at 378).

The property interest the plaintiff claims was taken in this case is the plaintiff's interest to sell its property to the Navy for the development of a housing project, without conditions or additional financial burden. Although the plaintiff in this case was interested in selling its property to the Navy, certainly at the best price, and without additional costs, this interest is not a compensable property right. "[T]he Fifth Amendment concerns itself solely with the 'property,' i.e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership." Mitchell Arms, Inc. v. United States, 7 F.3d 212, 217 (Fed. Cir. 1993) (citing United States v. Gen. Motors, 323 U.S. at 378), cert. denied, 511 U.S. 1106 (1994).

In Mitchell Arms, Inc. v. United States, the plaintiff argued that the government took its property when the Bureau of Alcohol, Tobacco, and Firearms ("ATF") revoked a

permit which would allow the plaintiff to import semi-automatic rifles into the United States after the plaintiff had purchased the firearms. Id. at 213-15. The United States Court of Appeals for the Federal Circuit found that although the government "took" the plaintiff's "ability to realize an expectation in the ultimate market disposition of the rifles," the Fifth Amendment did not protect the plaintiff's "collateral interest" in realizing an expectation by selling the rifles on the United States market. Id. at 217. The court pointed out that Mitchell "retained complete control over the rifles." Id. The court also noted that "Mitchell's ability to import the rifles and sell them in the United States was at all times entirely subject to the exercise of ATF's regulatory power. Consequently, any expectation which arose on Mitchell's part as a result of the import permits did not constitute a property right protected by the Fifth Amendment," and no taking occurred. Id.

In Air Pegasus, the United States Court of Appeals for the Federal Circuit distinguished between "property taken" as opposed to "incidental or consequential losses" based on the rationale that "the sovereign need only pay for what it actually takes, rather than for all that the owner has lost." Air Pegasus of D.C., Inc. v. United States, 424 F.3d at 1215 (quoting Klein v. United States, 179 Ct. Cl. 910, 916, 375 F.2d 825, 829 (1967)); see also R.J. Widen Co. v. United States, 174 Ct. Cl. 1020, 1028-29, 357 F.2d 988, 993 (1966). In Air Pegasus, the plaintiff alleged that governmental regulations of navigable airspace, which impacted the use of the heliport that plaintiff had leased, constituted a taking of the plaintiff's property, its heliport business, by destroying the economic value of the business. Air Pegasus of D.C., Inc. v. United States, 424 F.3d at 1210. However, the court found that the plaintiff did not have a cognizable property interest because the plaintiff did not actually own any helicopters. Id. at 1215-16. The plaintiff admitted that its injury was a "derivative injury," and the court concluded that plaintiff's economic injury was a result of the government's taking of other people's property. Id. at 1215. The Federal Circuit recognized that the plaintiff's business expectations were frustrated by the regulation, and that the plaintiff was injured, but found that the plaintiff's derivative injury "does not form the basis for a viable takings claim." Id. at 1215. The court stated that "a claimant seeking compensation from the government for an alleged taking of private property must, at a minimum, assert that *its* property interest was actually taken by the government action." Id. (emphasis in original). In reaching its conclusion, the court relied on the Supreme Court's ruling in Omnia Commercial Co. v. United States, 261 U.S. 502 (1923), which stated that: "If, under any power, a contract or other property is *taken* for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable." Air Pegasus of D.C., Inc. v. United States, 424 F.3d at 1216 (quoting Omnia Commercial Co. v. United States, 261 U.S. at 510) (emphasis in original).

Plaintiff Schooner Harbor's interest in selling the property to the government without the need to obtain mitigation property at additional cost to the plaintiff is similarly a collateral interest to the plaintiff's physical ownership in the property. The court does not disagree with the plaintiff's assertion that as a fee simple owner of the property, "[p]laintiff had the right to sell and develop the Property." The court also does not dispute the plaintiff's assertion that "[t]hese development rights were an integral part

of the Property's title and value." The plaintiff's argument fails in that the plaintiff is asserting that it had the right to sell its property to the government, without conditions imposed, in this instance to meet regulatory burdens imposed on the Navy, by obtaining the mitigation parcel. Whereas, the right to alienate the property is a cognizable property interest, the right to sell the property to the government at a particular price and without conditions is not a cognizable property interest which is protected by the Fifth Amendment.

The plaintiff's injury does not amount to a taking. Moreover, the Critical Habitat designation occurred in 1977 and the plaintiff purchased the property at issue in 2000. Although not necessary to arrive at the court's conclusion on the defendant's motion, it somewhat stretches the credulity of the court that plaintiff, as a real estate developer, did not do due diligence and was not aware of the protected status of the land at issue. Plaintiff did not have an inherent right to sell its property to the government without valid regulatory derivative conditions imposed on the sale. The plaintiff's argument that it did not enjoy the right to alienate its property also is vulnerable because the plaintiff engaged in four separate sales of the adjacent property, despite the location of the property and, in fact, consummated the sale to the Navy of the property at issue.

The court recognizes that the plaintiff's expectations as to its financial gain with regards to selling the property may have been somewhat frustrated as a result of government regulation, in that the plaintiff may have realized less profit in its sale as a result of the requirement that the plaintiff purchase a mitigation parcel in order to consummate the sale. However, what occurred in this case is no different than any arms length, real estate transaction in which the buyer imposes conditions to finalize a sale.

In addition, when determining whether a particular government action constitutes a taking, courts also will consider the character of the government's alleged interference with property rights. Sun Oil Co. v. United States, 215 Ct. Cl. 716, 769, 572 F.2d 786, 818 (1978) (citing Finks v. United States, 184 Ct. Cl. 480, 489, 395 F.2d 999, 1004, cert. denied, 393 U.S. 960 (1968)). "When the government 'takes' property, it exercises its rights as sovereign to acquire property from the rightful owner for the public good." J & E Salvage Co. v. United States, 36 Fed. Cl. 192, 195 (1996), aff'd, 152 F.3d 945 (Fed. Cir.) (table), cert. denied, 525 U.S. 827 (1998). On the other hand, when the government "comes down from its position of sovereignty, and enters the domain of commerce, it submits itself to the same laws that govern individuals there." Id. (quoting Sun Oil Co. v. United States, 215 Ct. Cl. at 770, 572 F.2d at 818). "As a consequence, a takings claim cannot be based on the Government's acting in its proprietary capacity." J & E Salvage Co. v. United States, 36 Fed. Cl. at 195 (citing Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 798 (Fed. Cir. 1993)). "[T]he concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract. In such instances, interference with such contractual rights generally gives rise to a breach claim not a taking claim." Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001) (quoting Sun Oil Co. v. United States, 215 Ct. Cl. at 770, 572 F.2d at 818), reh'g and reh'g en banc denied (2002); see also St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed.

Cir. 2008); J & E Salvage Co. v. United States, 36 Fed. Cl. at 195. "Taking claims rarely arise under government contracts because the Government acts in its commercial or proprietary capacity in entering contracts, rather than in its sovereign capacity. Accordingly, remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights." Hughes Commc'ns Galaxy, Inc. v. United States, 271 F.3d at 1070 (citing Sun Oil Co. v. United States, 215 Ct. Cl. at 769-70, 572 F.2d at 818) (citations omitted). "[W]hen the Government acts as a contractual partner in a commercial venture, the rights and responsibilities of the parties must be analyzed with reference to the contract . . . ." System Fuels, Inc. v. United States, 78 Fed. Cl. 769, 809 (2007).

In the case currently before the court, the nature of the transaction was commercial, and the government was acting in its proprietary, not its sovereign capacity. In a commercial transaction, such as this one, the buyer has the right to negotiate the terms of the sale. At the time of the sale, the Navy was indisputably bound by Section 7 of the Endangered Species Act, 16 U.S.C. § 1536, and the designation of a Critical Habitat for the Mississippi Sandhill Crane, which required that federal agencies "insure that actions authorized, funded, or carried out by them do not adversely affect this Critical Habitat." 42 Fed. Reg. at 39,986. This requirement was a restriction on the government's behavior as a purchaser. In an arms-length transaction, the mitigation parcel was the buyer's condition that the seller needed to comply with in order to induce the government, in its proprietary capacity, to purchase the property from the plaintiff. The government was under no obligation to purchase the plaintiff's property in particular, nor was the seller obligated to sell to a particular buyer if the buyer imposed conditions on the sale. The plaintiff cannot now rewrite the terms of the agreement through a takings claim, given that the "Government clearly did not utilize its position as sovereign to appropriate private property from its rightful owner." J & E Salvage Co. v. United States, 36 Fed. Cl. at 195.

## CONCLUSION

For the foregoing reasons, the court finds that the plaintiff has not established it possessed a compensable property interest which could have been taken by the government. The court, therefore, **GRANTS** the defendant's motion for summary judgment. The clerk's office shall **DISMISS** the complaint, with prejudice.

**IT IS SO ORDERED.**

_s/ Marian Blank Horn____
**MARIAN BLANK HORN**
**Judge**